Michael Critchley, Sr.
Michael Critchley, Jr.
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue
Roseland, NJ 04068
Tel: (973) 422-9200

Derek W. Loeser (*pro hac vice forthcoming*)
Gretchen S. Obrist (*pro hac vice forthcoming*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIA BOSS, RUTH A. HART, RUTH JOHNSON, LEANN RICE, and TYPE 1 DIABETES DEFENSE FOUNDATION, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION, CAREMARK RX, L.L.C., EXPRESS SCRIPTS HOLDING COMPANY, EXPRESS SCRIPTS, INC., UNITEDHEALTH GROUP, INC., OPTUMRX, INC., SANOFI-AVENTIS U.S. LLC, NOVO NORDISK INC., and ELI LILLY AND COMPANY,<br><br>Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................... 1

II.     PARTIES .............................................................................................. 13

        A.    Plaintiffs .................................................................................... 13

        B.    Defendants ................................................................................ 16

III.    JURISDICTION AND VENUE .......................................................... 19

IV.     FACTUAL ALLEGATIONS ............................................................... 21

        A.    Life Saving Insulin is Not a New Drug. ................................... 21

              1.    Diabetes Requires Insulin. ............................................... 21

              2.    Discovery and Early History of Insulin. .......................... 22

              3.    Analog Insulin. ................................................................. 24

        B.    Insulin's Price Has Risen Dramatically in the Past Decade. ............................ 28

        C.    The Insulin Market is Enormous. ............................................. 35

        D.    The Pharmaceutical Supply Chain. ........................................... 37

        E.    Consumer Costs in the Insulin Supply Chain. .......................... 39

        F.    The Rise of the PBMs in the Pharmaceutical Supply Chain. ............................ 45

        G.    The Insulin Pricing Scheme: Rebates Gone Awry. .................. 48

        H.    The Insulin Pricing Scheme Has Caused Insulin List and Net
              Prices to Diverge to the Detriment of Patients. ........................ 50

              1.    The List/Net Price Divergence. ........................................ 50

        I.    The Drug Manufacturer Defendants Admit the Insulin Pricing
              Scheme and its Impact on Patients. .......................................... 56

        J.    High List Prices Directly Impact Patients' Ability to Pay for
              Insulin. ...................................................................................... 61

V.     ERISA ALLEGATIONS ................................................................ 65

     A.     The PBM Defendants Are Fiduciaries and Parties In Interest. ........... 65

     B.     The PBM Defendants' ERISA Duties. ............................................. 73

     C.     The PBM Defendants Breached Their Duties. .................................. 79

VI.     MEDICARE ALLEGATIONS ..................................................... 82

     A.     The Insulin Pricing Scheme. ......................................................... 82

     B.     Defendants' Concealment of the Insulin Pricing Scheme. ................. 82

VII.     TOLLING OF THE STATUTE OF LIMITATIONS .......................... 83

     A.     Plaintiffs and the Classes Are Entitled to Tolling Due to Fraud or Concealment. ............................................................................. 83

     B.     Estoppel. .................................................................................... 85

VIII.     CLASS ACTION ALLEGATIONS ................................................ 85

IX.     CLAIMS FOR RELIEF ............................................................... 92

COUNT ONE — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ.* ..................................................... 92

     A.     Description of the CVS Health RICO Enterprise. .............................. 93

     B.     The CVS Health RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues. ................................................. 97

     C.     Predicate Acts: Mail and Wire Fraud. ........................................... 100

COUNT TWO — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ.* .................................................. 104

     A.     Description of the Express Scripts RICO Enterprise. ....................... 106

     B.     The Express Scripts RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues. ................................... 109

     C.     Predicate Acts: Mail and Wire Fraud. ........................................... 112

COUNT THREE — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND  CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ.*................................................................. 117

    A.    Description of the OptumRx RICO Enterprise.................................. 118

    B.    The OptumRx RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues. ................................................... 122

    C.    Predicate Acts: Mail and Wire Fraud............................................... 124

COUNT FOUR — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)  THE RACKETEER INFLUENCED AND  CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.*................................................................. 129

    A.    The Levemir/NovoLog Pricing Enterprise. ..................................... 130

    B.    Conduct of the Levemir/NovoLog Pricing Enterprise..................... 137

    C.    Novo Nordisk's Pattern of Racketeering Activity. ........................... 139

    D.    Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities............................................................................................. 140

    E.    Damages Caused by Novo Nordisk's Levemir and NovoLog Pricing Fraud.................................................................................... 143

COUNT FIVE — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)  THE RACKETEER INFLUENCED AND  CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.*................................................................. 145

    A.    The Humalog Pricing Enterprise. ..................................................... 146

    B.    Conduct of the Humalog Pricing Enterprise.................................... 152

    C.    Eli Lilly's Pattern of Racketeering Activity. .................................... 154

    D.    Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities........................ 155

    E.    Damages Caused by Eli Lilly's Humalog Pricing Fraud................................. 158

COUNT SIX — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND  CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.*............................................................. 160

    A.    The Lantus/Apidra Pricing Enterprise. ........................................... 161

B. Conduct of the Lantus/Apidra Pricing Enterprise.............................. 167

C. Sanofi's Pattern of Racketeering Activity. ...................................... 169

D. Sanofi's Use of the U.S. Mail and Interstate Wire Facilities........................... 170

E. Damages Caused by Sanofi's Lantus and Apidra Pricing Fraud..................... 174

COUNT SEVEN — VIOLATION OF §§ 1 AND 3 OF THE SHERMAN ACT,
15 U.S.C. §§ 1, 3, *ET SEQ.* ........................................................................... 175

COUNT EIGHT — PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. §
1132(A)(3) FOR VIOLATIONS OF ERISA § 406(B), 29 U.S.C. §
1106(B) ........................................................................................................ 178

COUNT NINE — PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)
FOR VIOLATIONS OF ERISA § 404, 29 U.S.C. § 1104 ........................... 180

COUNT TEN — PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)
FOR VIOLATIONS OF ERISA § 702, 29 U.S.C. § 1182 ........................... 183

COUNT ELEVEN — PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. §
1132(A)(3) FOR KNOWING PARTICIPATION IN VIOLATIONS OF
ERISA ........................................................................................................ 186

COUNT TWELVE — VIOLATION OF THE NEW JERSEY CONSUMER
FRAUD ACT AGAINST SANOFI (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*).............. 187

COUNT THIRTEEN — VIOLATION OF THE NEW JERSEY CONSUMER
FRAUD ACT AGAINST NOVO NORDISK  (N.J. STAT. ANN. § 56:8-
1, *ET SEQ.*) ............................................................................................... 191

COUNT FOURTEEN — VIOLATION OF THE ALABAMA DECEPTIVE
TRADE PRACTICES ACT (ALA. CODE § 8-19-1, *ET SEQ.*) ................................. 196

COUNT FIFTEEN — VIOLATION OF THE ALASKA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (ALASKA STAT.
ANN. § 45.50.471, *ET SEQ.*)....................................................................... 198

COUNT SIXTEEN — VIOLATION OF THE ARIZONA CONSUMER FRAUD
ACT (ARIZONA REV. STAT. § 44-1521, *ET SEQ.*)................................... 200

COUNT SEVENTEEN — VIOLATION OF THE ARKANSAS DECEPTIVE
TRADE PRACTICES ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*) ................... 202

COUNT EIGHTEEN — VIOLATION OF THE CALIFORNIA LEGAL
    REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ.*) ........................................... 204

COUNT NINETEEN — VIOLATION OF THE CALIFORNIA UNFAIR
    COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)................. 206

COUNT TWENTY — VIOLATION OF THE COLORADO CONSUMER
    PROTECTION ACT (COLO. REV. STAT. § 6-1-101, *ET SEQ.*) .............................. 208

COUNT TWENTY-ONE — VIOLATION OF THE CONNECTICUT UNFAIR
    TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110A, *ET SEQ.*) ................ 210

COUNT TWENTY-TWO — VIOLATION OF THE DELAWARE CONSUMER
    FRAUD ACT (DEL. CODE TIT. 6, § 2513, *ET SEQ.*) ............................................... 212

COUNT TWENTY-THREE — VIOLATION OF THE D.C. CONSUMER
    PROTECTION PROCEDURES ACT (D.C. CODE § 28-3901, *ET SEQ.*) ................ 213

COUNT TWENTY-FOUR — VIOLATION OF THE FLORIDA UNFAIR AND
    DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET
    SEQ.*)........................................................................................................................ 216

COUNT TWENTY-FIVE — VIOLATION OF THE GEORGIA FAIR
    BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390, *ET SEQ.*) ............... 217

COUNT TWENTY-SIX — VIOLATION OF THE GEORGIA UNIFORM
    DECEPTIVE TRADE PRACTICES ACT (GA. CODE. ANN § 10-1-370,
    *ET SEQ.*) .................................................................................................................. 220

COUNT TWENTY-SEVEN — VIOLATION OF THE HAWAII UNFAIR AND
    DECEPTIVE TRADE PRACTICES ACT (HAW. REV. STAT. § 480, *ET
    SEQ.*)........................................................................................................................ 221

COUNT TWENTY-EIGHT — VIOLATION OF THE IDAHO CONSUMER
    PROTECTION ACT (IDAHO CODE ANN. § 48-601, *ET SEQ.*) .............................. 223

COUNT TWENTY-NINE — VIOLATION OF THE ILLINOIS CONSUMER
    FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL.
    COMP. STAT. § 505/1, *ET SEQ.* AND 720 ILL. COMP. STAT. §
    295/1A) ..................................................................................................................... 225

COUNT THIRTY — VIOLATION OF THE INDIANA DECEPTIVE
    CONSUMER SALES ACT  (IND. CODE § 24-5-0.5-3) ........................................... 227

COUNT THIRTY-ONE — VIOLATION OF THE IOWA PRIVATE RIGHT OF
    ACTION OR CONSUMER FRAUDS ACT (IOWA CODE § 714H.1, *ET
    SEQ.*) ............................................................................................................ 229

COUNT THIRTY-TWO — VIOLATION OF THE KANSAS CONSUMER
    PROTECTION ACT (KAN. STAT. ANN. § 50-623, *ET SEQ.*) ................................. 231

COUNT THIRTY-THREE — VIOLATION OF THE KENTUCKY
    CONSUMER PROTECTION ACT (KY. REV. STAT. ANN. § 367.110,
    *ET SEQ.*) ...................................................................................................... 233

COUNT THIRTY-FOUR — VIOLATION OF THE LOUISIANA UNFAIR
    TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA.
    REV. STAT. ANN. § 51:1401, *ET SEQ.*) ..................................................... 235

COUNT THIRTY-FIVE — VIOLATION OF THE MAINE UNFAIR TRADE
    PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*) ................. 237

COUNT THIRTY-SIX — VIOLATION OF THE MARYLAND CONSUMER
    PROTECTION ACT (MD. CODE, COM. LAW § 13-101, *ET SEQ.*) ....................... 239

COUNT THIRTY-SEVEN — VIOLATION OF THE MASSACHUSETTS
    GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1,
    *ET SEQ.*) ...................................................................................................... 241

COUNT THIRTY-EIGHT — VIOLATION OF THE MICHIGAN CONSUMER
    PROTECTION ACT (MICH. COMP. LAWS § 445.903, *ET SEQ.*).......................... 243

COUNT THIRTY-NINE — VIOLATION OF THE MINNESOTA
    PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. §
    325F.68, *ET SEQ.*) ....................................................................................... 245

COUNT FORTY — VIOLATION OF THE MINNESOTA DECEPTIVE
    TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48, *ET SEQ.*) ...................... 247

COUNT FORTY-ONE — VIOLATION OF THE MISSISSIPPI CONSUMER
    PROTECTION ACT (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*) .............................. 249

COUNT FORTY-TWO — VIOLATION OF THE MISSOURI
    MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010,
    *ET SEQ.*) ...................................................................................................... 250

COUNT FORTY-THREE — VIOLATION OF THE MONTANA UNFAIR
    TRADE PRACTICES ND CONSUMER PROTECTION ACT OF 1973
    (MONT. CODE ANN. § 30-14-101, *ET SEQ.*)............................................ 252

COUNT FORTY-FOUR — VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT (NEB. REV. STAT. § 59-1601, *ET SEQ.*).................................254

COUNT FORTY-FIVE — VIOLATION OF THE NEVADA DECEPTIVE
TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903, *ET SEQ.*)...................256

COUNT FORTY-SIX — VIOLATION OF THE NEW HAMPSHIRE
CONSUMER PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1,
*ET SEQ.*) .....................................................................................................................257

COUNT FORTY-SEVEN — VIOLATION OF THE NEW JERSEY
CONSUMER FRAUD ACT (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)........................259

COUNT FORTY-EIGHT — VIOLATION OF THE NEW MEXICO UNFAIR
TRADE PRACTICES ACT (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*) ...................261

COUNT FORTY-NINE — VIOLATION OF THE NEW YORK GENERAL
BUSINESS LAW §§ 349-350 (N.Y. GEN. BUS. LAW §§ 349-350) .......................263

COUNT FIFTY — VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-
1.1, *ET SEQ.*) .............................................................................................................265

COUNT FIFTY-ONE — VIOLATION OF THE NORTH DAKOTA
CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-15-02) .................................267

COUNT FIFTY-TWO — VIOLATION OF THE OHIO CONSUMER SALES
PRACTICES ACT (OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*)........................268

COUNT FIFTY-THREE — VIOLATION OF THE OKLAHOMA CONSUMER
PROTECTION ACT (OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)................................270

COUNT FIFTY-FOUR — VIOLATION OF THE OREGON UNLAWFUL
TRADE PRACTICES ACT (OR. REV. STAT. §§ 646.605, *ET SEQ.*) .....................273

COUNT FIFTY-FIVE — VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES ND CONSUMER PROTECTION LAW (73 PA.
CONS. STAT. § 201-1, *ET SEQ.*) ...............................................................................275

COUNT FIFTY-SIX — VIOLATION OF THE RHODE ISLAND UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION ACT (R.I.
GEN. LAWS § 6-13.1, *ET SEQ.*) ................................................................................277

COUNT FIFTY-SEVEN — VIOLATION OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10, *ET
SEQ.*).............................................................................................................................279

COUNT FIFTY-EIGHT — VIOLATION OF THE SOUTH DAKOTA
DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION
LAW (S.D. CODIFIED LAWS § 37-24-6) .................................................. 281

COUNT FIFTY-NINE — VIOLATION OF THE TENNESSEE CONSUMER
PROTECTION ACT (TENN. CODE ANN. § 47-18-101, *ET SEQ.*) ......................... 282

COUNT SIXTY — VIOLATION OF THE TEXAS DECEPTIVE TRADE
PRACTICES CONSUMER PROTECTION ACT (TEX. BUS. & COM.
CODE §§ 17.41, *ET SEQ.*) ....................................................... 284

COUNT SIXTY-ONE — VIOLATION OF THE UTAH CONSUMER SALES
PRACTICES ACT (UTAH CODE ANN. § 13-11-1, *ET SEQ.*) ................................. 286

COUNT SIXTY-TWO — VIOLATION OF THE VERMONT CONSUMER
FRAUD ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*) ....................................... 288

COUNT SIXTY-THREE — VIOLATION OF THE VIRGINIA CONSUMER
PROTECTION ACT (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*) .............................. 290

COUNT SIXTY-FOUR — VIOLATION OF THE WASHINGTON
CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. §§
19.86.010, *ET SEQ.*) .................................................... 292

COUNT SIXTY-FIVE — VIOLATION OF THE WEST VIRGINIA
CONSUMER CREDIT AND PROTECTION ACT (W. VA. CODE §
46A-1-101, *ET SEQ.*) ................................................... 293

COUNT SIXTY-SIX — VIOLATION OF THE WISCONSIN DECEPTIVE
TRADE PRACTICES ACT (WIS. STAT. § 110.18) .................................. 296

COUNT SIXTY-SEVEN — VIOLATION OF THE WYOMING CONSUMER
PROTECTION ACT (WYO. STAT. §§ 40-12-105 *ET SEQ.*) .................................. 298

COUNT SIXTY-EIGHT — COMMON LAW FRAUD ......................................... 300

COUNT SIXTY-NINE — UNJUST ENRICHMENT ........................................... 302

X.    DEMAND FOR JUDGMENT ....................................................... 303

XI.   JURY DEMAND ............................................................. 305

Plaintiffs Julia Boss, Ruth Hart, Ruth Johnson, LeAnn Rice, and the Type 1 Diabetes Defense Foundation (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action individually and on behalf of all others similarly situated against Defendants CVS Health Corporation ("CVS Health"), Caremark Rx, L.L.C., Express Scripts Holding Company, Express Scripts, Inc. ("Express Scripts"), UnitedHealth Group, Inc. ("UnitedHealth"), OptumRx, Inc. ("OptumRx"), Novo Nordisk Inc. ("Novo Nordisk"), Eli Lilly and Company ("Eli Lilly"), and Sanofi-Aventis U.S. LLC ("Sanofi") (collectively, "Defendants") to redress Plaintiffs' injuries due to Defendants' Insulin Pricing Scheme, which has driven up the cost of insulin to the substantial benefit of the Defendants. Plaintiffs' allegations are based on their own experiences and personal knowledge, their research, the research of their counsel, publicly available articles, studies, reports, and other sources, a reasonable inquiry under the circumstances, and on information and belief. Plaintiffs' allegations are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery.

## I.    INTRODUCTION

1.    Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with the condition. In total, nearly 30 million people, 9.3% of the country, live with diabetes.[1] Of this number, approximately six million people rely on daily insulin treatments to survive. Several analogs of human insulin are available. Interruptions to or interference with insulin therapy (*e.g.*, insufficient insulin use due to cost) can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb

---

[1] Allison Tsai, *The Rising Cost of Insulin,* Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

amputations in the United States.[2] Missed or inadequate insulin therapy can leave people with diabetes with too little insulin in their system, triggering hyperglycemia (hyperosmolar hyperglycemic state or "HHS") and then diabetic ketoacidosis ("DKA"). Left untreated, DKA can lead to loss of consciousness and death within days.[3] DKA is responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[4]

2.    Defendants Sanofi, Novo Nordisk, and Eli Lilly (collectively, the "Drug Manufacturer Defendants") manufacture analog insulins currently used to treat diabetes in the United States and its territories—the relevant geographic market. Over the course of the last decade, each has raised the list prices of their respective analog insulins—*i.e.*, those insulins necessary to maintain the current standard of care—in an astounding and inexplicable manner. Drugs that used to cost $25 per prescription now cost between $250 and $450. And in the last five years alone, Sanofi, Novo Nordisk, and Eli Lilly have raised their list prices for analog insulins by over 150%. Some patients now pay over $1,000 a month just to obtain the insulin drugs they need to survive.

3.    That insulin cost is in addition to the hundreds of dollars people living with diabetes must spend on their other diabetes supplies (*e.g.*, the test strips and glucose meter that people with diabetes must use to read their blood sugar levels prior to taking insulin and the

---

[2] *Chronic Disease Prevention and Health Promotion: Diabetes*, Centers for Disease Control Prevention (July 25, 2016), https://www.cdc.gov/chronicdisease/resources/publications/aag/diabetes.htm.

[3] *Diabetic Ketoacidosis*, Mayo Clinic: Diseases and Conditions, http://www.mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/basics/definition/con-20026470 (last visited Mar. 10, 2017).

[4] Abbas E. Kitabchi, *et al.*, *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 DIABETES CARE 7, 1335-1343 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2699725/.

syringes, along with pen needles, infusion sets, and/or pods they need to administer their insulin).

In short, living with diabetes now costs many people *well over* $1,000 per month.

    4.      Sanofi, Novo Nordisk, and Eli Lilly's analog insulin price increases have been both rapid and in lock-step:

**Figure 1: Sanofi and Novo Nordisk Increase Long-Acting Insulin List Prices in Lock-Step:[5]**



---

[5]Lydia Ramsey, *A 93-year-old drug that can cost more than a mortgage payment*, Business Insider (Sept. 17, 2016, 3:00 PM), http://www.businessinsider.com/insulin-prices-increase-2016-9; *see also* Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2016), http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lock-step.

**Figure 2: Eli Lilly and Novo Nordisk Increase Rapid-Acting Insulin List Prices in Lock-Step:[6]**



5.      The skyrocketing cost of insulin cannot be explained away with typical drug company rationalizations for high costs. Indeed, the manufacturers *admit* that their price hikes are unrelated to any jump in production or research and development costs. Instead, the increased list prices are the result of a scheme and enterprise among the three dominant drug manufacturers of insulin, Sanofi-Aventis U.S. LLC, Novo Nordisk Inc., and Eli Lilly and Company ("Drug Manufacturer Defendants"), and the three largest Pharmacy Benefit Managers, CVS Health, Express Scripts, and OptumRx (collectively, as defined below, the "PBM Defendants"). In this scheme, the Drug Manufacturer Defendants set two different prices for their insulin treatments: a

_____

[6] *Id.*

4

publicly-available "list" price, and an undisclosed lower, "net" price that the PBMs actually pay for the drugs. For the analog insulins, the gap between these two figures has increased significantly.

6.      To understand the Insulin Pricing Scheme at the core of this case, and the reason it is so profitable for the Defendants, it is first necessary to understand the role of PBMs in the pharmaceutical supply chain in the United States. The PBM Defendants serve as both middlemen and gatekeepers between drug manufacturers on the one hand, and health insurers and patients on the other. Business is booming for the PBM Defendants. Together, they report more than $200 billion a year in revenue. And they control over 80% of the PBM industry, administering and managing pharmacy benefits for over 180 million insured people.

7.      Based purportedly on the price they are able to secure, the PBM Defendants set up exclusionary tiered formularies for their clients (the health insurers or plan administrators). Formularies are ranked lists of drugs, where some cheaper and some more effective medicines are supposed to be placed into lower tiers, generally with lower cost-sharing amounts due from patients. The health insurers rely on these formularies to determine how much of their members' drug costs they will cover. Drugs in lower, preferred formulary tiers are supposed to be cheaper for plan members.

8.      Where two medicines are largely interchangeable, a PBM will sometimes exclude the more expensive of the two from its formulary—again purportedly based on the price of the drug for consumers. When a drug is excluded from or disfavored from the formulary, health insurers using that formulary either will not reimburse their members for purchase of that drug or will require the member to pay a larger coinsurance amount calculated based on sticker (list) price rather than the actual net price paid by the PBM. As a result, exclusionary formularies

enable PBMs, including the PBM Defendants here, to push patients toward certain brands of drugs over others. This power gives them enormous control over drug purchasing behavior and leverage over manufacturers.

9.      Whereas the PBM Defendants could use their market power as gatekeepers to drive down drug prices to patients by forcing drug companies to compete on price for formulary placement, instead, they and the Drug Manufacturer Defendants have figured out a way to game the system for their mutual benefit. To gain formulary access, the Drug Manufacturer Defendants *raise* their published list prices, and then "rebate" a significant portion of the list price back to the PBM Defendants. The rebates are provided under a variety of labels—discounts, credits, concession fees, etc. But however they are described, they are a *quid pro quo* for formulary inclusion or placement.[7]

10.      In the context of this complaint, rebates should be understood to include all payments or financial benefits of any kind conferred by the Manufacturers to the PBMs, either directly via contract or indirectly via Manufacturer-controlled intermediaries.

11.      The result of this rebating scheme is a wide difference between the list price used by the Drug Manufacturer Defendants, and the net price realized by the Manufacturers once all rebates paid to the PBMs are taken into account. This difference may be as great as, or even greater than, 50% of list price.

12.      The PBM Defendants may pass a portion of rebates on to their major insurer clients (some of which are owned by or affiliated with them), and pocket the rest. The higher the rebate, the more the PBM Defendants pocket. The total amount and nature of the rebates, the

---

[7] *See*, *e.g.*, Linda Cahn, "Don't Get Trapped By PBMs' Rebate Labeling Games," Managed Care January 2009.

amount the PBM pockets, and the amount the PBM passes through to clients/payers are all carefully guarded secrets.

13.     This rebate scheme creates a best of both worlds scenario for the Defendants. The PBM Defendants obtain ever larger rebates in exchange for access to the exclusionary formularies, increasing their take, and the Drug Manufacturer Defendants pay the rebates without cutting into their profit margins. This is because the net price for their drugs—the amount the PBM Defendants actually pay—stays the same. In effect, the *quid pro quo* arrangement between the PBMs and Drug Manufacturers creates a price war in reverse. The Drug Manufacturer Defendants keep raising their list prices, so that they can pay larger and larger "rebates" to the PBM Defendants. One astute commentator refers to this as "bubblenomics."[8]

14.     The result of the scheme is an ever widening gap between the price paid by the PBM Defendants for insulin (*i.e.* the net realized price actually received by Manufacturer Defendants), and the publicly available Manufacturer list price. The following chart shows this gap for Lantus, Sanofi's top-selling insulin:

**Figure 3: Gap Between List and Net Price for Lantus:**[9]

---

[8] Adam J. Fein, *Novo Nordisk Sheds New Light on PBM Rebates, the Gross-to-Net Bubble, and Warped Channel Incentives*, Drug Channels (Dec. 6, 2016), http://www.drugchannels.net/2016/12/novo-nordisk-sheds-new-light-on-pbm.html.

[9] Denise Roland & Peter Loftus, *Insulin Prices Soar While Drugmakers' Share Stays Flat*, WALL ST. J. (Oct. 7, 2016), *https://www.wsj.com/articles/insulin-prices-soar-while-drugmakers-share-stays-flat-1475876764*.



Percentage change since 2007

Sources: Truven Health Analytics (list prices) and Bernstein (net price estimates)
THE WALL STREET JOURNAL.

15.    The PBM Defendants tout their market power to drive down drug prices. They boast about the "rebates" or "discounts" for which they bargain with drug manufacturers. The story they tell is that these rebates and discounts are obtained for the benefit of patients since they purportedly result in lower costs for prescription drugs. For example, Express Scripts claims, "[w]e put medicine within reach of patients while helping health benefit providers improve access to prescription drugs and make them more affordable. . . ."[10]

16.    OptumRx also claims that its PBM "businesses have dedicated units that help improve overall health system performance through optimizing care quality, reducing costs and improving consumer experience and care provider performance leveraging distinctive

---

[10] Express Scripts Holding Company, Annual Report (Form 10-K) (Dec. 31, 2016).

capabilities in data and analytics, pharmacy care services, population health, health care delivery and health care operations."[11]

17.     CVS Health Corp. contends, "[w]e assist our clients in designing pharmacy benefit plans that help minimize the costs to the client while helping improve health outcomes . . . ."[12]

18.     But the story the PBM Defendants tell is far from the whole truth. They obtain rebates and discounts, but neglect to reveal the large portion of the rebates that they pocket. They also neglect to reveal that their formulary decisions are based on the amount of the spread they obtain from the rebate paid by drug companies. And they neglect to reveal that the consequence of this scheme is higher drug costs for patients, whose payments at the pharmacy point of sale are calculated based on the unrebated list price of the drugs, not the lower price paid by the PBMs once all rebates and other financial benefits received by the PBM from the Manufacturers and other third parties are taken into account. Indeed, the PBM Defendants misrepresent the role they play in the supply chain, and their impact on the prices actually paid by consumers for drugs.

19.     The PBMs are avaricious middlemen, with a stranglehold on the prescription drug supply chain. Their scheme to sell formulary access for rebates drives up the cost of prescription drugs for the people who need to use them to stay alive.

20.     The Drug Manufacturers Defendants are equally at fault. Their conduct deprives patients of a fair price for insulin—a price that would result from the operation of normal market forces. They maintain the ability to sell insulin to the millions of Americans who depend on it,

---

[11] *Id.*
[12] *Id.*

without having to lower the "real," net prices to gain market share. They bargain for market share by providing ever-larger rebates to PBMs and entering into exclusive relationships with those PBMs (*e.g.* Eli Lilly and ExpressScripts, NovoNordisk and CVS Caremark), inflating the prices paid by consumers in order to preserve their net realized price. Their refusal to disclose their net realized prices for insulins and the web of confidentiality agreements they have created and/or participated in with PBMs have been critical to the furtherance of the Insulin Pricing Scheme.

21.     Eli Lilly spokeswoman Julie Williams admitted the company's pricing scheme in a statement issued in January 2017:

> There is a wide and growing discrepancy between the published "list price" Lilly sets and the "net price" that Lilly actually receives.
>
> The list price (also known as the wholesale acquisition cost or WAC) is the price that a manufacturer sets as a starting point for negotiations with federal and state governments, private insurers, and pharmacy benefit managers to gain formulary access. Manufacturers also use list price in negotiations with wholesalers and others involved in the distribution process.
>
> The amount the manufacturer receives after all discounts and rebates are applied is considerably less than the list price. For example, the net price for Humalog—our most commonly used insulin—increased by 4 percent over the five-year period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.

22.     While this admission is illuminating, it far from solves the problem of opacity in drug pricing and kickback schemes. This New York Times op-ed called for transparency in setting prices:

> In the meantime, we need a fair and transparent system for setting prices. In much of Europe, insulin costs about a sixth of what it does here. That's because the governments play the role of pharmacy benefit managers. They negotiate with the manufacturer directly and have been very effective at driving down prices. In the United States, we rely on the

private sector and a free market for drug pricing. But in order for this to work, we need to regulate it better and demand greater transparency.[13]

23.     Patients who rely on insulin to stay alive are the victims of the Defendants' Insulin Pricing Scheme. These patients are saddled with crushing out of pocket expenses for insulin because their payment obligations are based on the list prices, not the opaque net prices provided to the PBM Defendants. This is the case whether these patients are insured and paying large deductibles, paying coinsurance, or high-tier copayments, insured but vulnerable to the Medicare Part D "Donut Hole," or uninsured. All of these patients are making payments based on the inflated list price.

24.     The physical, emotional, and financial tolls of the excessive prices for insulin, particularly the analog insulins that have been the U.S. standard of care for decades, are devastating. Many patients cannot afford their insulin and suffer dire consequences as a result. Others resort to under-dosing their insulin, injecting expired insulin, and starving themselves to control their blood sugars with as little insulin as possible. These behaviors are dangerous for people living with diabetes. Because such behaviors ineffectively control those individuals' blood sugar levels, they can lead to serious complications such as kidney failure, heart disease, blindness, infection, and amputations. In some cases, patients are forced by exclusionary formulary tiering to use an insulin brand that is less effective in controlling their individual blood sugars, or to which they have some degree of allergic reaction—or to pay increased cost-sharing to access the non-preferred brand of insulin they need. The cost of analog insulin—the most effective and favored type that is at issue here—has gone up so much that some prominent physicians have started encouraging some patients to switch to human insulin despite its many

---

[13] Kasia Lipska, *Break Up the Insulin Racket*, N.Y. Times (Feb. 20, 2016), https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html.

disadvantages, thus undermining the U.S. standard of care in relation to international best medical practices for diabetes.[14]

25.    This action alleges that the three largest PBMs—CVS Health, Express Scripts, and OptumRx—violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the Sherman Act, 15 U.S.C. §§ 1, 3 *et seq.*, various state consumer protection laws, and state common law, by engaging in extortion, a RICO enterprise, a self-dealing and conflict-laden scheme, and anticompetitive and deceptive conduct, whose purpose is to unlawfully extract ever-larger portions of rebates along with other payments—"PBM Kickbacks"—from the three makers of analog insulin drug products—Sanofi, Novo Nordisk, and Eli Lilly. Plaintiffs further allege that these three makers of analog insulin drugs, while angling to secure, via exclusionary formulary placement, anticompetitive relationships with the PBM Defendants, have provided the PBM Defendants ever-larger rebates and kickbacks by inflating the list prices of rapid- and long-acting analog insulin drugs, and then have further conspired with the PBM Defendants and their insurer clients to prevent disclosure of net prices to consumers—also in violation of the aforementioned laws. Defendants' Insulin Pricing Scheme directly and foreseeably causes consumers to overpay for these life-saving medications. Thus, this action is brought to redress Plaintiffs' injuries that flow from Defendants' Insulin Pricing Scheme—which has driven up the cost of insulin to the substantial benefit of PBMs and insulin manufacturers—and to obtain prospective injunctive relief to curtail Defendants' practices and provide greater transparency in insulin pricing, as well as lower prices going forward. The causes

---

[14] Irl B. Hirsch, MD, *Changing Cost of Insulin Therapy in the U.S.* (Mar. 6, 2016), http://professional.diabetes.org/files/media/Changing_Cost_Insulin.pdf.

of action asserted herein allow, *inter alia*, the remedies of monetary damages, damage

multipliers, surcharge, restitution, injunctive relief, and other equitable relief.

## II.    PARTIES

**A.    Plaintiffs**

26.    **Plaintiff Julia Boss** is domiciled in the state of Oregon. She is the mother and a

caretaker of her minor daughter who has type 1 diabetes. In both Oregon and Washington, where

she formerly resided, Plaintiff Boss purchased and enrolled in health benefit plans through the

Affordable Care Act ("ACA") marketplace, as well as directly through an insurer, for which

Defendants CVS Health and Express Scripts administer pharmacy benefits. On numerous

occasions, pursuant to the terms of those plans, Plaintiff Boss paid a copay, coinsurance, and/or

the full price of prescription insulin produced by one or more of the following manufacturers:

Defendants Sanofi, Novo Nordisk, and Eli Lilly.

27.    In the past, Ms. Boss purchased Humalog and Lantus-brand insulins but currently

pays a 50% coinsurance for non-preferred brand NovoLog. In 2015, while residing in

Washington state, she paid for her daughter's insulin drugs out-of-pocket until she reached her

$6,000 deductible/out-of-pocket maximum. From January 1, 2016 to August 31, 2016, Ms. Boss

paid for her daughter's insulin drugs out-of-pocket until she reached her $3,000 deductible, and

then paid a 20% coinsurance until she reached her $4,100 out-of-pocket maximum. In 2016, Ms.

Boss moved her family from Washington to Oregon. From September 1, 2016 to December 31,

2016, while residing in Oregon, Ms. Boss paid a $50 copay for preferred brand Humalog and a

50% coinsurance for non-preferred brand NovoLog after her daughter developed an allergy to

Humalog. Since January 1, she has paid 50% coinsurance for non-preferred brand NovoLog.

28.    **Plaintiff Ruth Hart** is domiciled in the State of Arizona. Ms. Hart has type 1

diabetes. She is currently taking Humalog-brand insulin to treat her diabetes, but in the past has

used NovoLog. Between May 2013 and April 2015, Ms. Hart was insured through her employer, IDT911, and enrolled in an employee welfare benefit health plan governed by ERISA for which Defendant OptumRx administered pharmacy benefits. Beginning in June 2015, she started work at Springleaf and enrolled in the company's employee welfare benefit health plan, which is also governed by ERISA, and for which Defendant Express Scripts administers pharmacy benefits. Ms. Hart's current plan has high co-payments. She pays a $250 copay per 90-day supply for her insulin. On multiple occasions, Plaintiff Hart used the prescription drug benefit administered by OptumRx and Express Scripts to purchase insulin produced by Defendants Eli Lilly and Novo Nordisk.

29.    **Plaintiff Ruth Johnson** is domiciled in the State of Michigan. Ms. Johnson has type 2 diabetes and is insured under a Medicare Part D prescription drug plan for which Defendant OptumRx administers pharmacy benefits. She consistently reaches the Medicare Part D "Donut Hole" where she pays a coinsurance of up to $330 for her insulin medication. On numerous occasions, Plaintiff Johnson used the prescription drug benefit provided by OptumRx to purchase Lantus-brand insulin produced by Sanofi to treat her diabetes.

30.    **Plaintiff LeAnn Rice** is domiciled in the State of Nebraska. She is the mother and a caretaker of her minor daughter who has type 1 diabetes. Plaintiff Rice works for Aflac, Inc. and is enrolled in the Aflac Employee Health and Welfare Benefits Plan, for which Defendant CVS Health administers pharmacy benefits. The plan is an employee welfare benefit health plan governed by ERISA. On numerous occasions, Plaintiff Rice used the prescription benefit provided by CVS Health to purchase insulin produced by Defendants Sanofi and Novo Nordisk.

31.     Ms. Rice currently purchases NovoLog-brand insulin for her daughter, and she has previously purchased Apidra-brand insulin for her daughter. In the past, she paid high copays for Apidra until she began using a co-pay savings card. As of January 1, 2017, her plan no longer covers Apidra and her daughter was forced to switch to NovoLog. Ms. Rice now pays a $130 copay for a 3-week supply of NovoLog.

32.     **Plaintiff Type 1 Diabetes Defense Foundation ("T1DF")** is a not-for-profit corporation initially incorporated in Washington State and currently organized and existing under the laws of the State of Oregon. T1DF is an organization operated exclusively for charitable purposes and to promote the social welfare, further the common good, and protect the legal rights of all individuals diagnosed with type 1 diabetes and individuals with other insulin-dependent diabetes. In furtherance of its goals, the organization works through lobbying, litigation, and campaigns to raise public awareness about issues that affect people with type 1 diabetes.

33.     On information and belief, each individual Plaintiff paid out-of-pocket for insulin and that payment was based on the artificially inflated list price. As a result, each individual Plaintiff has been injured and Plaintiffs have standing to protect their own rights and the rights of others whose interests are at stake in this case.

34.     Together, Plaintiffs Julia Boss and T1DF are referred to herein as the "Non-ERISA Employee/Exchange Plaintiffs." The Non-ERISA Employee/Exchange Plaintiffs seek to represent the Non-ERISA Employee/Exchange Plan Class, as defined below.

35.     Together, Plaintiffs Ruth Hart, LeAnn Rice, and T1DF are referred to herein as the "ERISA Plaintiffs." The ERISA Plaintiffs seek to represent the ERISA Class, as defined below.

36.    Together, Plaintiffs Ruth Johnson and T1DF are referred to herein as the "Medicare Plaintiffs." The Medicare Plaintiffs seek to represent the Medicare Class, as defined below.

37.    T1DF seeks to represent the Uninsured Class, as defined below.

**B.    Defendants**

38.    **Defendant CVS Health Corporation** is a corporation organized under the laws of Delaware and headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895. CVS Health is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers with Novo Nordisk, Eli Lilly, and Sanofi for purchase of the analog insulin medications these pharmaceutical companies make. CVS Health Corporation provides comprehensive prescription benefit management services to over 2,000 health plans, including corporations, managed care organizations, insurance companies, unions and government entities, and covers 65 million lives.[15] CVS Healthcare Corporation reported $177.5 billion in revenue in 2016.[16]

39.    **Defendant Caremark Rx, L.L.C.** is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management subsidiaries. Caremark Rx, L.L.C. is a subsidiary of Defendant CVS Health Corporation.

40.    **Defendant Caremark Rx, Inc.** is a corporation organized under the laws of Delaware and headquartered at 211 Commerce Street, Suite 800, Nashville, Tennessee, 37201. Caremark Rx, Inc. is an immediate or indirect parent of many subsidiaries, including pharmacy benefit management subsidiaries, and a subsidiary of Defendant CVS Health Corporation.

---

[15] Ed Kaplan & Wendy Pongracz, *Negotiating and Drafting Pharmacy Benefit Manager Contracts for Self-Insured Plans*, Strafford (June 21, 2016), http://media.straffordpub.com/products/negotiating-and-drafting-pharmacy-benefit-manager-contracts-for-self-funded-plans-2016-06-21/presentation.pdf.

[16] CVS Health Corp., Annual Report (Form 10-K) (Dec. 31, 2016).

Collectively, Defendant CVS Health Corporation, Defendant Caremark Rx, L.L.C. and Defendant Caremark Rx, Inc. are referred to as "CVS Health."

41.    **Defendant Express Scripts Holding Company** is a Delaware corporation. Its principal place of business is at 1 Express Way, St. Louis, Missouri, 63121.

42.    **Defendant Express Scripts, Inc.** is a corporation organized under the laws of Delaware and headquartered at 1 Express Way, St. Louis, Missouri, 63121. Express Scripts is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers with Novo Nordisk, Eli Lilly, and Sanofi for purchase of the analog insulin medications these pharmaceutical companies make. As the largest pharmacy benefit management organization in the United States, Defendant Express Scripts Inc. covers 79 million lives[17] and the company reported $96.5 billion in revenue in 2016.[18] Defendant Express Scripts, Inc. is a subsidiary of Defendant Express Scripts Holding Company. Defendant Express Scripts, Inc., and Defendant Express Scripts Holding Company collectively are referred to as "Express Scripts."

43.    **Defendant UnitedHealth Group, Inc. ("UnitedHealth")** is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343. UnitedHealth is a diversified managed healthcare company. In 2015, UnitedHealth Group reported revenue in excess of $157 billion, and the company is currently ranked sixth on the Fortune 500 list. UnitedHealth offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

---

[17] Kaplan & Pongracz, *supra* note 15.
[18] Express Scripts Holding Co., *supra* note 10.

44.    **Defendant OptumRx, Inc.** is a corporation organized under the laws of California and headquartered at 2300 Main St., Irvine, California, 92614. OptumRx is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers with Novo Nordisk, Eli Lilly, and Sanofi for purchase of the analog insulin medications these pharmaceutical companies make. As one of the largest pharmacy benefit management companies in the United States, OptumRx covers 65 million lives[19] and reported approximately $48.2 billion in revenue in 2015; and over $60.44 billion in 2016.[20] Collectively, Defendant OptumRx and Defendant UnitedHealth are referred to as "OptumRx."

45.    Together, CVS Health, Express Scripts, and OptumRx are referred to herein as the "PBM Defendants."

46.    **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its headquarters in Bridgewater, New Jersey. Sanofi manufactures Apidra, a rapid-acting insulin, and Lantus, a long-acting insulin. For 2015, the Sanofi group reported that Lantus "was the Group's leading product … representing 17.2% of the Group's aggregate net sales for the year."[21] Sanofi's revenue from Lantus sales in 2015 was reportedly $6.98 billion and $376 million for Apidra.[22]

47.    **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation. Its headquarters are in Plainsboro, New Jersey. Novo Nordisk manufactures insulin products

---

[19] Kaplan & Pongracz, *supra* note 15.

[20] UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2016).

[21] Sanofi, Annual Report (Form 10-K) (Dec. 31, 2016).

[22] *The world's top selling diabetes drugs*, pharmaceutical-technology.com (March 30, 2016), http://www.pharmaceutical-technology.com/features/featurethe-worlds-top-selling-diabetes-drugs-4852441/.

including NovoLog, a rapid-acting insulin, and Levemir, a long-acting insulin. In 2015, Novo

Nordisk's revenue was $3.03 billion for NovoLog and $2.68 billion for Levemir.[23]

48.     **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation, and

its principal place of business is in Indianapolis, Indiana. Eli Lilly produces the rapid-acting

insulin product Humalog. In the United States alone, Eli Lilly's revenue from Humalog sales in

2015 was approximately $2.84 billion.[24]

49.     Together, Sanofi, Novo Nordisk, and Eli Lilly are referred to herein as the "Drug

Manufacturer Defendants."

### III.     JURISDICTION AND VENUE

50.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction pursuant

to 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law, and under 18 U.S.C. §

1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1962. Further, 29 U.S.C. § 1132(e)(1) confers subject matter

jurisdiction on this Court over claims brought under Title I of ERISA. In addition, this Court has

subject matter jurisdiction pursuant to 28 U.S.C. § 1337 because this action alleges violations of

an Act of Congress regulating commerce or protecting trade and commerce against restraints and

monopolies. And 15 U.S.C. § 4 and § 16 confer subject matter jurisdiction on this Court over

claims brought under the Sherman Act. This Court also has supplemental jurisdiction over the

state law claims in this action pursuant to 28 U.S.C. § 1367. This Court also has subject matter

jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), (5), because Plaintiffs and

most members of the putative Class are citizens of different states than the Defendants, the

---

[23] *Id.*

[24] *Id.*

aggregate amount in controversy exceeds five million dollars, exclusive of interest and costs, and the Class has more than 100 members.

51.    **Personal Jurisdiction.** The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 15 U.S.C. § 22 provide for nationwide service of process. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

52.    **Venue.** Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to the complaint took place within this district. Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because most Defendants reside or may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court. Venue is also proper in this District pursuant to 15 U.S.C. § 22 because most Defendants inhabit, are found, have an agent, or transact business in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Life Saving Insulin is Not a New Drug.

#### 1.    Diabetes Requires Insulin.

53.    Diabetes is a condition in which the body does not properly process food for use as energy. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the bloodstream so as to be effectively used, by the body, as energy. People with diabetes are unable to make enough insulin or cannot use insulin as effectively as necessary, causing glucose, or sugar, to build up in the blood-stream. These consistently high levels of blood glucose, or blood sugar, pose a number of serious health risk including "heart disease, blindness, kidney failure, and lower-extremity amputations."[25] Diabetes-related complications are the "seventh leading cause of death in the United States."[26] Though treatable, diabetes can be fatal or severely debilitating if left untreated.

54.    As of 2014, 29.1 million people in the United States, or 9.3 percent of the population, had diabetes and that number continues to grow.[27] The most common types of diabetes in the U.S. are type 1 and type 2, as well as gestational diabetes.[28] Type 1 diabetics are unable to produce insulin at all; as their immune system attacks and destroys the cells in the pancreas that make it.[29] With type 2 diabetes, although people with the condition are able to

---

[25] Centers for Disease Control and Prevention, *Diabetes?*,
   https://www.cdc.gov/media/presskits/aahd/diabetes.pdf (last accessed, Mar. 16, 2017).
[26] *Id.*
[27] Centers for Disease Control and Prevention, *National diabetes statistics report: estimates of diabetes and its burden in the United States* (2014),
   www.cdc.gov/diabetes/data/statistics/2014StatisticsReport.html.
[28] National Institute of Health, *What is Diabetes* (Nov. 2016), https://www.niddk.nih.gov/health-information/diabetes/overview/what-is-diabetes.
[29] *Id.*

produce insulin, they are unable to use it effectively, and about 95 percent of cases of diabetes in adults are type 2.[30] Regular use of prescription insulin is necessary to treat type 1 and type 2[31] diabetes to prevent life-threatening health complications.[32]

### 2.    Discovery and Early History of Insulin.

55.    Insulin, technically a hormone, was first discovered in the pancreas of dogs in 1921 by a relatively unknown orthopedic surgeon, Dr. Frederic Banting, and a medical student, Charles Best, at the University of Toronto.[33]

56.    Less than a year later, in 1922, Banting and Best used the hormone to successfully treat human patients.[34] Until that time, diabetes was considered a death sentence and Banting was awarded a Nobel prize for his discovery.[35]

57.    In an act of gratitude and humanitarianism, Banting and Best sold the patent for insulin to the University for just one dollar.[36] "It was the best way, they believed, to ensure that no company would have a monopoly and patients would have affordable access to safe, effective drug." But, without outside support, the University was simply unable to produce enough insulin

---

[30] Centers for Disease Control and Prevention, *supra* note 27.

[31] It is possible to treat type 2 diabetes with lifestyle changes, but most people with the condition eventually need to take insulin by injection.

[32] Valencia Higuera, *Everything You Need to Know About Insulin,* Healthline (Dec. 7, 2016), http://www.healthline.com/health/type-2-diabetes/insulin.

[33] *History of Insulin*, Diabetes.co.uk (2007), http://www.diabetes.co.uk/insulin/history-of-insulin.html.

[34] *Id.*

[35] *The Discovery of Insulin*, *supra* note 35.

[36] Serena Gordon, *Insulin prices skyrocket, putting many diabetics in a bind*, CHI. TRIB. (Nov. 30, 2016, 11:54 AM), http://www.chicagotribune.com/lifestyles/health/sc-anger-over-high-insulin-prices-health-1207-20161130-story.html.

in order to meet demand. Indeed, today, in the United States alone, more than 29.1 million people have diabetes.[37]

58.     In order to facilitate widespread distribution of the medication, the University partnered with drug manufacturers in the United States and abroad, including Eli Lilly & Co., which as early as 1923, was producing enough insulin to supply the entire North American continent. In exchange for this assistance, however, the University gave up its exclusive control over the patent for insulin to private manufacturers.[38]

59.     Nevertheless, the drug was made widely available at a low cost. In fact, the New York Times estimated that, in 1924, many patients received the drug for less than seven cents a week in 2016 dollars.[39]

60.     Since that time, there have been some improvements in the medication. The earliest insulin available to the public, for example, was derived from cow and pig hormones and, until the 1980s, this "animal-derived" insulin was the only treatment for diabetes.[40]

61.     Although effective, animal-derived insulin created the risk of an allergic reaction in many human patients. This risk was lessened in 1982 when synthetic insulin, or "human insulin," was developed and marketed by Eli Lilly and other manufacturers, after insulin became

---

[37] Centers for Disease Control, *supra* note 27.
[38] *The Discovery of Insulin*, *supra* note 35.
[39] Hirsch, MD, *supra* note 14.
[40] *Animal Insulin*, Diabetes.co.uk (2007), http://www.diabetes.co.uk/insulin/animal-insulin.html.

the first protein in history to be sequenced and chemically synthesized.[41] This type of insulin was marketed as Humulin R (rapid) and N (NPH, intermediate-acting).[42]

62.    But, even after the development of "human insulin," doctors found that "there's no one insulin that's right for everyone," and each diabetes patient may react differently to each formulation of the protein.[43] This recognition gave rise to the most recent iteration of insulin available on the market today: "analog insulin."

### 3.    Analog Insulin.

63.    Analog insulin is a "genetically modified form of insulin whereby the amino acid sequence is altered to change how the insulin is absorbed, distributed, metabolized and excreted."[44]

64.    Analog insulins are closely related to the human insulin structure, and were developed for specific aspects of glycemic control in terms of fast action (prandial insulins) and long action (basal insulins). The first biosynthetic insulin analog was developed by Eli Lilly and Company for clinical use at mealtime (prandial insulin), Humalog (insulin lispro). It is more rapidly absorbed after subcutaneous injection than regular insulin, with an effect 15 minutes after injection. Other rapid-acting analogs are Novolog (insulin aspart) and Apidra (insulin glulisine), with similar profiles. These are used in combination basal-bolus therapy with longer-acting insulins Lantus and Levemir. These rapid-acting and long-acting analog insulins were introduced in the U.S. between 1996 and 2006. They replaced older insulins, such as NPH, that had been

---

[41] *History of Insulin*, *supra* note 33.

[42] Celeste C. Quianzon & Issam Cheikh, MD, *History of insulin*, J. COMMUNITY HOSP. INTERN. MED. PERSPECT. (July 16, 2012), available: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3714061/.

[43] Gordon, *supra* note 36.

[44] *Id.*

developed during the 1940s, and regular (*e.g.* Lente, Humulin), developed in the 1970s and marketed in early 1980s.

65.    When first introduced, and for years after, analog insulins remained affordable. Today, however, Defendants' Insulin Pricing Scheme has resulted in extreme price increases that have put the 100-year old medicine financially out of reach for many people in the United States with diabetes.[45]

66.    The newer, analog insulins provide important benefits over older "human" insulin for some people with diabetes. As the mother of a diabetic child explained, older types of insulin require diabetics to follow rigid meal schedules that correspond to insulin doses so that they can avoid blood sugar fluctuations.[46]

67.    More modern insulins, such as Humalog, which is short acting, and Lantus, a long-acting insulin, can help diabetics maintain blood sugar levels and improve their quality of life.[47] The new analog insulins are particularly important for children, who face a higher risk of nocturnal hypoglycemia; there is a known prevalence of dead-in-bed syndrome among children and young adults with T1D.[48] Indeed, one researcher found that "[h]uman insulin has become almost entirely obsolete in private clinical practice…." [49] Nevertheless, some doctors are again beginning to recommend its use despite its downsides for patient health and effective diabetes

---

[45] Hirsch, MD, *supra* at 14.

[46] Nicki Nichols, *Why Walmart Insulins Aren't the Answer to High Insulin Prices, Insulin Nation* (Sept. 16, 2016), http://insulinnation.com/treatment/why-walmart-insulins-arent-the-answer-to-high-insulin-prices/.

[47] *See id.*

[48] A.M. Secrest et al., *Characterising sudden death and dead-in-bed syndrome in Type 1 diabetes*, 28 DIABETES MED. 7, 293-300 (Mar. 2011), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3045678/.

[49] Tsai, *supra* note 1.

management, because it can be obtained at much cheaper prices than more effective analog insulin.[50] In a stark reversal of decades of progress toward more effective diabetes management regimens, the American Diabetes Association and the Endocrine Society recently called for a return to obsolete insulin regimens for some patients, to solve the alleged pricing crisis engineered by Defendants.[51]

68.    As the below chart demonstrates, human insulin prescriptions were overtaken by analog prescriptions over a decade ago, yet they still accounted for almost 12% of prescriptions in 2015.

**Figure 4:** [52]



A shift to new and more expensive insulins

Since 2000, prescriptions for newer, pricier analog insulins have increased, while those for older human insulins have sharply decreased.

Source: IMS Health                                              THE WASHINGTON POST

---

[50] Hirsch, *supra* note 14.

[51] Tori Rodriguez, MA, LPC, *Rising Insulin Prices: ADA & Endocrine Society Call for Action,* EndocrinologyAdvisor (Feb. 24, 2017), http://www.endocrinologyadvisor.com/diabetes/insulin-prices-rising/article/640087/.

[52] *See* Carolyn Y. Johnson, *Why treating diabetes keeps getting more expensive*, WASH. POST (Oct. 31, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/.

69.    As for the lion's share of today's insulin market—analogs—most of these insulins have been available for 15-20 years, yet as explained next, their prices have gone through the roof.

70.    The following table shows the current types of analog insulin available and their current point of sale prices:

**Figure 5:**

| Insulin Type | Brand Name | Ingredients | Company | Approval Date | Price Range* |
|---|---|---|---|---|---|
| Rapid-acting (Analog) | NovoLog | Insulin aspart | Novo Nordisk | 06/07/2000 | $241-324 |
| | Apidra | Insulin glulisine | Sanofi-Aventis | 04/16/2004 | $268-392 |
| | Humalog | Insulin lispro | Lilly | 06/14/1996 | $268-306 |
| Long-acting (Analog) | Lantus | Insulin glargine | Sanofi-Aventis | 04/20/2000 | $262-316 |
| | Levemir | Insulin detemir | Novo-Nordisk | 06/15/2005 | $244-355 |
| | Basaglar | Insulin glargine | Lilly | 12/16/2015 | $331-411** |
| | Toujeo Solostar | Insulin glargine | Sanofi-Aventis | 02/25/2015 | $350-458*** |
| Pre-Mixed**** (Analog) | NovoLog Mix 70/30 | Insulin aspart protamine recombinant; insulin aspart recombinant | Novo-Nordisk | 11/01/2001 | $240-343 |
| | Humalog mix 50/50 | Insulin lispro protamine recombinant; insulin lispro recombinant | Lilly | 12/22/1999 | $278-303 |
| | Humalog mix 75/25 | Insulin lispro protamine recombinant; insulin lispro recombinant | Lilly | 12/22/1999 | $278-350 |

*Price range is quoted from www.goodrx.com as of March 6, 2017 for one vial 10ml 100 units/ml.

**Price range is quoted from www.goodrx.com as of March 15, 2017 for one carton of five 3 ml 100 units/ml kwickpens. Basaglar is a follow-on to Lantus, but it is not a generic or biosimilar, due to its method of FDA approval. It has only been on the market a short time and pricing data begins in February 2017. Its price is similar to other analogs.

*** Price range is quoted from www.goodrx.com as of March 15, 2017 for one carton of three 1.5ml 300 units/ml pens. Toujeo is another new follow-on to Lantus, and like Basaglar, it is not a generic or biosimilar.

****Premixed insulins combine specific amounts of intermediate-acting and short-acting insulin in one bottle or insulin pen. (The numbers following the brand name indicate the percentage of each type of insulin).

## B.    Insulin's Price Has Risen Dramatically in the Past Decade.

71.    Since 2003, the cost of one vial of glargine insulin or one box of five insulin lispro pens has increased by more than 500%; an astounding increase especially when compared to a general inflation rate of 8.3% and a "medical inflation [rate] of 46% in this same time period."[53]

72.    According to a report by the Washington Post, similar price increases can be identified across insulin products and across manufacturers: "A version of insulin that carried a list price of $17 a vial in 1997 is priced at $139 today. Another that launched two decades ago, with a sticker price of $21 a vial has been increased to $255."[54]

**Figure 6:**[55]

---

[53] Hirsch, *supra* note 14.

[54] Johnson, *supra* note 52.

[55] Hirsch, *supra* note 14.



73.     In fact, as indicated below, products from the three largest insulin manufacturers in the United States can be counted amongst the six brand-name pharmaceuticals that have increased their prices the most in the last five years:

**Figure 7:** [56]

| Drug<br>Dosage \| Quantity | Drugmaker | Condition | Quarterly Price | Price growth<br>Q1 2010–Q1 2015 |
|---|---|---|---|---|
| Xyrem<br>500MG \| 1 milliliter | Jazz Pharmaceuticals | Narcolepsy symptoms | | 351% |
| Humulin R U-500<br>U-500 injection \| 1 milliliter | Eli Lilly | Diabetes | | 325% |
| EpiPen<br>0.3MG injection \| 1 EpiPen | Mylan | Allergic reactions | | 223% |
| Premarin Vaginal Cream<br>0.625MG \| 1 gram | Pfizer | Menopausal symptoms | | 218% |
| Levemir<br>Vial injection \| 1 milliliter | Novo Nordisk | Diabetes | | 169% |
| Lantus<br>Vial injection \| 1 milliliter | Sanofi | Diabetes | | 168% |

---

[56] Langreth, *supra* note 5.

29

74.     These price increases have occurred even in the face of supposed competition between manufacturers making similar drugs. Since the mid-1990s, there have been more than two dozen price increases on a vial of Humalog insulin, as detailed below:

**Figure 8:** [57]



## The list price of Humalog insulin keeps going up

Since 1996, there have been more than two dozen price increases on a vial of Humalog insulin. Adjusted for inflation, the current price is 700% higher than it was 20 years ago.

Note: List price is in unadjusted dollars and does not reflect rebates or discounts
Source: Truven Health Analytics                    THE WASHINGTON POST

75.     Driven by these price hikes, patient spending on insulin has skyrocketed, with totals in the tens of billions of dollars. According to the Journal of the American Medical Association, more money is spent per patient on insulin than all other diabetes medications combined.[58]

76.     These price increases are even more troubling when one considers their timing and context, which seem to bear little relation to developmental advances or market demand. For

_____

[57] Johnson, *supra* note 52.

[58] *Id.*

example, as indicated below, in 10 instances since 2009, prices for two competing long-acting analog insulin products—Sanofi's Lantus and Novo Nordisk's Levemir–went up in lock-step.[59]

**Figure 9:**[60]



77.     Similarly, Humalog, a short-acting analog insulin produced by Eli Lilly, and its direct competitor, Novolog, produced by Novo Nordisk, matched thirteen of each other's price increases since 2009.

---

[59] Langreth, *supra* note 5.
[60] Ramsey, *supra* note 5; *see also* Langreth, *supra* note 5.

**Figure 10**: [61]



78.     This practice of increasing drug prices in lock-step with competitors is known as

"shadow pricing"[62] and, as noted in the below chart prepared by Dr. Irl B. Hirsch, has functioned

to precipitously increase the price of insulin in the United States.

---

[61] Ramsey, *supra* note 5.

[62] *Id.*

**Figure 11:** [63]



79.     The overlap in price hikes across both categories of analog insulins (rapid and long-acting) is remarkable as well:

---

[63] Hirsch, *supra* note 14.

**Figure 12:** [64]



JEFFERY DELVISCIO/STAT
Source: Truven Health Analytics

80.    Moreover, while generic forms of many drugs are available to purchase for as little as a few dollars, in the United States there is no generic form of insulin. Even though insulin was first extracted nearly 100 years ago, only three major pharmaceutical companies hold patents in the United States that allow them to manufacture insulin.[65] Part of the reason that no generic insulin is available in the United States may be that large-molecule biologic drugs, such as insulin, are more difficult to copy than small-molecule drugs.[66] But insulin manufacturers also have incrementally changed their insulin products, and "the trailing edge of old insulin products did not generate a market for generic competition but rather became a set of obsolete products

---

[64] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.
[65] *See* Lipska, *supra* note 13.
[66] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. ENG. J. MED. 1171, 1172–73 (2015).

that were promptly removed from the U.S. market."[67] Even when practitioners prescribe cheaper

versions of insulin that still are available in the United States, the prescriptions instead are filled

with newer recombinant products.[68] Thus, "[n]early a century after its discovery, there is still no

inexpensive supply of insulin for people living with diabetes in North America…."[69] Instead,

diabetes patients who need insulin to survive are stuck in Defendants' Pricing Scheme.

**C.    The Insulin Market is Enormous.**

81.    Nearly 30 million Americans live with diabetes, and another 86 million

Americans have prediabetes, a health condition that significantly increases a person's risk of type

2 diabetes. The condition is a significant source of health care costs. One in five health care

dollars nationwide—and one in three Medicare dollars—is spent caring for people with diabetes.

---

[67] *Id.* at 1174.
[68] *Id*.
[69] *Id*. at 1175.

**Figure 13:** [70]



83.     Thus, millions of purchasers of insulin whose lives—or the lives of their loved ones—depend on the drug are captive to the market manipulation and other harmful aspects of Defendants' Insulin Pricing Scheme that has unlawfully hiked the price of this needed drug.

84.     Here, the relevant market is—geographically—the United States and its territories. The relevant product market is the market for long-acting and rapid-acting analog insulins which includes Lantus, Apidra, NovoLog, Levimir, and Humalog.

---

[70] *The Staggering Costs of Diabetes In America*, American Diabetes Assoc., http://main.diabetes.org/dorg/images/infographics/adv-cost-of-diabetes.gif (last visited Mar. 9, 2017).

85.    As noted above, revenue from these top selling analog insulins tops $15.9 billion ($6.98 billion for Sanofi's Lantus and $376 million for its Apidra;[71] $3.03 billion for Novo Nordisk's NovoLog and $2.68 billion for its Levemir;[72] and $2.84 billion for Eli Lilly's Humalog).[73] It is reported that by 2020 the global insulin market is expected to top $48 billion.[74] This price tag has severely limited access and hurt patients physically, financially, and psychologically.

**D.    The Pharmaceutical Supply Chain.**

86.    The pharmaceutical supply chain in the United States consists of four major actors: Drug Manufacturers, Wholesale Distributors, Pharmacies, and PBMs.

87.    Pharmaceutical products originate in manufacturing sites; are transferred to wholesale distributors (in the case of insulin); are stocked at retail, mail-order, and other types of pharmacies; are subject to price negotiations and processed through quality and utilization management screens by PBMs; are dispensed by pharmacies; and ultimately are delivered to and taken by patients.[75]

88.    The technical function of a PBM is to administer a health coverage provider's prescription drug program. A PBM develops the coverage provider's drug formulary (the list of drugs included in coverage at various pricing "tiers"), processes claims, creates a network of

---

[71] Sanofi, *supra* note 21.

[72] *The world's top selling diabetes drugs*, *supra* note 22.

[73] *Id.*

[74] Tsai, *supra* note 1.

[75] Health Strategies Consultancy LLC, *Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain* (Mar. 2005), https://kaiserfamilyfoundation.files.wordpress.com/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf.

retail pharmacies that provide discounts in exchange for access to a provider's plan participants, and negotiates with pharmaceutical manufacturers. Often, PBMs are also responsible for performing drug utilization reviews and operating their own mail-order and specialty pharmacies. PBMs also contract with a network of retail and community pharmacies. Pharmacies agree to dispense prescription drugs to covered patients. The contract provides for a payment rate for each prescription, plus a dispensing fee. Pharmacies are also responsible for collecting patient cost-sharing payments and sending those to the PBM or reducing the PBM's or plan's share owed by that amount. Many PBMs also own mail-order and specialty pharmacies, which directly supply prescription drugs to patients.

89.     In addition, and of particular significance here, PBMs have contractual relationships with pharmaceutical manufacturers and pharmaceutical wholesalers. PBMs negotiate rebates, fees, and other concessions with the manufacturers. These relationships allow PBMs to exert tremendous influence and control over what drugs are made available to health plans and insureds.

90.     The following chart illustrates the pharmaceutical supply chain, and the PBMs central role in it:

**Figure 14:** [76]



**How Drug Distribution Works**
A complex supply chain determines how prescription drugs are paid for in the U.S.

Sources: Avalere Health

THE WALL STREET JOURNAL.

### E.    Consumer Costs in the Insulin Supply Chain.

91.    Defendants' schemes to make a larger and larger profit off of insulin have devastating effects on the lives of real people. Unlike the PBMs, insurers, pharmacies, and health plans, patients are directly subjected by the PBM Defendants to the list price artificially set by the Drug Manufacturer Defendants. The manner and extent of this impact depends on how patients get their insulin.

92.    **Uninsured**. First, uninsured consumers who need insulin—because they are completely outside of the PBMs' and drug manufacturers' web of PBM Kickback financing arrangements through health plans—must pay the full list price. This is not a small population. Despite significant coverage increases under the Affordable Care Act, by the end of 2015 there

---

[76] Joseph Walker, *Drugmakers Point Finger at Middlemen for Rising Drug Prices*, WALL ST. J. (Oct. 3, 2016, 12:43 PM), https://www.wsj.com/articles/drugmakers-point-finger-at-middlemen-for-rising-drug-prices-1475443336.

were 28.5 million nonelderly Americans who lacked insurance.[77] In 2012, there were 2 million adults between the ages of 18-64 with diabetes without health insurance coverage, which has "considerable public health and economic impact."[78]

93.    **Deductibles**. Second, consumers who are in health plans also suffer directly from inflated prescription prices when they pay their deductibles. The deductible is the amount that an insured must pay before insurance benefits will contribute to medical and pharmacy expenses. Thus, until the deductible is met, an insured must pay out-of-pocket. Depending on the plan, consumers may be required to pay the full list price of drugs.

94.    Moreover, deductibles are rising, meaning that insured consumers are having to pay more out-of-pocket for medical needs, including prescription drugs. The Kaiser Family Foundation found that in 2016, deductibles rose 12% in the market group and four times faster than premiums increased.[79] The higher the deductible, the more consumers have to pay full price for their prescriptions until their coverage begins.

95.    Almost a quarter of all people obtaining insurance through employers are now enrolled in high-deductible-health plans ("HDHPs"), up from 4% in 2006. The average deductible amount has increased 67% since 2010. And almost half of workers are covered by

---

[77] *Key Facts about the Uninsured Population*, The Kaiser Family Foundation (Sept. 29, 2016), http://kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/.

[78] Sarah Casagrande & Catherine Cowie, *Health Insurance Coverage Among People With and Without Diabetes in the U.S. Adult Population*, Diabetes Care, Nov. 2012, 35(11), 2243-2249, available at: http://care.diabetesjournals.org/content/35/11/2243.

[79] Drew Altman, *The Missing Debate Over Rising Health-Care Deductibles*, The Kaiser Family Foundation (Sept. 18, 2016), http://kff.org/health-costs/perspective/the-missing-debate-over-rising-health-care-deductibles/.

insurance with annual deductibles of at least $1,000 for individual coverage.[80] With the surge in

popularity among employer-sponsored health plans of "high-deductible" plans, deductible

thresholds affect an ever-increasing number of patients:

**Figure 15: Percent Increase of High-Deductible Plans:**[81]



\*Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



96.    High deductible plans require consumers to pay thousands of dollars before their

coverage kicks in. Many individuals and families cannot afford to hit their high-deductible costs

year after year. As a result, rising drug list prices are particularly harmful to patients in high-

deductible plans, not only because they hit their deductibles annually, but because they hit their

deductibles over a *shorter period of time*, resulting in significant financial burden at the start of

---

[80] National Prescription Coverage Association, *Don't Be Fooled By Eli Lilly's & Express Scripts' New Insulin Program* (2017), http://nationalprescriptioncoveragecoalition.com/dont-be-fooled-by-eli-lillys-express-scripts-new-insulin-program/.

[81] *Employer Health Benefits: 2016 Summary of Findings*, The Kaiser Family Foundation (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

each calendar year. Individuals or families who do not have excess cash or access to credit to meet this annual burden may resort to altering their insulin therapy to spread their out-of-pocket payments over a longer period of time.

97.    **Cost Sharing**. Third, even after deductibles are paid, insured consumers' prescription costs still are affected by the PBMs' and drug manufacturers' pricing scheme through copayments and coinsurance requirements. Some plans require these payments during the deductible phase, while others require payment of the full list price with copayments and coinsurance requirements only after the deductible is met.

98.    Copayments are set amounts that an insured must pay for medical services, including prescriptions. Copayments vary by drug, with drugs in preferred formulary positions carrying a lower copay and drugs in a disfavored position costing the insured more. A patient who must use a specific brand of insulin due to an allergy, for example, is hurt by tiered formularies that place the only drug that will work for that patient at a more expensive price point—placement that is driven by Defendants' Insulin Pricing Scheme. Moreover, because the five analog insulins at issue here are all still branded drugs, they are placed in more expensive tiers than generics would be—meaning they frequently are second-tier, third-tier, or potentially higher in the formulary.

99.    Coinsurance is a percentage of the cost of a medical service or drug, which the insured must pay. In the case of prescription drugs, the coinsurance amount is based on the inflated list price, not an adjusted price based on the secret rebates and kickbacks that PBMs negotiate, and not the amount that manufacturers actually collect and PBMs/their clients actually pay.

100.    To add insult to injury, the portion of prescription drug costs that an insured person's *plan* will pay is often not based on the full, inflated list price—it is based on a negotiated lower price, which will take into account some rebates, discounts, or other concessions passed through to the plan by the PBM. Thus, plans with such arrangements do not simply pay the difference between the participant's payment and the list price—they instead pay something less—and for large insurers or those that own PBMs, something *much* less. The burden on participants and beneficiaries of such plans is disproportionate to whatever percentages they may think they are shouldering.

101.    **Medicare**. Fourth, consumers covered by Medicare are also overcharged as a result of the Insulin Pricing Scheme. In 2017, for Medicare Part D participants, there is an initial $400 deductible phase during which many Medicare Part D plan participants must foot the entire bill for the inflated cost of insulin. After meeting the $400 deductible, Medicare Part D participants are responsible for a 25% coinsurance payment in their second coverage phase. They stay in this phase until they and the plan have spent a total of $3,700 on covered drugs. Paying 25% of an inflated price injures these participants. After hitting the second coverage breakpoint, the participant is in what is known as the Medicare Part D "Donut Hole," which refers to a coverage gap phase where the participant must pay even more. In 2017, for brand drugs, participants pay 40%[82] of the list price (the manufacturer discounts brand drugs by 50%, and the plan pays the remaining 10%).[83] Again, the percentage-of-cost requirement means that inflated insulin prices hurt Medicare participants in this third coverage phase. A participant leaves the

---

[82] In prior years in the Class Period, these percentages were even higher—for example Donut Hole cost sharing for participants was 50% in 2011 and 2012.

[83] *Costs in the coverage gap*, Medicare.gov, https://www.medicare.gov/part-d/costs/coverage-gap/part-d-coverage-gap.html (last visited Mar. 15, 2017).

coverage gap and is covered again in the catastrophic phase with a 5% coinsurance requirement only after spending total $4,950 out-of-pocket—which is also when total drug costs covered by the participant, the plan, and discounts reach $7,425.[84]

**Figure 16:** [85]



## Standard Medicare Prescription Drug Benefit, 2017

NOTE: Some amounts rounded to nearest dollar. [1]Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.



102.    Thus, Medicare Part D participants face a double burden when it comes to inflated drug prices. First, they cost-share based on inflated insulin list prices, regardless of the phase they are in, often paying the entire drug cost in their deductible phase, and always paying percentages of inflated drug prices in later coverage phases. Second, because the *total* list price

---

[84] *Catastrophic coverage*, Medicare.gov, https://www.medicare.gov/part-d/costs/catastrophic-coverage/drug-plan-catastrophic-coverage.html (last visited Mar. 15, 2017).

[85] *The Medicare Part D Prescription Drug Benefit*, The Kaiser Family Foundation (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

of the drug, including amounts contributed by all parties, is used to calculate when the

participant reaches each coverage phase's breakpoints throughout the year, the inflated price of

insulin *pushes the participants into the "Donut Hole" faster*—where coverage is less generous

and their out-of-pocket costs are higher. The acceleration of Medicare Part D participants'

movement through coverage phases due to inflated drug prices means they ultimately pay even

more for insulin and other drugs they need.

**F.      The Rise of the PBMs in the Pharmaceutical Supply Chain.**

103.    When they first came into existence in the late 1960s, PBMs provided

administrative services to health plans by processing claims and maintaining formularies. Over

time, they played a larger role negotiating prices with drug manufacturers. Since PBMs were

independent, they generally were thought to pass savings back to health plans and consumers by

using their leverage to negotiate lower reimbursement rates with pharmacies and discounts with

drug manufacturers.[86]

104.    In the 1990s, drug manufacturers began acquiring PBMs, which caused an

"egregious conflict[] of interest," prompting the Federal Trade Commission to undo those deals.

The deals allowed drug manufacturers to coordinate pricing policies, see their competitors'

sensitive pricing information, and favor their own drugs over those of their competitors.[87]

105.    In the early and late 2000s, PBMs started buying pharmacies, which has caused a

similar conflict of interest that resulted from the merger of drug manufacturers and PBMs in the

1990s. When a PBM combines with a pharmacy, they "lose the incentive to police against

---

[86] Brian Feldman, *Big pharmacies are dismantling the industry that keeps US drug costs even sort-of under control* (Mar. 17, 2016), https://qz.com/636823/big-pharmacies-are-dismantling-the-industry-that-keeps-us-drug-costs-even-sort-of-under-control/.

[87] *Id.*

pharmaceutical company schemes to steer patients to more expensive drugs. Indeed, they may collude in them."[88] The power of the largest PBMs has continued to grow, and has allowed them to distort the pharmaceutical supply chain to their own financial advantage.

106.    Drug manufacturers well understand the power of PBMs.[89] Because of their size, and the many thousands of health plan clients they represent, PBMs can steer business from one drug manufacturer to another based on which one pays the larger PBM Kickback.

107.    PBMs make outsize profits by exploiting the United States' complex pharmaceutical distribution system. While the role of PBMs in the supply chain is well known, the size of the rebates and other fees they extract from drug companies for formulary placement, and the portion of these payments they pocket (the "PBM Kickbacks") are carefully guarded secrets.[90]

108.    PBMs depend on the lack of transparency to conduct their business and have vigorously resisted any requirement that they disclose the details of their agreements with drug manufacturers, and the PBM Kickbacks they receive from them—as well as their agreements with the insurers and pharmacies.[91]

109.    According to the Pharmaceutical Care Management Association, the trade group that represents the PBM industry, PBMs manage pharmacy benefits for over 266 million

---

[88] *Id.*

[89] *See* Roland & Loftus, *supra* note 9.

[90] *See, e.g.*, Lydia Ramsey, *One of the largest middlemen in the drug industry just released a video showing why it should be able to remain secretive*, Business Insider (Feb. 9, 2017), http://www.businessinsider.com/what-pharmacy-benefit-managers-are-doing-about-trump-and-drug-pricing-2017-2.

[91] *Id.*

Americans.[92] Three large companies dominate the PBM market: Express Scripts, CVS Health, and OptumRx. Together, these companies cover roughly 78% of insured Americans.[93]

110.    Express Scripts is the largest PBM in the United States.[94] In 2016, annual revenue for Express Scripts was approximately $102.287 billion.[95] As of December 31, 2016, more than 69,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.[96]

111.    Insulin is a substantial part of Express Scripts' business. Indeed, Lantus and Humalog—analog insulins produced by Sanofi-Aventis and Eli Lilly, respectively, held the top two positions in Express Scripts' ranking of the "Top 10 traditional drugs" for 2016, ranked by per-member-per-year spend.[97]

112.    CVS Health Corporation, including its subsidiary CVS Caremark filled or managed approximately 1.2 billion prescriptions during the year ended December 31, 2016, equaling approximately 1.6 billion prescriptions when counting 90-day prescriptions as three separate prescriptions.[98]

---

[92] *Our Mission*, Pharmaceutical Care Management Association, https://www.pcmanet.org/our-industry/ (last visited Feb. 26, 2017).

[93] Patricia M. Danzon, PhD, *2014 ERISA Advisory Council PBM Compensation and Fee Disclosure* (2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/ACDanzon061914.pdf.

[94] Anne Steele, *Express Scripts Revenue Falls*, WALL ST. J. (Feb. 14, 2017), https://www.wsj.com/articles/express-scripts-revenue-falls-1487108990.

[95] Express Scripts, *supra* note 11.

[96] *Id.*

[97] *Express Scripts Commercial Drug Trend Report* (2016), available: http://lab.express-scripts.com/lab/drug-trend-report.

[98] CVS Health Corp., *supra* note 16.

113.     In 2015, CVS Health Corporation's pharmacy services segment, which includes the corporation's PBM activities but not its retail/long-term care segment, brought in $100.363 billion in net revenues.[99] CVS Health, through its subsidiary PBM, provides pharmacy benefit administration for a network of more than 68,000 retail pharmacies, including approximately 41,000 chain pharmacies and 27,000 independent pharmacies.[100]

114.     The third largest PBM, OptumRx, owned by UnitedHealth, provides pharmacy care services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities. In 2016, OptumRx managed more than $80 billion in pharmaceutical spending. OptumRx's 2016 revenue was $60.44 billion.

115.     Business for the PBM Defendants is booming. For example, from 2014 to 2015, Express Scripts' net income increased by $468.8 million, or 23.4 percent. During the same time, gross profit for CVS Health's pharmacy services segment, which includes the PBM CVS Caremark, increased 9.6 percent. And OptumRx's earnings from operations increased 47 percent over the same period.

116.     The PBM Defendants' earnings increased further in 2016. Express Scripts' net income increased 37.5 percent from 2015 to 2016. CVS Health's gross profits from its pharmacy services segment increased by an additional 9.6 percent. And OptumRx reported a 53 percent increase in earnings from operations.

**G.      The Insulin Pricing Scheme: Rebates Gone Awry.**

117.     PBMs turn a profit in three primary ways: first, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies; second,

---

[99] CVS Health, 2015 ANNUAL REPORT (2016).
[100] *Id.*

insurers pay transaction fees on the different operations required to manage the complex cash flows between insurers, pharmacists and manufacturers; and third, PBMs take a cut of the drug "rebates" and other fees they negotiate with drug companies.

118.    This rebate arrangement, if operated ethically and honestly, would create an incentive for PBMs to negotiate *lower* net drug prices: if PBMs could purchase drugs more cheaply from the drug companies, they could increase their margins when they sell the drugs to their clients.[101] Indeed, PBMs have the greatest leverage to negotiate lower prices when two or more drug companies make ostensibly interchangeable products—*i.e.*, drugs within the same therapeutic class. In such a scenario, the drug companies should compete on price, as in normal competitive markets, for the PBMs' business.

119.    However, the arrangement is not operated ethically and honestly. The Drug Manufacturer Defendants and PBMs are gaming the system. They have realized that they both benefit if, instead of forcing the Drug Manufacturer Defendants to sell their drugs to the PBMs for cheaper, they induce the Drug Manufacturers to raise their publicly reported list price, but largely maintain the net prices. This creates what is, in effect, a massive slush fund derived from the difference between the net and list prices that can be used by the Drug Manufacturer Defendants to pay the larger and larger rebates demanded by the PBM Defendants for formulary placement.[102]

---

[101] Although the PBMs treat different insulin as if they were completely interchangeable, in fact, they have different inactive ingredients that can cause allergic reactions for diabetes patients. Type 1 diabetes is an autoimmune disease, and many patients are sensitive to insulin changes. Moreover, the fallacy of therapeutic interchangeability is also based on the assumption that all insulins are absorbed based on the same normal curve, which is not always true. Patients can have different duration of insulin action on one insulin versus another.

[102] Roland & Loftus, *supra* note 9.

120.    The scheme allows the Drug Manufacturer Defendants to maintain their profit margins on drugs sold in the United States—which are higher than anywhere else in the world—and ensure their access to the millions of Americans whose drugs are made available via the PBM formularies. And, the scheme allows the PBM Defendants to leverage their control over formularies to obtain PBM Kickbacks. With net prices staying the same, and list prices going up, the rebates get bigger, and so does the PBM Defendants' cut. The scheme artificially drives up list prices specifically so the PBM Defendants can earn more profit from the rebates they pay to the PBM Defendants behind the scene. And the Drug Manufacturers can pay the PBM Defendants what they demand without significantly impacting the Drug Manufacturers profits.

121.    Thus, far from using their prodigious bargaining power to lower drug prices, the PBM Defendants abuse their position in order to benefit both themselves and the Drug Manufacturer Defendants. It is a profitable enterprise, though deeply unethical and damaging to consumers who shoulder the burden of the higher list prices through increased out-of-pocket payments. This dynamic lies at the heart of the surging cost of insulin, and the resulting public health disaster.

**H.    The Insulin Pricing Scheme Has Caused Insulin List and Net Prices to Diverge to the Detriment of Patients.**

**1.    The List/Net Price Divergence.**

122.    While the Defendants often obscure the true net realized prices for insulin and other drugs, the escalating list price is a matter of public record. As noted above, the list prices for the analog insulins sold by Sanofi, Eli Lilly, and Novo Nordisk have skyrocketed largely in lock-step. Indeed, in 13 instances since 2009, Sanofi and Novo Nordisk raised the list prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase

down to the decimal point within a few days of each other."[103] As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[104] Eli Lilly and Novo Nordisk have engaged in the same lock-step behavior with respect to their rapid-acting analog insulins, Humalog and Novolog.

123.    The question, then, is why aren't the Drug Manufacturer Defendants competing on price? They sell similar, and in many ways interchangeable drugs, and have been for years. Indeed, the drugs are the same as they were ten years ago, and the clinical benefit of the drugs is unchanged. Yet, the list price keeps going up. The answer is the Insulin Pricing Scheme. The Drug Manufacturer Defendants are not competing on price because instead they are competing on rebates and other fees paid to the PBM Defendants, and the profits the PBMs make on these fees. This anti-competitive, market-distorting conspiracy explains the spectacular rise in insulin list prices, while the real prices that the PBM Defendants pay for insulin, and hence the net prices realized by Manufacturers remain relatively constant.

124.    Figures 17 and 18—included in a press release by Novo Nordisk—illustrate this phenomenon. Note that figures 17 and 18 show percentage price changes, not dollar amounts.

---

[103] Langreth, *supra* note 5.
[104] *Id.*

**Figure 17: NovoLog Vial Net Versus List Price Increases:[105]**



**Figure 18: NovoLog FlexPen[106] Net Versus List price increases:[107]**



---

[105] *Novo Nordisk Press Release* (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

[106] The FlexPen is a type of insulin injection in which patients use a pen-like stick insulin distributor instead of injecting insulin through a pump.

[107] *Novo Nordisk Press* Release, supra note 105.

125.    As indicated in the below diagrams prepared by SSER Health,[108] a health-industry research firm, the same widening spread has occurred for the other major analog insulins:

**Figure 19: SSER Health Diagrams:**



126.    Sanofi, Novo Nordisk, and Eli Lilly's spread-increasing behavior is also visible from data on these companies' aggregate rebates to PBMs and insurers. The two figures below illustrate Novo Nordisk's aggregate rebates from 2007 to 2014.

---

[108] Robert Langreth, et al., *Decoding Big Pharma's Secret Drug Pricing Practices*, Bloomberg (June 29, 2016), https://www.bloomberg.com/graphics/2016-drug-prices/.

**Figure 20: Novo Nordisk's Reported Rebates as a Percentage of U.S. Gross Sales from 2007-2014:[109]**



Source: Company data, Credit Suisse estimates

127.     Sanofi has also greatly increased its rebates off the inflated list prices. Figures 19 and 21 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

---

[109] Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*, Credit Suisse, 23 (May 1, 2015).

**Figure 21: Sanofi's Reported Rebates as a Percentage of U.S. Gross Sales from 2007-2014:[110]**



128.    Finally, Eli Lilly has greatly increased its rebates off the inflated list prices.

Figures 19 and 22 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to

2014. Contrary to NovoNordisk, for which insulin represents a substantial amount of gross

revenues, Eli Lilly is an extremely diversified manufacturer. As a result, the impact of the very

steep insulin rebating that has gained Lilly the lion's share of the U.S. insulin market in recent

years is attenuated in the graph below by less aggressive rebating on other drug classes.

---

[110] *Id.* at 26.

**Figure 22: Eli Lilly's Reported Rebates as a Percentage of U.S. Gross Sales from 2007-2014:**[111]



Source: Company data, Credit Suisse estimates

## I.    The Drug Manufacturer Defendants Admit the Insulin Pricing Scheme and its Impact on Patients.

129.    The Drug Manufacturer Defendants have come up with a variety of excuses for the escalating insulin list prices. For example, Novo Nordisk offered as one justification the "clinical benefit"[112] of their drugs—a nonsensical explanation given that both the drugs and the benefits have been the same for years. Yet, in the face of widespread criticism of insulin prices spinning out of control—and out of reach for many patients, the Drug Manufacturer Defendants have admitted the true reasons for the price escalation.

130.    On November 30, 2016, Novo Nordisk issued a press release stating:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by **XX percent leads to an automatic XX percent profit**

---

[111] *Id.* at 17.

[112] Tsai, *supra* note 1.

for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[113]

131.    In its 2016 annual report, Novo Nordisk admitted to the practice of exchanging rebates for preferential formulary placement noting that: "Increasingly, PBMs and health plans play a key role in negotiating price concessions with drug manufacturers on behalf of private payers for both the commercial and government channels, and determining the list of drugs covered in the health plan's formulary. Specifically, . . . Payer pressure to reduce the overall drug costs has resulted in greater focus on negotiating higher rebates from drug manufacturers. Private payers are increasingly keen to adopt narrow formularies that exclude certain drugs, while securing increased rebates from the preferred brand."[114] As a consequence, the report went on to explain, Novo Nordisk has announced contract negotiations for 2017 with higher-than-anticipated rebates to obtain broader coverage for its products.

132.    Eli Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary positions: "The reason drugmakers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[115]

---

[113] *Novo Nordisk Press Release*, *supra* note 105.

[114] Novo Nordisk, 2016 ANNUAL REPORT, 20 (2017).

[115] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, WALL ST. J., at B1 (Oct. 10, 2016).

133.    In June 2016, CEO of Eli Lilly, John C. Lechleiter, further explained that those "higher rebates can be an incentive for a payer to stick with—with essentially a higher-priced product."[116]

134.    Sanofi has admitted to the same practices. In February 2015, Peter Guenter, Sanofi's Executive Vice President, explained that: "As expected, increased rebates in the U.S. to secure favorable formula repositions for Lantus with key payers have kicked in since January 1, 2015."[117]

135.    And the next year, Olivier Brandicourt, Sanofi's Chief Executive Officer, stressed the continuing importance of maintaining a favorable formulary position, after the company was excluded from CVS Caremark's formulary, announcing: "if you look at the way CVS is organized in the U.S., they are covering about 30 million lives as a PBM … I think it's actually 34 million. 15 million are part of the national formulary and that's very strict, all right. So, we wouldn't have access to those 15 million lives."[118]

136.    The Drug Manufacturer Defendants, thus, acknowledge that the Insulin Pricing Scheme drives up list prices. While the message they appear to be trying to send is that the "PBMs made them do it," the fact of the matter is they could compete for access to formularies by lowering the list prices for their insulin products and refusing to rebate. This, however, would cut into their bottom line. as it would involve the Manufacturers in direct competition on price.

---

[116] BERNSTEIN THIRTY-SECOND ANNUAL STRATEGIC DECISIONS CONFERENCE 2016 (JUNE 2, 2016), available: https://cc.talkpoint.com/bern001/060116a_ae/?entity=60_XQX7ENW.

[117] SANOFI, 2014 FULL YEAR'S RESULTS CONFERENCE CALL (FEB. 5, 2015), available: https://seekingalpha.com/article/2892016-sanofis-sny-q4-2014-results-earnings-call-transcript.

[118] BANK OF AMERICA MERRILL LYNCH GLOBAL HEALTHCARE CONFERENCE, LONDON, UK (SEPT. 16, 2016), available: http://edge.media-server.com/m/p/7neehd6y.

137.    Moreover, the Drug Manufacturer Defendants do not deny the impact of the pricing scheme on patients. Indeed, they are fully aware that when list prices go up, even though the PBMs don't pay more for the drugs, many patients do.

138.    The following graphic from Novo Nordisk explains who shoulders the largest burden due to inflated list prices—patients:

**Figure 23:** [119]



139.    While not "real" for the PBM Defendants, the list price is real for patients. It determines what many people are asked pay out-of-pocket. Thus, the Insulin Pricing Scheme benefits the Drug Manufacturer Defendants and PBM Defendants at the expense of almost all prescription insulin consumers. Those who are uninsured must pay the entire artificially inflated list price for insulin. Even insured consumers—rather than benefitting from the hidden rebates paid by the Drug Manufacturer Defendants—are directed via PBMs to pay deductibles and

---

[119] Fein, *supra* note 7.

coinsurance based on the *list* price. Furthermore, Medicare Part D participants are also left paying inflated amounts in all phases as soaring prices cause them to speed toward the Donut Hole.

140.    The end result of Defendants' scheme is that, notwithstanding the rebates the PBM Defendants extract from the Drug Manufacturers Defendants purportedly for the benefit of consumers, patients are saddled with out-of-pocket costs based on artificially inflated list prices. Patients who cannot afford the skyrocketing costs lose access to the drug they need to stay alive.

141.    Comparing the list price of insulin in the United States to other nations puts into clear focus the dire consequences of the Defendants' scheme:

**Figure 24:**[120]



---

[120] Hirsch, *supra* note 13.

**J.    High List Prices Directly Impact Patients' Ability to Pay for Insulin.**

142.    A drug that used to cost seven cents a week in 1924 (in 2016 dollars), today now costs hundreds of dollars a month. For people who cannot not afford the list price of insulin, they are forced to sacrifice their health and compromise their treatment regimen.

143.    Doctors are speaking up about the number of diabetes patients coming in with poorly controlled blood sugar who explain that they were not taking their insulin because it is too expensive.[121] Patients who are worried about the cost of insulin may ration their insulin, frequently not taking it when they need to, cutting their doses in half, or refilling their pump hours after the insulin runs out, even though it means their blood sugar will go up.[122] Patients may also deprive themselves of food to keep their blood sugar low and avoid the need for insulin.[123]

144.    The less controlled an individual's blood sugar is, the higher their risk for diabetes-related complications. As noted above, these complications include cardiovascular disease, nerve damage that can lead to amputation of limbs, kidney disease and failure, eye damage such as blindness or glaucoma, skin conditions, hearing impairment, and Alzheimer's disease.[124]

145.    The American Diabetes Association estimates that the average person diagnosed with diabetes has about $13,700 in medical expenditures each year, of which about $7,900 is

---

[121] Johnson, *supra* note 47.

[122] *Id.*; Claudia Buck, *Diabetes Has Become One of America's Most Expensive Diseases*, Sacramento Bee (Feb. 5, 2015), http://www.sacbee.com/news/local/health-and-medicine/article130487694.

[123] Hirsch, MD, *supra* note 13.

[124] Mayo Clinic Staff, *Diabetes: Complications*, Mayo Clinic: Diseases and Conditions (July 31, 2014) http://www.mayoclinic.org/diseases-conditions/diabetes/basics/complications/con-20033091.

attributable to diabetes.[125] Costs for people with type 1 diabetes are typically much higher, as the

ADA averages include many type 2 patients who are able to manage on low-cost oral

medications alone. The median household income in the United States in 2012 was

approximately $51,370—in other words, people with diabetes spend 15% of their income

specifically on diabetes expenses and over 25% of their income on total medical expenses.[126]

146.    Diabetic patients' inability to afford medical care has a direct and detrimental

impact on their health: People with diabetes who do not have health insurance have 79% fewer

physician office visits and are prescribed 68% fewer medications than people with insurance

coverage—and, unsurprisingly, they also have 55% more emergency room visits than people

who have insurance.

147.    The financial burden of diabetes means that many Class members do not receive

the care they need for a disease that has been treatable for almost a century. In addition, the

uncertainty of being able to pay for the insulin that is necessary for their survival leaves many

Class members in a constant state of stress and anxiety. Insulin rationing is common, as is

patients allowing themselves to go into DKA in order to get insulin in emergency rooms.[127]

148.    The high list price for insulin is particularly acute problem because of changes in

the insurance industry in the past several years, as noted above. The move to high deductibles in

employer-sponsored plans—where over 150 million Americans get their insurance—means that

many people cannot satisfy their cost-sharing obligations. The same is true for deductibles and

---

[125] American Diabetes Association, *Economic Costs of Diabetes in the U.S. in 2012, Diabetes Care* (March 6, 2013), http://care.diabetesjournals.org/content/early/2013/03/05/dc12-2625.full-text.pdf.

[126] Amanda Noss, *Household Income: 2012*, U.S. Census Bureau (Sept. 2013), https://www.census.gov/prod/2013pubs/acsbr12-02.pdf.

[127] Hirsch, MD, *supra* note 13.

co-insurance obligations in other types of plans. As patients are required to shoulder more of the burden of their health care costs, the scheme to inflate list price so that the PBM Defendants can extract larger Kickbacks imposes an ever-larger toll on patients—financially, physically, and emotionally.

149.    While the PBM Defendants continue to conceal the amount they make on PBM Kickbacks, the Drug Manufacturer Defendants have attempted to blunt criticism through various actions. For example, in its November 30, 2016 press release, Novo Nordisk made a modest commitment to "limit[] any potential future list price increases for our medicines to no more than single-digit percentages annually."[128]

150.    On December 13, 2016, Eli Lilly announced that, starting on January 1,[129] patients who pay full-retail prices out-of-pocket for Eli Lilly's insulin will gain access to 40% discounts on their Eli Lilly's insulins.[130] These price reductions are, however, ultimately self-serving.

151.    In order to take advantage of Eli Lilly's discount program, patients have to purchase their insulin outside of their insurance plan, "which will likely result in higher 'net prices' for Lilly than its sales through PBMs" because the 'discounted' sales "will be based on retail pharmacies' walk-in pharmacy prices which are far higher" than the prices the company uses to sell insulin to PBMs, and will not be subject to rebate payments negotiated by PBMs.[131]

---

[128] *Novo Nordisk Press Release*, *supra* note 105.

[129] *Eli Lilly Press Release* (Dec. 13, 2016), https://investor.lilly.com/releasedetail.cfm?ReleaseID=1003887.

[130] *Id.*

[131] National Prescription Coverage Association, *supra* note 80.

152.    As such, Lilly's realized profit on a 'discounted' sale of insulin, will be greater than on the sale of fully-priced insulin purchased through an insurance plan. In this way, Eli Lilly, and other insulin manufactures, have begun to use discounts and other patient assistance programs to anchor their price concessions at a point substantially higher than their current net realized price and extract even greater profits from consumers. Moreover, because discounted purchases must be made outside of an insurance plan, they cannot be counted towards a patient's deductible or out-of-pocket maximum, meaning a patient on a bronze ACA plan could conceivably, in a given year, pay thousands of dollars for insulin on top of satisfying an individual out-of-pocket maximum of $6,000 or more.

153.    These too little too late measures are largely publicity stunts that provide only modest relief to a limited subset of patients. The measures do not end or even address the insidious practice of competing for the PBM Defendants' business based on the rebate provided to the PBMs, and the PBM Kickbacks derived from the rebate.  Nor do they compensate patients for the thousands of dollars they have spent out-of-pocket on insulins over the few years. The structural problems that have caused the escalation of the list price for insulin remain, and Insulin Rebate Scheme continues. The Defendants continue to game the system, and people with diabetes continue to pay the price.

154.    The fact remains that the insulin market in the United States is an ideal source of profit for unethical middlemen and drug manufacturers like the Defendants. About six million Americans use insulin. Although it has been commercially produced for almost a hundred years, in the United States only three major pharmaceutical companies hold patents that allow them to manufacture the drug. These three manufacturers "compete" with each other not on price, but by offering ever-steeper discounts for insulin to another select group—a handful of PBMs who

profit from every list price increase through the Kickbacks they receive. The result is a staggering abuse of power and trust. The Defendants are gaming the system, and people with diabetes are paying the price.

## V.      ERISA ALLEGATIONS

**A.      The PBM Defendants Are Fiduciaries and Parties In Interest.**

155.    The ERISA Plaintiffs and the members of the ERISA Class (as defined below) are participants in employee welfare benefit plans, as that term is defined in 29 U.S.C. § 1002(1)(A), whose pharmacy benefits covering prescription medications are administered by the PBM Defendants ("ERISA Plans").

156.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

157.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

158.    The PBM Defendants are fiduciaries of all of the ERISA Class members' ERISA Plans for which they administered prescription drug benefits in that they exercised discretionary authority or control respecting the following plan management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that they had discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the ERISA Class, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because, by way of example, they did and/or could do one or more of the following *with respect to the ERISA Plans*:

A.    negotiate with the Drug Manufacturer Defendants for the inclusion of the drugs they manufacture on the PBM Defendants' formularies that govern prescription drug coverage through the ERISA Plans;

B.    negotiate with the Drug Manufacturer Defendants the prices that patients and the ERISA Plans will pay, including through placement of specific drugs on tiered formularies;

C.    dictate whether a particular drug was covered, and if so, in which tier it was categorized;

D.    dictate the prices of prescription drugs to patients and ERISA Plans;

E.    negotiate with the Drug Manufacturer Defendants the amount of rebates, discounts, fees, or other financial incentive payments (*i.e.*, PBM Kickbacks, as defined above) that the PBM Defendants will receive from the Drug Manufacturer Defendants upon the purchase of specific drugs by patients and health plans;

F.    induce the Drug Manufacturer Defendants to artificially inflate the list prices so that there is room enough in the drug pricing regime for the PBM Kickbacks,

66

while the Drug Manufacturer Defendants' net profits and sales volumes are buoyed by

their drugs' inclusion on PBM formularies;

G.      dictate the portion, *if any*, of the PBM Kickbacks that are shared with or

passed through to other entities, such as health insurers, plan administrators, plan

sponsors, or patients;

H.      dictate the amount ultimately paid to pharmacies for prescription drugs;

I.      dictate the amount pharmacies charge patients for prescription drugs;

J.      manage the prescription drug benefit program, including processing and

paying prescription drug claims received from pharmacies;

K.      choose whether to fill a prescription from a participant, reject the

prescription, or shift the participant to a different prescription medication or require the

use of the PBM Defendants' exclusive mail order pharmacies;

L.      determine the amount of and require the collection of additional profits

and compensation for services provided by the PBM Defendants pursuant to the ERISA

Plans;

M.      set their own margin/compensation for services performed as fiduciaries

by dictating the amount of PBM Kickbacks they will collect from the Drug Manufacturer

Defendants and the amount of such PBM Kickbacks they will ultimately keep for

themselves in connection with prescription drug purchases;

N.      unilaterally collect their own compensation for services performed as

fiduciaries by collecting PBM Kickbacks;

O.      set and change the compensation of themselves with respect to the ERISA

Plans by allocating the proceeds of PBM Kickbacks;

P.      misrepresent, conceal, and/or fail to disclose to patients and fiduciaries other than the PBM Defendants the manner in which the PBM Defendants charged for prescription drugs as alleged above;

Q.      misrepresent, conceal, and/or fail to disclose to patients and to fiduciaries other than the PBM Defendants the amounts and components of PBM Kickbacks that the PBM Defendants collect from the Drug Manufacturer Defendants;

R.      misrepresent, conceal, and/or fail to disclose to patients and to fiduciaries other than the PBM Defendants the PBM Defendants' compensation and profit collected in connection with prescription drug transactions;

S.      improperly trade off the interests of ERISA Plan participants and beneficiaries for the benefit of themselves in charging inflated prices in order to obtain excessive profits at the expense of participants and others paying amounts that are captured by the PBM Defendants as PBM Kickbacks;

T.      improperly trade off the interests of plan participants and beneficiaries for the benefit of third parties, including the Drug Manufacturer Defendants, who are able to sell more of the drugs they produce as a result of their participation in the pricing scheme described herein;

U.      improperly trade off the interests of plan participants and beneficiaries for the benefit of third parties, including the Drug Manufacturer Defendants, who are able to sell the drugs they produce at a higher price as a result of their participation in the pricing scheme described herein; and

V.      leverage their contractual relationships with ERISA Plans, their insurers, and the pharmacies from which the ERISA Plans and their participants and beneficiaries

purchase prescription drugs to exert control over billions of dollars that flow from

prescription drug purchases by ERISA Plans and their participants and beneficiaries, as

well as the ERISA Plan instruments that govern these transactions, as described further

below, causing Plan participants to pay inflated prices for insulin.

159.    The PBM Kickbacks are possible because of the PBMs' discretion and power to

do the foregoing, which makes them fiduciaries to the ERISA Plans. The PBM Defendants'

*relationships with* and *access to* the ERISA Plans and related prescription drug purchases are the

source of this discretion and power. They have and use discretion and authority to set their own

fees and compensation by virtue of their role with respect to the administration and/or

management of the ERISA Plans—a central part of which is and was negotiating drug prices

from which the PBM Defendants extract a significant cut of rebates and other payments from the

Drug Manufacturer Defendants while increasing, rather than decreasing, costs to ERISA Plan

participants. Thus the PBM Defendants' fiduciary power is, in part, the power over their own

fees and compensation, because their fees and compensation flow from the drug price

negotiations *only they* have the power to conduct on behalf of the ERISA Plans. The fees and

compensation the PBM Defendants extract from these negotiations performed on behalf of the

ERISA Plans are achieved at the substantial expense of the ERISA Plans' participants and

beneficiaries, who must pay purchase prices that result from the inflated list prices that are

central to and caused by Defendants' Insulin Pricing Scheme.

160.    Further, the PBM Kickbacks were additional compensation for the administration

of prescription drug coverage that was collected by the PBM Defendants that was neither

disclosed to nor agreed to by the participants and beneficiaries or others that were required to

make these additional payments so that participants and beneficiaries could receive their covered

prescription drugs. The PBM Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed compensation, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

161.    The PBM Kickbacks are additional "premium" within the meaning of ERISA § 702, for the provision of prescription drug coverage that was collected by the PBM Defendants that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional contributions to receive their covered prescription drugs. The PBM Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed premium payment, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

162.    In addition to their fiduciary status under the foregoing provisions, the PBM Defendants are fiduciaries of all of the ERISA Class members' ERISA Plans in that they exercised authority or control respecting management or disposition of *plan assets*, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because:

> A.    The copayments, coinsurance, and deductible payments the PBM Defendants required pharmacies to collect from participants and beneficiaries are "plan assets" within the meaning of ERISA;
>
> B.    The contracts (*e.g.*, insurance policies and administrative-services-only ("ASO") contracts) underpinning the plans are "plan assets" within the meaning of ERISA; and
>
> C.    Through the pricing scheme, as described above, the PBM Defendants exercised control over both (i) drug payments from participants and beneficiaries and (ii)

70

the contracts underpinning the ERISA Plans. They successfully leveraged their relationships to the ERISA Class members' ERISA Plans to benefit themselves and third parties, and their authority or control over significant plan assets and relationships with the ERISA Plans enabled them to do so. Through this scheme, the PBM Defendants caused participants to pay inflated prices for insulin.

163.    In addition, any plan-paid amounts that were contributed to participant prescription drug transactions were "plan assets" within the meaning of ERISA. Incident to their pricing scheme, the PBM Defendants also exercised control over these plan assets, part of which became PBM Kickbacks, making the PBM Defendants fiduciaries for purposes of these transactions.

164.    The PBM Defendants are able to pervert their ostensible role as the entity that will drive drug prices *down*—and instead induce the Drug Manufacturer Defendants to *raise* prices on prescription medications to allow for PBM Kickbacks—because they *have* and *exercise* control over both ERISA Plans and ERISA plan assets. The PBM Defendants' access to the ERISA Plans and their ERISA plan assets is used as leverage in the PBM Defendants' negotiations with the Drug Manufacturer Defendants. But for the PBM Defendants' access to millions of insureds' prescription drug transactions and the funds used to purchase drugs for plan participants, the PBM Defendants would not be able to negotiate and extract the PBM Kickbacks. Thus, the PBM Defendants leveraged their unique and powerful access to one of the most exploitable (and lucrative) plan assets that exists today—health insurance policies and ASO contracts—as well as their key relationships with and access to thousands of ERISA Plans.

165.    In addition to the conduct described herein the PBM Defendants are fiduciaries because they exercise discretion to set the prices that the members of the ERISA Class were and

71

are required to pay for their prescription medications. PBMs are required to act in the best interests of the members of the ERISA Class, but by allowing participants and beneficiaries of ERISA Plans to be subject to the pricing scheme described herein and participating in this scheme with the Drug Manufacturer Defendants, the PBM Defendants have also breached their fiduciary duties to the ERISA Class, as described more below.

166.    The PBM Defendants are aware of the effect the pricing scheme is having on the ERISA Class. Nevertheless, they have maximized and continue to maximize their revenues and the revenues of the Drug Manufacturer Defendants at the expense of the ERISA Class by engaging in the illegal conduct described herein.

167.    Furthermore, in negotiating and entering into a contract on behalf of an ERISA plan, a fiduciary must act prudently and negotiate terms that are reasonable and in the best interests of *plan participants and beneficiaries*. In these negotiations and in the contract, agreement, or arrangement that is ultimately agreed upon, a fiduciary cannot place its interests over the interests of the plan participants and beneficiaries. To the extent the PBM Defendants have negotiated agreements subject to the Insulin Pricing Scheme described herein, they have exercised discretionary authority and control over the ERISA Plans, their management and administration, and ERISA plan assets by setting their own margins and compensation for the sale of prescription medications through rebate and other payment negotiations with the Drug Manufacturer Defendants. As discussed further below, this same conduct breached their fiduciary duties under ERISA and constituted prohibited transactions.

168.    In addition to being fiduciaries for the foregoing reasons, the PBM Defendants are also parties in interest under ERISA because (a) they are fiduciaries, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) they provided plan administration and pharmacy benefit

management services to the ERISA Plaintiffs' and the ERISA Class members' health plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

169.    As further described below, the PBM Defendants—fiduciaries and parties in interest—also received and used for their own and third parties' benefit "plan assets," including patients' and certain ERISA Plans' contributions to prescription drug purchases and ERISA Plan contracts under which they had access to the ERISA Plans and ERISA plan assets, and were able to impose their pricing scheme on the ERISA Class.

170.    Notably, the foregoing powers and activities confer fiduciary status on the PBM Defendants *for all types of ERISA Plans* for which they provide pharmacy benefit services— including both insured plans and self-insured or union funded (Taft-Hartley) plans for which a health insurance company provides administrative-services-only (ASO) plan administration— because these plans all utilize PBMs in the same manner. Thus, *all participants and beneficiaries* in ERISA Plans of whatever type are owed fiduciary duties by the PBM Defendants, and these participants and beneficiaries may bring claims for *their own personal losses* caused by the PBM Defendants' breaches and prohibited transactions, as set forth below.

171.    As a result of the PBM Defendants' misuse of their fiduciary power, ERISA Plan participants and beneficiaries are forced to finance the PBM Kickbacks, from which the PBM Defendants and others profit. The PBM Kickbacks do not just enrich the PBM Defendants. They do so to the detriment of Plan participants, who pay inflated prices for insulin as a result of the scheme.

**B.    The PBM Defendants' ERISA Duties.**

172.    **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

173.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty—that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

174.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

175.    **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a

74

duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

176. **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become *per se* violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a). As noted above, under ERISA, a "party in interest" includes a fiduciary as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

177. ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

178. ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

179. **Co-Fiduciary Liability.** A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances.

ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

180. **The Duty to Monitor.** In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

181. **The Duty Not To Discriminate.** A health insurer may not discriminate against insureds by charging excessive premiums. ERISA § 702, 29 U.S.C. § 1182, states in pertinent part:

> Prohibiting discrimination against individual participants and beneficiaries based on health status.

76

(a) In eligibility to enroll.

(1)      In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

> (A)      Health status.
>
> (B)      Medical condition (including both physical and mental illnesses).
>
> (C)      Claims experience.
>
> (D)      Receipt of health care.
>
> (E)      Medical history.
>
> (F)      Genetic information.
>
> (G)      Evidence of insurability (including conditions arising out of acts of domestic violence).
>
> (H)      Disability.

(2)      No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

> (A)      to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or
>
> (B)      to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3)      Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

> (b)      In premium contributions.

(1)      In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan

on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

182.    **Non-Fiduciary Liability.** Under ERISA, non-fiduciaries—regardless of whether they are parties in interest—who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Accordingly, as to the ERISA claims, even for Defendants who have no fiduciary or party-in-interest status themselves, they must nevertheless restore unjust profits or fees and are subject to other appropriate equitable relief with regard to the transactions at issue in this action, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and well established case law. Thus, even though the Drug Manufacturer Defendants are not fiduciaries to the ERISA Plans with regard to any transaction at issue in this action, they are nevertheless subject to equitable relief under ERISA based on their actual or constructive knowledge of the wrongdoing at issue.

183.    **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.** ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. The ERISA Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3), as further set forth below.

**C.    The PBM Defendants Breached Their Duties.**

184.    The PBM Defendants committed breaches of fiduciary duty and prohibited transactions, and harmed the ERISA Plaintiffs and ERISA Class members in the following ways:

A.    The ERISA Plaintiffs and ERISA Class members were charged excessive "copayments" or "coinsurance" contributions for insulin as a result of the Insulin Pricing Scheme, which caused the list price of insulin to be artificially inflated;

B.    Through the Insulin Pricing Scheme, the ERISA Plaintiffs and ERISA Class members were charged unlawful fees and additional premiums for insulin;

C.    The ERISA Plaintiffs and ERISA Class members were overcharged for copayment and coinsurance contributions in that rather than paying a percentage of an uninflated price for insulin or a flat fee based on an uninflated price for insulin, these cost-sharing payments were based on substantially inflated amounts;

D.    The ERISA Plaintiffs and ERISA Class members were overcharged when making payments toward their deductibles or out-of-pocket maximums in that rather than paying an uninflated price for insulin, they were charged inflated amounts as a result of the Insulin Pricing Scheme;

E.    The PBM Defendants improperly leveraged their relationships with and access to the ERISA Plans and their plan assets to extract the PBM Kickbacks from the Drug Manufacturer Defendants;

F.    The PBM Defendants discriminated against patients who have diabetes as compared to those who do not;

G.    The PBM Defendants misrepresented and failed to disclose to ERISA Plan participants and beneficiaries the manner in which they charged for prescription drugs as alleged above;

H.    The PBM Defendants set their own compensation for services performed as fiduciaries by inducing the Drug Manufacturer Defendants to inflate insulin list prices to facilitate the PBM Defendants' collection of PBM Kickbacks;

I.    The PBM Defendants unilaterally collected their own compensation for services performed as fiduciaries by collecting the PBM Kickbacks;

J.    The PBM Defendants set and changed the compensation of third parties with respect to the ERISA Class members' ERISA Plans by allocating the proceeds of the PBM Kickbacks without heeding the best interests of participants and beneficiaries;

K.    The PBM Defendants maximized their own profits and profits to third parties, at the expense of the ERISA Plaintiffs and ERISA Class members;

L.    The PBM Defendants received improper compensation from entities doing business with the ERISA Plans whose pharmacy benefits the PBM Defendants administered and managed;

M.    The PBM Defendants knew or reasonably should have known that their actions would injure plan participants and beneficiaries of *all* ERISA Plans whose insulin prices they manipulated;

N.    The PBM Defendants negotiated insulin prices and PBM Kickbacks based on disloyal and self-interested factors and made such decisions without putting the interests of participants and beneficiaries first;

O.    The PBM Defendants drove up insulin prices instead of driving them down, in order to increase their and the Drug Manufacturer Defendants' profits at the expense of participants and beneficiaries of the ERISA Plans; and

P.     The Drug Manufacturer Defendants knowingly participated in and profited from the fiduciary breaches and prohibited transactions committed by the PBM Defendants.

185.    The ERISA Plaintiffs and ERISA Class members were overcharged for and/or paid unauthorized and excessive copayments, coinsurance, and deductible payments in connection with the purchase of numerous analog insulins: Lantus, Levemir, NovoLog, Humalog, and/or Apidra.

186.    The ERISA Plaintiffs and ERISA Class members were harmed by an abuse of the fiduciary power that the PBM Defendants possess—a substantial part of which gives the PBM Defendants discretion and authority over the administration and management of the ERISA plans with respect to prescription drug benefits and costs and their own fees and compensation. The PBM Defendants' ability to wield their fiduciary power to extract from the Manufacturer Defendants kickbacks and other benefits for themselves directly and financially harmed participants and beneficiaries of the ERISA Plans. The ERISA Plaintiffs and ERISA Class members were forced to pay purchase prices for insulin that were based on the very same inflated list prices that facilitated the PBM Defendants' profits from rebates and other payments that the Drug Manufacturer Defendants paid in exchange for formulary placement and access to the insulin purchases of ERISA Plan participants and beneficiaries whose ERISA Plans the PBM Defendants managed and administered. Had the PBM Defendants required the Drug Manufacturer Defendants to compete on price, participants' cost sharing amounts would have been based on lower list prices. Thus, the PBM Defendants' profits derived from the Insulin Pricing Scheme directly harm participants and beneficiaries who must purchase analog insulin.

## VI.    MEDICARE ALLEGATIONS

187.    The Medicare Plaintiffs are participants in Medicare Part D or Medicare Advantage Plans that provide prescription drug coverage.

188.    Such plans, administered under Medicare Part D, add prescription drug coverage to the coverage provided by Medicare Part A of Medicare Part B (or, for some individuals, both Parts A and B). Medicare Part D plans help pay for prescription drugs, vaccines, biologicals, and some supplies not covered by Medicare Part A or Part B. Prescription drug coverage under the Plan is managed and administered by the PBM Defendants.

**A.    The Insulin Pricing Scheme.**

189.    The Medicare Plaintiffs and similarly situated Medicare plan enrollees are required to pay a "Copay" or "Coinsurance" for prescription drugs, in order to share the cost of prescription drugs. Members of the Medicare Class also must pay deductibles. They participate in percentage-based cost-sharing for insulin purchases in multiple coverage phases.

190.    In the case of insulin, the prices that Medicare Plaintiffs and the Medicare Class pay are inflated due to Defendants' Insulin Pricing Scheme, which generates PBM Kickbacks to the PBM Defendants and sales for the Drug Manufacturer Defendants.

**B.    Defendants' Concealment of the Insulin Pricing Scheme.**

191.    In their advertising and marketing materials, and in all other extracontractual communications with the Medicare Plaintiffs and members of the Medicare Class, Defendants have not disclosed their Insulin Pricing Scheme.

192.    Nor have Defendants disclosed the Insulin Pricing Scheme to the Medicare Plaintiffs and members of the Medicare Class, whether before or after their enrollment.

193.    Defendants keep secret the amount of rebates that the Drug Manufacturer Defendants pay for placement on the PBM Defendants' formularies. Likewise, the PBM

Defendants keep secret the portion of the rebates and other payments form the Drug

Manufacturer Defendants that they pocket. Defendants conceal that the purpose and effect on the

Insulin Pricing Scheme is to drive up the list price of insulin while maintaining the net prices

paid by the PBM Defendants so that ever larger rebates can be paid without affecting the Drug

Manufacturer Defendants' profits.

194.    Moreover, Defendants restrict the ability of enrollees to ask about the financial

incentives that the Drug Manufacturer Defendants provide to the PBM Defendants.

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

**A.    Plaintiffs and the Classes Are Entitled to Tolling Due to Fraud or Concealment.**

195.    By its nature, Defendants' Insulin Pricing Scheme has hidden Defendants'

unlawful conduct from consumers and injured parties.

196.    Plaintiffs and Class members had no way of knowing about Defendants' Insulin

Pricing Scheme and deception with respect to insulin pricing, nor could they have reasonably

discovered its existence until shortly before filing this action.

197.    Within the time period of any applicable statutes of limitation, Plaintiffs and

members of the proposed Class could not have discovered through the exercise of reasonable

diligence that Defendants were engaged in and/or concealing the conduct complained of herein

and misrepresenting the true cost of insulin and the amount of PBM Kickbacks that resulted from

the scheme.

198.    Plaintiffs and the other Class members did not discover, and did not know of facts

that would have caused a reasonable person to suspect, that Defendants were engaged in the

Insulin Pricing Scheme and were negotiating with the PBM Defendants based on phony list

prices, nor would reasonable and diligent investigation have disclosed the true facts.

199.    Even today, lack of transparency in insulin pricing and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants that result in the PBM Kickbacks continue to hide Defendants' unlawful conduct from members of the Classes.

200.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all analog insulins identified herein.

201.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action. For example, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation." And while the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the discovery of an injury, which limitation is subject to equitable tolling due to defendants' fraudulent concealment of their unlawful conduct. *Rotella v. Wood*, 528 U.S. 549 (2000). Further, antitrust conspiracies are inherently self-concealing. *E.g.*, *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083-84 (2d Cir. 1988).

202.    The insulin pricing scheme—by its nature a secret endeavor by Defendants—remains hidden from most members of the Classes. Indeed, although Defendants have admitted that their insulin pricing scheme has driven up prices, the precise amount of PBM Kickbacks remains information in Defendants' possession and largely a mystery to the Classes. Moreover, during the Class Period, as defined below, each Defendant actively and effectively concealed its participation in the Insulin Pricing Scheme from Plaintiffs and other members of the Classes

through opaque practices and secrecy policies. There is no question that Plaintiffs' claims are timely.

**B.     Estoppel.**

203.    Defendants were under a continuous duty to disclose to Plaintiffs and Class members the true price that they should have been charged for insulin, rather than the artificially inflated list price that resulted from the Insulin Pricing Scheme: net price paid by the PBM Defendants for insulin, the existence of the Insulin Pricing Scheme, and the impact that it had on Plaintiffs' and Class members' payment obligations for insulin. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VIII.   CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a), as well as (b)(3), (b)(2), and (b)(1), as representatives of four Classes defined as follows:

> **The Non-ERISA Employee/Exchange Plan Class.** All individuals residing in the United States and its territories who are or were enrolled in a non-ERISA employer-sponsored, ACA exchange, or state exchange health benefit plan or health insurance plan for which one or more of the PBM Defendants administers pharmacy benefits, who purchased Lantus, Levemir, NovoLog, Humalog, and/or Apidra pursuant to such plans or policies and were required to pay all or a portion of the purchase price based on an inflated list price.

> **The ERISA Class.** All individuals residing in the United States and its territories who are or were enrolled in an ERISA-covered health benefit plan or health insurance plan for which one or more of the PBM Defendants administers pharmacy benefits, who purchased Lantus, Levemir, NovoLog, Humalog, and/or Apidra pursuant to such plans or policies and were required to pay all or a portion of the purchase price based on an inflated list price.

> **The Medicare Class.** All individuals residing in the United States and its territories who are or were enrolled in a Medicare Prescription Drug Plan or a Medicare Advantage Plan that includes prescription drug coverage and for which one or more of the PBM Defendants administers pharmacy

benefits, who purchased Lantus, Levemir, NovoLog, Humalog, and/or Apidra pursuant to such plans or policies and were required to pay all or a portion of the purchase price based on an inflated list price.

**The Uninsured Class.** All individuals residing in the United States and its territories who are or were not enrolled in a health benefit plan or health insurance plan, who purchased Lantus, Levemir, NovoLog, Humalog, and/or Apidra where the purchase price was calculated by reference to an inflated list price and who paid any portion of the purchase price.

Plaintiffs reserve the right to redefine the Classes prior to certification.

205.    **Class Period.** Plaintiffs will seek Class certification, damages, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, under the Sherman Act, under RICO, 18 U.S.C. 1961, *et seq.* and the doctrine of equitable tolling, as well as under all state statutory and common law claims at issue here. Further, Plaintiffs reserve the right to refine the Class Period after they have learned the extent of Defendants' fraud and the length of its concealment.

206.    Excluded from the Classes are: (a) the named Defendants and any entity in which they have a controlling interest, and their legal representatives, officers, directors, assignees, and successors and (b) any co-conspirators, and their officers, directors, management, employees, subsidiaries, and affiliates.

207.    There are a number of ways in which a person may pay a portion of the purchase price of Lantus, Levemir, NovoLog, Humalog, and/or Apidra and thereby gain inclusion in the Classes. First, a person may be uninsured and, therefore, responsible for paying 100% of the cost of her prescription needs (the "uninsured scenario"). Second, a person's insurance plan may require her to satisfy a deductible before insurance benefits cover all or a portion of her prescription needs. If so, that person is paying for 100% of the cost of any prescriptions filled

before the deductible is met (the "deductible scenario"). Third, a person may have a coinsurance requirement—an obligation to pay a portion of any prescription or medical benefit that she purchases, which is expressed as a percentage of the cost of the medication or service provided (the "coinsurance scenario"). If so, she would be responsible for paying for a portion of the cost of her Lantus, Levemir, NovoLog, Humalog, and/or Apidra purchase, consistent with the terms of her plan. Fourth, a person may have a fixed copayment that is based on an inflated list price, which results in analog insulin being placed in higher and more expensive formulary tiers—with higher copayments—than would be required absent the Insulin Pricing Scheme (the "copayment scenario"). In this situation, the inflated list price directly impacts the copayment amount by bumping analog insulin into more expensive copayment tiers. Fifth, a person may obtain insurance through a Medicare Part D Plan; if so, in addition to being subject to the "deductible scenario," the "coinsurance scenario," and/or the "copayment scenario" during the first two coverage phases, there is a coverage gap, often referred to as the "Donut Hole" (the "Donut Hole scenario"). Once that person and her plan have spent a stated amount of money on prescription drugs, the person becomes responsible (in 2017)[132] for 40% of the cost of her brand-name prescriptions until her total annual out-of-pocket expenses reach the next stated list amount. After this amount, her plan covers the majority of her drug costs again. All of these individuals qualify as direct purchasers.

208.    In each of these scenarios—the uninsured scenario, the deductible scenario, the coinsurance scenario, the copayment scenario, and the Donut Hole scenario—a person's out-of-pocket expenses for Lantus, Levemir, NovoLog, Humalog, and/or Apidra are determined by the list prices of these drugs. Accordingly, each falls within the Class definitions and each incurred

---

[132] For prior years in the Class Period, the percentages were higher than 40%.

damages that are directly related to the inflated list prices driven by Defendants' Insulin Pricing Scheme.

209.    This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

210.    **Numerosity.** Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for Lantus, Levemir, NovoLog, Humalog, and/or Apidra throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals. The Class is readily identifiable from information and records in the possession of Sanofi, Novo Nordisk, Eli Lilly, CVS Health, Express Scripts, and OptumRx.

211.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants—*i.e.*, as a result of Sanofi, Novo Nordisk, Eli Lilly, CVS Health, Express Scripts, and OptumRx's misconduct, these purchasers paid artificially inflated prices for Lantus, Levemir, NovoLog, Humalog, and/or Apidra.

212.    **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Classes.

213.    Counsel that represent Plaintiffs are experienced in the prosecution of Class action antitrust, RICO, ERISA, and consumer litigation and have particular experience with Class action litigation involving pharmaceutical products and Pharmacy Benefit Managers.

214.    **Commonality.** Questions of law and fact common to the members of the Class

predominate over questions that may affect only individual Class members because Defendants

have acted on grounds generally applicable to the entire Class, thereby making overcharge

damages with respect to the Class as a whole appropriate. Such generally applicable conduct is

inherent in Defendants' wrongful conduct.

215.    Questions of law and fact common to the Class include:

      i.    Whether the list prices set by Sanofi, Novo Nordisk, or Eli Lilly is used as a list price for payments by Class members;

      ii.    What the list prices for Lantus, Levemir, NovoLog, Humalog, and/or Apidra are;

      iii.    Whether Sanofi, Novo Nordisk, and Eli Lilly are engaged in a course of conduct that improperly inflates the list-to-net price ratio and the ultimate list prices used by Plaintiffs and Class members as a basis for reimbursement;

      iv.    Whether Sanofi, Novo Nordisk, and Eli Lilly artificially inflated their list prices;

      v.    Whether Sanofi, Novo Nordisk, and Eli Lilly's pricing was false or misleading;

      vi.    Whether Sanofi, Novo Nordisk, and Eli Lilly gave rebates to CVS Health, Express Scripts, and OptumRx that created substantial spreads between the list prices and PBM-negotiated prices;

      vii.    Whether the large spreads between these prices benefitted CVS Health, Express Scripts, and OptumRx;

      viii.    Whether the large list-to-net price spread was intended to induce CVS Health, Express Scripts, and OptumRx to give Lantus, Levemir, NovoLog, Humalog, and/or Apidra favorable placement on their formularies;

      ix.    Whether the large spread did induce CVS Health, Express Scripts, and OptumRx to give Lantus, Levemir, NovoLog, Humalog, and/or Apidra favorable placement on their formularies;

      x.    Whether each Drug Manufacturer Defendant conspired with each PBM Defendant from the Pricing and Rebate Enterprises for the purpose of carrying out the pricing and rebate fraud;

      xi.    Whether Sanofi, Novo Nordisk, and Eli Lilly conducted, or

participated in the conduct of, the Pricing Enterprise;

xii.  Whether CVS Health, Express Scripts, and OptumRx conducted, or participated in the conduct of, the Rebate Enterprise;

xiii.  Whether Sanofi, Novo Nordisk, and Eli Lilly or CVS Health, Express Scripts, and OptumRx engaged in mail or wire fraud in furtherance of the Pricing and/or Rebate Enterprise;

xiv.  Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class members to make inflated payments for Lantus, Levemir, NovoLog, Humalog, and/or Apidra;

xv.  Whether Defendants engaged in deceptive fraudulent conduct;

xvi.  Whether Defendants' marketing material and other communications distributed by Defendants was false or misleading;

xvii.  Whether Defendants' deceptive and/or fraudulent activity was intended to defraud or harm Plaintiffs and Class members;

xviii.  Whether Defendants' conduct violated RICO or the State Consumer Protection Statutes;

xix.  Whether Defendants utilized or formed enterprises for the purpose of carrying out a scheme intended to defraud Plaintiffs and the Class;

xx.  Whether Defendants used the U.S. mails and interstate wire facilities to carry out a scheme intended to defraud Plaintiffs and the Class;

xxi.  Whether Defendants used the U.S. mails and interstate wire facilities to carry out their conspiracy and agreement;

xxii.  Whether Defendants are liable to Plaintiffs and the Class members for damages flowing from their misconduct;

xxiii.  Whether the PBM Defendants are fiduciaries under ERISA;

xxiv.  Whether the PBM Defendants are parties in interest under ERISA;

xxv.  Whether the PBM Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

xxvi.  Whether the PBM Defendants acts as alleged above breached ERISA's prohibited transaction rules;

xxvii.    Whether the PBM Defendants breached ERISA § 702;

xxviii.   Whether the Drug Manufacturer Defendants knowingly participated in and/or knew or had constructive knowledge of violations of ERISA, including breaches of fiduciary duty;

xxix.     Whether the ERISA Class is entitled to restitution, surcharge, an injunction, and/or other appropriate equitable relief;

xxx.      Whether Defendants violated the common law standards that exist in each state and nationwide;

xxxi.     Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class;

xxxii.    Whether Plaintiffs and the Class are entitled to compensatory damages and, if so, the nature of such damages;

xxxiii.   Whether Plaintiffs and the Class are entitled to exemplary or punitive damages and, if so, the nature of such damages; and

xxxiv.    Whether Plaintiffs and the Class are entitled to injunctive or equitable relief and, if so, the nature of that relief.

216.    Under Rule 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

217.    This action is also maintainable as a class action under Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief respecting the Classes as a whole.

218.    With respect to Rule 23(b)(1)(B), the prosecution of separate actions by each plaintiff in the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

219.    Finally, Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants.

220.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.    CLAIMS FOR RELIEF

### COUNT ONE —
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.*

(By Plaintiffs on Behalf of All Members of the Classes, Against
Defendants CVS Health, Sanofi, Novo Nordisk, and Eli Lilly)

221.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

222.    Plaintiffs bring this Count on behalf of themselves and the Class against Defendants CVS Health, Sanofi, Novo Nordisk, and Eli Lilly (inclusively, for purposes of this Count, the "CVS Health RICO Defendants").

223.    At all relevant times, the CVS Health RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

224.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

225.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

226.    As explained in detail below, Defendant CVS Health sought to infiltrate the business arrangement established between three insulin drug manufacturers–Sanofi, Novo Nordisk., and Eli Lilly–health plans and prescription drug insurance companies across the country through a fraudulent scheme designed to secure greater profits and market share, increase the cost of insulin medication, secure a favorable formulary position for Sanofi's, Novo Nordisk's, and Eli Lilly's insulin products, and extract hundreds of millions of dollars of revenue from Plaintiffs and the Class. As explained in detail below, the CVS Health RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

**A.    Description of the CVS Health RICO Enterprise.**

227.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

228.    For years, CVS Health and other pharmacy benefits managers played a small but meaningful role in the prescription drug business: providing administrative services on behalf of health plans that offer prescription drug benefits and negotiating with drug manufacturers on their behalf.

93

229.    In the past decade, however, CVS Health and other PBMs began to exert influence in their role as insurance-industry middle-men to dictate the success or failure of certain drugs in the marketplace by offering to include or threatening to exclude certain medications from some or all of their formularies and, in the process, extracting hundreds of millions of dollars in the form of 'discounts' or 'rebate' payments from drug manufacturers in exchange.

230.    Negotiations between PBMs and drug manufacturers regarding those discounts, however, take place in complex, closed-door meetings, during which PBMs sell access to their formularies in exchange for large rebates or discounts, a substantial portion of which they pocket as pure profit.

231.    In order to facilitate the payment of 'rebates' to PBMs, and ensure their position on certain formularies without impacting their bottom line, the Drug Manufacturers Defendants participate in a scheme with CVS Health to increase the list price of their drugs instead of competing on actual price with other insulin manufacturers.

232.    This scheme to increase the profits of PBMs through artificially increasing the list price of medications benefits everyone in the prescription drug industry supply chain except Plaintiffs and the Class, who are left paying fraudulently obtained, exorbitant, and ever-increasing prices for their medications. The practice is particularly pernicious in the case of medications such as insulin, because it decreases access to life-saving drugs. Nevertheless, insulin medications have become a common target of PBMs, specifically CVS Health.

233.    At all relevant times, the CVS Health RICO Defendants, along with insurance companies, pharmacies, wholesalers, and other individuals and entities, including unknown third parties, operated an ongoing association-in-fact enterprise. This association-in-fact enterprise

was formed for the purpose of ensuring that one or more of Sanofi's, Novo Nordisk's, and Eli Lilly's insulin products were included on CVS Health's formularies and increasing CVS Health's profits by fraudulently and artificially increasing the list price of those insulin products at the expense of Plaintiffs and the Class, and through which the CVS Caremark RICO Defendants conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

234.    Alternatively, each of the CVS Health RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the CVS Caremark RICO Defendants conducted their pattern of racketeering activity. The CVS Health RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the CVS Health RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CVS Health RICO Enterprise."

235.    At all relevant times, the CVS Health RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the CVS Health RICO Defendants' profit-making scheme.

236.    The association-in-fact CVS Health RICO Enterprise consisted of the following entities and individuals: (a) CVS Health, its subsidiaries, executives, employees, and agents; (b) Sanofi, its subsidiaries, executives, employees, and agents; (c) Eli Lilly, its subsidiaries, executives, employees, and agents; and (d) Novo Nordisk, its subsidiaries, executives, employees, and agents.

237.    While each of the CVS Health RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CVS Health RICO

Enterprise's affairs, at all relevant times, the CVS Health RICO Enterprise: (a) had an existence separate and distinct from each CVS Health RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CVS Health RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CVS Health RICO Defendants, along with other individuals and entities, including unknown third parties.

238.    The CVS Health RICO Defendants and their co-conspirators, through their illegal CVS Health RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CVS Health RICO Defendants and the other entities and individuals associated-in-fact with the CVS Health RICO Enterprise's activities by selling insulin products at an inflated and artificial price ("the CVS Health RICO Scheme").

239.    CVS Health orchestrated the CVS Health RICO Scheme, whereby CVS Health, as a PBM, leveraged its dominate position in the prescription drug insurance market to demand that insulin drug manufacturers, like Sanofi, Novo Nordisk, and Eli Lilly, pay substantial kickbacks in order to have their products included or be given priority on CVS Health's formularies.

240.    Insulin manufacturers Sanofi, Novo Nordisk, and Eli Lilly facilitated the CVS Health RICO Scheme by agreeing to provide ever-larger 'discounts' or 'rebates' to CVS Health in order to gain or maintain access to its formularies and funding those discounts by artificially increasing the list price of their insulin products.

241.    In furtherance of the scheme, the CVS Health RICO Defendants each affirmatively misrepresented or concealed the existence of the inflated and fraudulent nature of these list price increases as well as the existence, amount, and purpose of the discounts given to CVS Health to Plaintiffs, the Class, consumers, health care payers, and the general public.

Specifically, the CVS Health RICO Defendants claimed that the rebates paid to CVS Health were for the purpose of lowering drug costs when, in fact, they were quid pro quo payments for formulary access that had the opposite effect for Plaintiffs and the members of the Class.

**B.      The CVS Health RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.**

242.    Each CVS Health RICO Defendant benefited financially from the CVS Health RICO Enterprise. CVS Health received direct rebate payments from Sanofi, Novo Nordisk, and Eli Lilly, a large portion of which they pocketed as pure profit, as well as other fees.

243.    In exchange, one or more of Sanofi's, Novo Nordisk's, and Eli Lilly's products received a favorable position on one, or a number of CVS Health's formularies, translating into higher sales and profits for each of these manufacturers. And because the Drug Manufacturer Defendants financed the payment of rebates by inflating the list prices for those drugs, they maintained and, in some cases, increased their profit margins.

244.    At all relevant times, the CVS Health RICO Enterprise: (a) had an existence separate and distinct from each CVS Health RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CVS Health RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CVS Health RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of ensuring that one or more of Sanofi's, Novo Nordisk's, and Eli Lilly's insulin products were included on CVS Health's formularies and increasing CVS Health's profits by fraudulently and artificially increasing the list price of those insulin products at the expense of Plaintiffs and the Class, and paying rebates from the inflated list price.

245.    The CVS Health RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CVS Health RICO Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell insulin products at an inflated and artificial price.

246.    The CVS Health RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, distribution, and sale of insulin products throughout the country, and the receipt of monies from the sale of the same.

247.    Within the CVS Health RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CVS Health RICO Enterprise used this common communication network for purposes of marketing, pricing, and engaging in negotiations regarding insulin products, their pricing, and placement or position on CVS Health's formularies and for furthering the CVS Health RICO Scheme.

248.    Each participant in the CVS Health RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CVS Health RICO Enterprise, the CVS Health RICO Defendants functioned as a continuing unit with the purpose of furthering the CVS Health RICO Scheme.

249.    The CVS Health RICO Defendants participated in the operation and management of the CVS Health RICO Enterprise by directing its affairs, as described herein. While the CVS Health RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and

roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

250.    The CVS Health RICO Defendants exerted substantial control over the CVS Health RICO Enterprise, and participated in the affairs of the enterprise by: (a) negotiating and/or offering discounts for the insulin products described herein; (b) misrepresenting and/or concealing the existence, amount, or purpose of the discounts negotiated for the insulin products described herein; (c) misrepresenting and/or concealing the effect that the negotiated discounts had on the price of the insulin products for the end payer; (d) negotiating and/or setting the list price for the insulin products described herein; (e) misrepresenting and/or concealing the true cost of the insulin products described herein; (f) publishing, reproducing, and/or distributing documents containing the list price for the insulin products described herein; (g) negotiating and/or offering preferred formulary placement for the insulin product described herein; (h) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the enterprise and its effect on the pricing of insulin products; (i) otherwise misrepresenting and/or concealing the inflated and fraudulent nature of the pricing of the insulin products described herein; (j) collecting discounts, revenues, and/or profits from the sale of the insulin products described herein; and (k) ensuring that the other CVS Health RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

251.    Without each CVS Health RICO Defendant's willing participation, the CVS Health RICO Scheme and common course of conduct would not have been successful.

252.    The CVS Health RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of

which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

**C.    Predicate Acts: Mail and Wire Fraud.**

253.    To carry out, or attempt to carry out, the scheme to defraud, the CVS Health RICO Defendants, each of whom is a person associated-in-fact with the CVS Health RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the CVS Health RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

254.    Specifically, the CVS Health RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

255.    The multiple acts of racketeering activity which the CVS Health RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CVS Health RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CVS Health RICO Enterprise. The CVS Health RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

256.    The CVS Health RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

257.     In devising and executing the illegal scheme, the CVS Health RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Class or to obtain money from Plaintiffs and the Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the CVS Health RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

258.     The CVS Health RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a)     Mail Fraud: The CVS Health RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, price, and/or sell the insulin products described herein by means of false pretenses, misrepresentations, promises, and omissions.

(b)     Wire Fraud: The CVS Health RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

259.     The CVS Health RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of marketing or other materials indicating, setting, or negotiating the price of the insulin products described herein; (b) the transmission of marketing or other materials indicating or advertising that any of the CVS Health RICO Defendants reduce the price of the insulin products described herein; (c) written, telephone, or electronic communications regarding and/or negotiating the price of the insulin products described herein; (d) written, telephone, or electronic communications regarding and/or negotiating discounts and/or rebates for the insulin products described herein; (e) written, telephone, or electronic

communications regarding the existence, amount, or purpose of discounts and/or rebates for the insulin products described herein; (f) the transmission and/or distribution of the insulin products described herein through the mails; and (g) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of such insulin products described herein.

260.    The CVS Health RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

261.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the cost of insulin medication and fraudulently extract hundreds of millions of dollars of revenue from Plaintiffs and the Class.

262.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

263.    The CVS Health RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the CVS Health RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CVS Health RICO Defendants in these offenses and have performed acts in furtherance

of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

264. The CVS Health RICO Defendants aided and abetted others in the violations of the above laws.

265. To achieve their common goals, the CVS Health RICO Defendants hid from Plaintiffs, the Class, insurers, health plans, and the general public the true net price of the insulin products described herein, the inflated and fraudulent nature of the list price of the insulin products described herein, the relationship between the CVS Health RICO Defendants and their impact upon the price of the insulin products described herein, and the existence, amount, and purpose of rebates and discounts given for the insulin products described herein, and the portion of the rebates and discounts pocketed by CVS Health.

266. The CVS Health RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CVS Health RICO Defendants and their co-conspirators had to agree to conceal their fraudulent negotiations and pricing tactics.

267. The CVS Health RICO Defendants knew, and intended that, Plaintiffs and Class members would rely on the material misrepresentations and omissions made by them and incur increased costs as a result. Indeed, if Plaintiffs and the Class did not make inflated payments for the insulin products described herein, the CVS Health RICO scheme could not succeed.

268. As described herein, the CVS Health RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of

unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and the Class based on their misrepresentations and omissions, while providing insulin products that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

269.    During the CVS Health RICO Defendants' determination of discounts and/or rebates for the insulin products described herein, the true purpose of the discounts, the true cost of the insulin products, and the inflated and fraudulent nature of their pricing was revealed to each of the CVS Health RICO Defendants. Nevertheless, the CVS Health RICO Defendants continued to disseminate misrepresentations regarding the true cost of the insulin products as well as the existence, amount, and purpose of the discounts on those products, in furtherance of the scheme.

270.    By reason of, and as a result of the conduct of the CVS Health RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and the Class have been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated prices for the insulin products described herein.

271.    The CVS Health RICO Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Class who are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO —**
**VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)**
**THE RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ.***

(By Plaintiffs on Behalf of All Members of the Classes, Against
Defendants Express Scripts, Sanofi, Novo Nordisk, and Eli Lilly)

272.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

273.    Plaintiffs bring this Count on behalf of themselves and the Class against Defendants Express Scripts, Sanofi, Novo Nordisk, and Eli Lilly (inclusively, for purposes of this Count, the "Express Scripts RICO Defendants").

274.    At all relevant times, the Express Scripts RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

275.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

276.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

277.    As explained in detail below, Defendant Express Scripts sought to infiltrate the business arrangement established between three insulin drug manufacturers—Sanofi, Novo Nordisk., and Eli Lilly—health plans and prescription drug insurance companies across the country through a fraudulent scheme designed to secure greater profits and market share, increase the cost of insulin medication, secure a favorable formulary position for Sanofi, Novo Nordisk, and Eli Lilly's insulin products, and extract hundreds of millions of dollars of revenue from Plaintiffs and the Class. As explained in detail below, the Express Scripts RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

**A.      Description of the Express Scripts RICO Enterprise.**

278.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

279.    For years, Express Scripts and other pharmacy benefits managers played a small but meaningful role in the prescription drug business: providing administrative services on behalf of health plans that offer prescription drug benefits and negotiating with drug manufacturers on their behalf.

280.    In the past decade, however, Express Scripts and other PBMs began to exert influence in their role as insurance-industry middle-men to dictate the success or failure of certain drugs in the marketplace by offering to include or threatening to exclude certain medications from some or all of their formularies, and, in the process, extracting hundreds of millions of dollars in the form of 'discounts' or 'rebate' payments from drug manufacturers in exchange.

281.    Negotiations between PBMs and drug manufacturers regarding those discounts, however, take place in complex, closed-door meetings, during which PBMs sell access to their formularies in exchange for large rebates or discounts, a substantial portion of which they pocket as pure profit.

282.    In order to facilitate the payment of 'rebates' to PBMs, and ensure their position on certain formularies without impacting their bottom line, the Drug Manufacturers Defendants participate in a scheme with Express Scripts to increase the list price of their drugs instead of competing on actual price with other insulin manufacturers.

283.    This scheme to increase the profits of PBMs through artificially increasing the list price of medications benefits everyone in the prescription drug industry supply chain except Plaintiffs and the Class, who are left paying fraudulently obtained, exorbitant, and ever-increasing prices for their medications. The practice is particularly pernicious in the case of medications such as insulin, because it decreases access to life-saving drugs. Nevertheless, insulin medications have become a common target of PBMs, specifically Express Scripts.

284.    At all relevant times, the Express Scripts RICO Defendants, along with insurance companies, pharmacies, wholesalers, and other individuals and entities, including unknown third parties, operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that one or more of Sanofi's, Novo Nordisk's, and Eli Lilly's insulin products were included on Express Scripts' formularies and increasing Express Scripts' profits by fraudulently and artificially increasing the list price of those insulin products at the expense of Plaintiffs and the Class, and through which the Express Scripts RICO Defendants conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

285.    Alternatively, each of the Express Scripts RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the Express Scripts RICO Defendants conducted their pattern of racketeering activity. The Express Scripts RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the Express Scripts RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "Express Scripts RICO Enterprise."

286.    At all relevant times, the Express Scripts RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities,

as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Express Scripts RICO Defendants' profit-making scheme.

287.    The association-in-fact Express Scripts RICO Enterprise consisted of the following entities and individuals: (a) Express Scripts, its subsidiaries, executives, employees, and agents; (b) Sanofi, its subsidiaries, executives, employees, and agents; (c) Eli Lilly, its subsidiaries, executives, employees, and agents; and (d) Novo Nordisk, its subsidiaries, executives, employees, and agents.

288.    While each of the Express Scripts RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the Express Scripts RICO Enterprise's affairs, at all relevant times, the Express Scripts RICO Enterprise: (a) had an existence separate and distinct from each Express Scripts RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the Express Scripts RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Express Scripts RICO Defendants, along with other individuals and entities, including unknown third parties.

289.    The Express Scripts RICO Defendants and their co-conspirators, through their illegal Express Scripts RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Express Scripts RICO Defendants and the other entities and individuals associated-in-fact with the Express Scripts RICO Enterprise's activities by selling insulin products at an inflated and artificial price ("the Express Scripts RICO Scheme").

290.    Express Scripts orchestrated the Express Scripts RICO Scheme, whereby Express Scripts, as a PBM, leveraged its dominate position in the prescription drug insurance market to

demand that insulin drug manufacturers, like Sanofi, Novo Nordisk, and Eli Lilly, pay substantial kickbacks in order to have their products included or be given priority on Express Scripts' formularies.

291.    Insulin manufacturers Sanofi, Novo Nordisk, and Eli Lilly facilitated the Express Scripts RICO Scheme by agreeing to provide ever-larger 'discounts' or 'rebates' to Express Scripts in order to gain or maintain access to its formularies and funding those discounts by artificially increasing the list price of their insulin products.

292.    In furtherance of the scheme, the Express Scripts RICO Defendants each affirmatively misrepresented or concealed the existence of the inflated and fraudulent nature of these list price increases as well as the existence, amount, and purpose of the discounts given to Express Scripts to Plaintiffs, the Class, consumers, health care payers, and the general public. Specifically, the Express Scripts RICO Defendants claimed that the rebates paid to Express Scripts were for the purpose of lowering drug costs when, in fact, they were quid pro quo payments for formulary access that had the opposite effect for Plaintiffs and the members of the Class.

**B.    The Express Scripts RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.**

293.    Each Express Scripts RICO Defendant benefited financially from the Express Scripts RICO Enterprise. Express Scripts received direct rebate payments from Sanofi, Novo Nordisk, and Eli Lilly, a large portion of which they pocketed as pure profit, as well as other fees.

294.    In exchange, one or more of Sanofi's, Novo Nordisk's, and Eli Lilly's products received a favorable position on one, or a number of Express Scripts' formularies, translating into higher sales and profits for each of these manufacturers. And because the Drug

Manufacturer Defendants financed the payment of rebates by inflating the list prices for those drugs, they maintained and, in some cases, increased their profit margins.

295.    At all relevant times, the Express Scripts RICO Enterprise: (a) had an existence separate and distinct from each Express Scripts RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the Express Scripts RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Express Scripts RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of ensuring that one or more of Sanofi's, Novo Nordisk's, and Eli Lilly's insulin products were included on Express Scripts' formularies and increasing Express Scripts' profits by fraudulently and artificially increasing the list price of those insulin products at the expense of Plaintiffs and the Class, and paying rebates from the inflated list price.

296.    The Express Scripts RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Express Scripts RICO Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell insulin products at an inflated and artificial price.

297.    The Express Scripts RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, distribution, and sale of insulin products throughout the country, and the receipt of monies from the sale of the same.

298.    Within the Express Scripts RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Express Scripts

RICO Enterprise used this common communication network for purposes of marketing, pricing, and engaging in negotiations regarding insulin products, their pricing, and placement or position on Express Scripts' formularies and for furthering the Express Scripts RICO Scheme.

299.    Each participant in the Express Scripts RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the Express Scripts RICO Enterprise, the Express Scripts RICO Defendants functioned as a continuing unit with the purpose of furthering the Express Scripts RICO Scheme.

300.    The Express Scripts RICO Defendants participated in the operation and management of the Express Scripts RICO Enterprise by directing its affairs, as described herein. While the Express Scripts RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

301.    The Express Scripts RICO Defendants exerted substantial control over the Express Scripts RICO Enterprise, and participated in the affairs of the enterprise by: (a) negotiating and/or offering discounts for the insulin products described herein; (b) misrepresenting and/or concealing the existence, amount, or purpose of the discounts negotiated for the insulin products described herein; (c) misrepresenting and/or concealing the effect that the negotiated discounts had on the price of the insulin products for the end payer; (d) negotiating and/or setting the list price for the insulin products described herein; (e) misrepresenting and/or concealing the true cost of the insulin products described herein; (f) publishing, reproducing, and/or distributing documents containing the list price for the insulin

products described herein; (g) negotiating and/or offering preferred formulary placement for the insulin product described herein; (h) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the enterprise and its effect on the pricing of insulin products; (i) otherwise misrepresenting and/or concealing the inflated and fraudulent nature of the pricing of the insulin products described herein; (j) collecting discounts, revenues, and/or profits from the sale of the insulin products described herein; and (k) ensuring that the other Express Scripts RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

302.    Without each Express Scripts RICO Defendant's willing participation, the Express Scripts RICO Scheme and common course of conduct would not have been successful.

303.    The Express Scripts RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

**C.    Predicate Acts: Mail and Wire Fraud.**

304.    To carry out, or attempt to carry out, the scheme to defraud, the Express Scripts RICO Defendants, each of whom is a person associated-in-fact with the Express Scripts RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the Express Scripts RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

305.    Specifically, the Express Scripts RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

306.     The multiple acts of racketeering activity which the Express Scripts RICO
Defendants committed, or aided or abetted in the commission of, were related to each other,
posed a threat of continued racketeering activity, and therefore constitute a "pattern of
racketeering activity." The racketeering activity was made possible by the Express Scripts RICO
Defendants' regular use of the facilities, services, distribution channels, and employees of the
Express Scripts RICO Enterprise. The Express Scripts RICO Defendants participated in the
scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in
interstate or foreign commerce.

307.     The Express Scripts RICO Defendants used, directed the use of, and/or caused to
be used, thousands of interstate mail and wire communications in service of their scheme
through virtually uniform misrepresentations, concealments, and material omissions.

308.     In devising and executing the illegal scheme, the Express Scripts RICO
Defendants devised and knowingly carried out a material scheme and/or artifice to defraud
Plaintiffs and the Class or to obtain money from Plaintiffs and the Class by means of materially
false or fraudulent pretenses, representations, promises, or omissions of material facts. For the
purpose of executing the illegal scheme, the Express Scripts RICO Defendants committed these
racketeering acts, which number in the thousands, intentionally and knowingly with the specific
intent to advance the illegal scheme.

309.     The Express Scripts RICO Defendants' predicate acts of racketeering (18 U.S.C.
§ 1961(1)) include, but are not limited to:

> (a)     Mail Fraud: The Express Scripts RICO Defendants violated 18
> U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or
> received, materials via U.S. mail or commercial interstate carriers for the
> purpose of executing the unlawful scheme to design, manufacture, market,
> price, and/or sell the insulin products described herein by means of false
> pretenses, misrepresentations, promises, and omissions.

113

(b)    <u>Wire Fraud</u>: The Express Scripts RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

310.    The Express Scripts RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of marketing or other materials indicating, setting, or negotiating the price of the insulin products described herein; (b) the transmission of marketing or other materials indicating or advertising that any of the Express Scripts RICO Defendants reduce the price of the insulin products described herein; (c) written, telephone, or electronic communications regarding and/or negotiating the price of the insulin products described herein; (d) written, telephone, or electronic communications regarding and/or negotiating discounts and/or rebates for the insulin products described herein; (e) written, telephone, or electronic communications regarding the existence, amount, or purpose of discounts and/or rebates for the insulin products described herein; (f) the transmission and/or distribution of the insulin products described herein through the mails; and (g) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of such insulin products described herein.

311.    The Express Scripts RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

312.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the cost of insulin medication and fraudulently extract hundreds of millions of dollars of revenue from Plaintiffs and the Class.

313.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

314.    The Express Scripts RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the Express Scripts RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the Express Scripts RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

315.    The Express Scripts RICO Defendants aided and abetted others in the violations of the above laws.

316.    To achieve their common goals, the Express Scripts RICO Defendants hid from Plaintiffs, the Class, insurers, health plans, and the general public the true net price of the insulin products described herein, the inflated and fraudulent nature of the list price of the insulin products described herein, the relationship between the Express Scripts RICO Defendants and their impact upon the price of the insulin products described herein, and the existence, amount,

and purpose of rebates and discounts given for the insulin products described herein, and the portion of the rebates and discounts pocketed by Express Scripts.

317.    The Express Scripts RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the Express Scripts RICO Defendants and their co-conspirators had to agree to conceal their fraudulent negotiations and pricing tactics.

318.    The Express Scripts RICO Defendants knew, and intended that, Plaintiffs and Class members would rely on the material misrepresentations and omissions made by them and incur increased costs as a result. Indeed, if Plaintiffs and the Class did not make inflated payments for the insulin products described herein, the Express Scripts RICO scheme could not succeed.

319.    As described herein, the Express Scripts RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and the Class based on their misrepresentations and omissions, while providing insulin products that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

320.    During the Express Scripts RICO Defendants' determination of discounts and/or rebates for the insulin products described herein, the true purpose of the discounts, the true cost of the insulin products, and the inflated and fraudulent nature of their pricing was revealed to each of the Express Scripts RICO Defendants. Nevertheless, the Express Scripts RICO

Defendants continued to disseminate misrepresentations regarding the true cost of the insulin products as well as the existence, amount, and purpose of the discounts on those products, in furtherance of the scheme.

321.    By reason of, and as a result of the conduct of the Express Scripts RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and the Class have been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated prices for the insulin products described herein.

322.    The Express Scripts RICO Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Class who are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE —
## VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
## THE RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.*

(By Plaintiffs on Behalf of All Members of the Classes, Against Defendants OptumRx, Sanofi, Novo Nordisk, and Eli Lilly)

323.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

324.    Plaintiffs bring this Count on behalf of themselves and the Class against Defendants OptumRx, Sanofi, Novo Nordisk, and Eli Lilly (inclusively, for purposes of this Count, the "OptumRx RICO Defendants").

325.    At all relevant times, the OptumRx RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

326.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

327.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

328.    As explained in detail below, Defendant OptumRx sought to infiltrate the business arrangement established between three insulin drug manufacturers—Sanofi, Novo Nordisk., and Eli Lilly—health plans and prescription drug insurance companies across the country through a fraudulent scheme designed to secure greater profits and market share, increase the cost of insulin medication, secure a favorable formulary position for Sanofi, Novo Nordisk, and Eli Lilly's insulin products, and extract hundreds of millions of dollars of revenue from Plaintiffs and the Class. As explained in detail below, the OptumRx RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

**A.    Description of the OptumRx RICO Enterprise.**

329.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

330.    For years, OptumRx and other pharmacy benefits managers played a small but meaningful role in the prescription drug business: providing administrative services on behalf of health plans that offer prescription drug benefits and negotiating with drug manufacturers on their behalf.

331.    In the past decade, however, OptumRx and other PBMs began to exert influence in their role as insurance-industry middle-men to dictate the success or failure of certain drugs in the marketplace by offering to include or threatening to exclude certain medications from some or all of their formularies, and, in the process, extracting hundreds of millions of dollars in the form of 'discounts' or 'rebate' payments from drug manufacturers in exchange.

332.    Negotiations between PBMs and drug manufacturers regarding those discounts, however, take place in complex, closed-door meetings, during which PBMs sell access to their formularies in exchange for large rebates or discounts, a substantial portion of which they pocket as pure profit.

333.    In order to facilitate the payment of 'rebates' to PBMs, and ensure their position on certain formularies without impacting their bottom line, the Drug Manufacturers Defendants participate in a scheme with OptumRx to increase the list price of their drugs instead of competing on actual price with other insulin manufacturers.

334.    This scheme to increase the profits of PBMs through artificially increasing the list price of medications benefits everyone in the prescription drug industry supply chain except Plaintiffs and the Class, who are left paying fraudulently obtained, exorbitant, and ever-increasing prices for their medications. The practice is particularly pernicious in the case of medications such as insulin, because it decreases access to life-saving drugs. Nevertheless, insulin medications have become a common target of PBMs, specifically OptumRx.

335.    At all relevant times, the OptumRx RICO Defendants, along with insurance companies, pharmacies, wholesalers, and other individuals and entities, including unknown third parties, operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that one or more of Sanofi's, Novo Nordisk's, and Eli

Lilly's insulin products were included on OptumRx's formularies and increasing OptumRx's profits by fraudulently and artificially increasing the list price of those insulin products at the expense of Plaintiffs and the Class, and through which the OptumRx RICO Defendants conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

336.    Alternatively, each of the OptumRx RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the OptumRx RICO Defendants conducted their pattern of racketeering activity. The OptumRx RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the OptumRx RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "OptumRx RICO Enterprise."

337.    At all relevant times, the OptumRx RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in OptumRx RICO Defendants' profit-making scheme.

338.    The association-in-fact OptumRx RICO Enterprise consisted of the following entities and individuals: (a) OptumRx, its subsidiaries, executives, employees, and agents; (b) Sanofi, its subsidiaries, executives, employees, and agents; (c) Eli Lilly, its subsidiaries, executives, employees, and agents; and (d) Novo Nordisk, its subsidiaries, executives, employees, and agents.

339.    While each of the OptumRx RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the OptumRx RICO Enterprise's affairs, at all relevant times, the OptumRx RICO Enterprise: (a) had an existence

separate and distinct from each OptumRx RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the OptumRx RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the OptumRx RICO Defendants, along with other individuals and entities, including unknown third parties.

340.    The OptumRx RICO Defendants and their co-conspirators, through their illegal OptumRx RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the OptumRx RICO Defendants and the other entities and individuals associated-in-fact with the OptumRx RICO Enterprise's activities by selling insulin products at an inflated and artificial price ("the OptumRx RICO Scheme").

341.    OptumRx orchestrated the OptumRx RICO Scheme, whereby OptumRx, as a PBM, leveraged its dominate position in the prescription drug insurance market to demand that insulin drug manufacturers, like Sanofi, Novo Nordisk, and Eli Lilly, pay substantial kickbacks in order to have their products included or be given priority on OptumRx's formularies.

342.    Insulin manufacturers Sanofi, Novo Nordisk, and Eli Lilly facilitated the OptumRx RICO Scheme by agreeing to provide ever-larger 'discounts' or 'rebates' to OptumRx in order to gain or maintain access to its formularies and funding those discounts by artificially increasing the list price of their insulin products.

343.    In furtherance of the scheme, the OptumRx RICO Defendants each affirmatively misrepresented or concealed the existence of the inflated and fraudulent nature of these list price increases as well as the existence, amount, and purpose of the discounts given to OptumRx to Plaintiffs, the Class, consumers, health care payers, and the general public. Specifically, the OptumRx RICO Defendants claimed that the rebates paid to OptumRx were for the purpose of

lowering drug costs when, in fact, they were quid pro quo payments for formulary access that

had the opposite effect for Plaintiffs and the members of the Class.

**B.     The OptumRx RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.**

344.    Each OptumRx RICO Defendant benefited financially from the OptumRx RICO

Enterprise. OptumRx received direct rebate payments from Sanofi, Novo Nordisk, and Eli Lilly,

a large portion of which they pocketed as pure profit, as well as other fees.

345.    In exchange, one or more of Sanofi's, Novo Nordisk's, and Eli Lilly's products

received a favorable position on one, or a number of OptumRx's formularies, translating into

higher sales and profits for each of these manufacturers. And because the Drug Manufacturer

Defendants financed the payment of rebates by inflating the list prices for those drugs, they

maintained and, in some cases, increased their profit margins.

346.    At all relevant times, the OptumRx RICO Enterprise: (a) had an existence

separate and distinct from each OptumRx RICO Defendant; (b) was separate and distinct from

the pattern of racketeering in which the OptumRx RICO Defendants engaged; and (c) was an

ongoing and continuing organization consisting of legal entities, including the OptumRx RICO

Defendants, along with other individuals and entities, including unknown third parties that

operated an association-in-fact enterprise, which was formed for the purpose of ensuring that one

or more of Sanofi's, Novo Nordisk's, and Eli Lilly's insulin products were included on

OptumRx's formularies and increasing OptumRx's profits by fraudulently and artificially

increasing the list price of those insulin products at the expense of Plaintiffs and the Class, and

paying rebates from the inflated list price.

347.    The OptumRx RICO Defendants and their co-conspirators, through their illegal

Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to

increase revenue for the OptumRx RICO Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell insulin products at an inflated and artificial price.

348.    The OptumRx RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, distribution, and sale of insulin products throughout the country, and the receipt of monies from the sale of the same.

349.    Within the OptumRx RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The OptumRx RICO Enterprise used this common communication network for purposes of marketing, pricing, and engaging in negotiations regarding insulin products, their pricing, and placement or position on OptumRx's formularies and for furthering the OptumRx RICO Scheme.

350.    Each participant in the OptumRx RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the OptumRx RICO Enterprise, the OptumRx RICO Defendants functioned as a continuing unit with the purpose of furthering the OptumRx RICO Scheme.

351.    The OptumRx RICO Defendants participated in the operation and management of the OptumRx RICO Enterprise by directing its affairs, as described herein. While the OptumRx RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

352.    The OptumRx RICO Defendants exerted substantial control over the OptumRx RICO Enterprise, and participated in the affairs of the enterprise by: (a) negotiating and/or offering discounts for the insulin products described herein; (b) misrepresenting and/or concealing the existence, amount, or purpose of the discounts negotiated for the insulin products described herein; (c) misrepresenting and/or concealing the effect that the negotiated discounts had on the price of the insulin products for the end payer; (d) negotiating and/or setting the list price for the insulin products described herein; (e) misrepresenting and/or concealing the true cost of the insulin products described herein; (f) publishing, reproducing, and/or distributing documents containing the list price for the insulin products described herein; (g) negotiating and/or offering preferred formulary placement for the insulin product described herein; (h) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the enterprise and its effect on the pricing of insulin products; (i) otherwise misrepresenting and/or concealing the inflated and fraudulent nature of the pricing of the insulin products described herein; (j) collecting discounts, revenues, and/or profits from the sale of the insulin products described herein; and (k) ensuring that the other OptumRx RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

353.    Without each OptumRx RICO Defendant's willing participation, the OptumRx RICO Scheme and common course of conduct would not have been successful.

354.    The OptumRx RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

**C.    Predicate Acts: Mail and Wire Fraud.**

355.    To carry out, or attempt to carry out, the scheme to defraud, the OptumRx RICO Defendants, each of whom is a person associated-in-fact with the OptumRx RICO Enterprise,

did knowingly conduct or participate, directly or indirectly, in the affairs of the OptumRx RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

356.    Specifically, the OptumRx RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

357.    The multiple acts of racketeering activity which the OptumRx RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the OptumRx RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the OptumRx RICO Enterprise. The OptumRx RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

358.    The OptumRx RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

359.    In devising and executing the illegal scheme, the OptumRx RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Class or to obtain money from Plaintiffs and the Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the OptumRx RICO Defendants committed these racketeering acts, which

number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

360.    The OptumRx RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

> (a)    Mail Fraud: The OptumRx RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, price, and/or sell the insulin products described herein by means of false pretenses, misrepresentations, promises, and omissions.

> (b)    Wire Fraud: The OptumRx RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

361.    The OptumRx RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of marketing or other materials indicating, setting, or negotiating the price of the insulin products described herein; (b) the transmission of marketing or other materials indicating or advertising that any of the OptumRx RICO Defendants reduce the price of the insulin products described herein; (c) written, telephone, or electronic communications regarding and/or negotiating the price of the insulin products described herein; (d) written, telephone, or electronic communications regarding and/or negotiating discounts and/or rebates for the insulin products described herein; (e) written, telephone, or electronic communications regarding the existence, amount, or purpose of discounts and/or rebates for the insulin products described herein; (f) the transmission and/or distribution of the insulin products described herein through the mails; and (g) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of such insulin products described herein.

362.    The OptumRx RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

363.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the cost of insulin medication and fraudulently extract hundreds of millions of dollars of revenue from Plaintiffs and the Class.

364.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

365.    The OptumRx RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the OptumRx RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the OptumRx RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

366. The OptumRx RICO Defendants aided and abetted others in the violations of the above laws.

367. To achieve their common goals, the OptumRx RICO Defendants hid from Plaintiffs, the Class, insurers, health plans, and the general public the true net price of the insulin products described herein, the inflated and fraudulent nature of the list price of the insulin products described herein, the relationship between the OptumRx RICO Defendants and their impact upon the price of the insulin products described herein, and the existence, amount, and purpose of rebates and discounts given for the insulin products described herein, and the portion of the rebates and discounts pocketed by OptumRx.

368. The OptumRx RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the OptumRx RICO Defendants and their co-conspirators had to agree to conceal their fraudulent negotiations and pricing tactics.

369. The OptumRx RICO Defendants knew, and intended that, Plaintiffs and Class members would rely on the material misrepresentations and omissions made by them and incur increased costs as a result. Indeed, if Plaintiffs and the Class did not make inflated payments for the insulin products described herein, the OptumRx RICO scheme could not succeed.

370. As described herein, the OptumRx RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and the Class based on their misrepresentations and omissions, while providing insulin products that were worth significantly less than the purchase price paid.

The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

371.    During the OptumRx RICO Defendants' determination of discounts and/or rebates for the insulin products described herein, the true purpose of the discounts, the true cost of the insulin products, and the inflated and fraudulent nature of their pricing was revealed to each of the OptumRx RICO Defendants. Nevertheless, the OptumRx RICO Defendants continued to disseminate misrepresentations regarding the true cost of the insulin products as well as the existence, amount, and purpose of the discounts on those products, in furtherance of the scheme.

372.    By reason of, and as a result of the conduct of the OptumRx RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and the Class have been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated prices for the insulin products described herein.

373.    The OptumRx RICO Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Class who are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT FOUR —**
**VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)**
**THE RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.***

(By the Non-ERISA Employee/Exchange Plaintiffs, the ERISA Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against Novo Nordisk)

374.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

375.    This claim is brought on behalf of all the Classes against Novo Nordisk for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

376.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

377.    Plaintiffs and the members of the Class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Novo Nordisk's wrongful conduct.

378.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

379.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

## A.    The Levemir/NovoLog Pricing Enterprise.

380.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

381.    Novo Nordisk formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Levemir/NovoLog Pricing Enterprise. The Levemir/NovoLog Pricing Enterprise consists of (a) Novo Nordisk, including its employees and agents; (b) the

PBM CVS Health, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

382.    Alternatively, each of the above-named entities constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity.

383.    The Levemir/NovoLog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to secure an exclusive, or at least favorable, formulary position for Novo Nordisk's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, NovoLog, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

384.    To accomplish this purpose, the Levemir/NovoLog Pricing Enterprise periodically and systematically inflated the list prices of Levemir and NovoLog and represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers, including Plaintiffs and the Class, that Levemir and NovoLog's list prices fairly and accurately reflected the actual cost of this drug. The Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and the Class members, the existence and amount of steep rebates Novo Nordisk gave to the PBMs. These rebates comprise as much as 45% of the list price. The Levemir/NovoLog Pricing Enterprise also concealed from the public the purpose of these rebates: The difference between the list price and the net prices of Levemir and NovoLog negotiated by the PBMs resulted in increased profits for the PBMs. These large rebates served to ensure that the PBMs would place, and maintain, Levemir and NovoLog in a preferred or favorable position on the PBMs' formularies. By

securing a favorable position on the formulary, the Levemir/NovoLog Pricing Enterprise ensured that a larger number of Levemir and NovoLog prescriptions would be written and filled. This scheme translated into higher sales (and therefore profits) for Novo Nordisk and larger spreads for the PBMs.

385.    The persons engaged in the Levemir/NovoLog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Novo Nordisk. There is regular communication between Novo Nordisk and each of the PBMs, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Novo Nordisk and the PBMs share information regarding the Levemir and NovoLog list prices and discuss and agree on rebate amounts. Novo Nordisk and the PBMs functioned as a continuing unit for the purposes of implementing the Levemir and NovoLog pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

386.    At all relevant times, CVS Health was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. CVS Health struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and NovoLog and profit from the inflated rebates. CVS Health represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But it knew that the rebates did not actually decrease the costs of Levemir and NovoLog for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates, instead of passing the savings through to consumers, and PBMs, on behalf of their insurer

clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. CVS Health also knew, but did not disclose, that the other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Levemir/NovoLog Pricing Enterprise's unlawful fraud, CVS Health would have had the incentive to disclose the deceit by Novo Nordisk, thereby forcing competition on net price. By failing to disclose this information, CVS Health perpetuated the Levemir/NovoLog Pricing Enterprise's scheme, and reaped substantial profits.

387.    At all relevant times, Express Scripts was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Express Scripts struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and NovoLog and profit from the inflated rebates. Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But it knew that the rebates did not actually decrease the costs of Levemir and NovoLog for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates, instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. Express Scripts also knew, but did not disclose, that the other PBMs—CVS Health and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Levemir/NovoLog Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, Express Scripts perpetuated the Levemir/NovoLog Pricing Enterprise's scheme, and reaped substantial profits.

388.     At all relevant times, OptumRx was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. OptumRx struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and NovoLog and profit from the inflated rebates. OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But it knew that the rebates did not actually decrease the costs of Levemir and NovoLog for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates, instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. OptumRx also knew, but did not disclose, that the other PBMs—CVS Health and Express Scripts—were engaged in the same rebating scheme, to the detriment of consumers. But for the Levemir/NovoLog Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, OptumRx perpetuated the Levemir/NovoLog Pricing Enterprise's scheme, and reaped substantial profits.

389.     Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Novo Nordisk's reported list prices, terminate their role in the Levemir/NovoLog Pricing Enterprise, or disclose publicly that the Levemir and NovoLog list prices did not accurately reflect the price actually paid for the drugs.

390.     CVS Health, Express Scripts, and OptumRx participated in the conduct of the Levemir/NovoLog Pricing Enterprise, sharing the common purpose of securing exclusive or

favorable formulary positions for Levemir and NovoLog, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.      The actual net prices of Levemir and NovoLog;

b.      The extent to which the actual net prices of Levemir and NovoLog departed from the published, artificially-inflated list prices;

c.      The extent to which Novo Nordisk and the PBMs had negotiated the rebates discounting the list prices of Levemir and NovoLog in good faith and for a proper purpose;

d.      Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.      Whether the rebates saved health care payers, plan members, and the general public money;

f.      Whether Levemir and NovoLog's "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

g.      Whether Levemir and NovoLog would have been placed in a "preferred" formulary position absent the rebates; and

h.      The extent to which the rebating scheme would force plan members to incur additional expenses for their Levemir and NovoLog prescriptions.

391.    Novo Nordisk alone could not have accomplished the purpose of the Levemir/NovoLog Pricing Enterprise, without the assistance of the PBMs. For Novo Nordisk to

profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Levemir and NovoLog were given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts. However, these discounts were only significant because the list prices were artificially inflated. The discounts were fictitious: the result of a deliberate scheme to create large rebates without lowering net prices. And, contrary to their representations, the rebates benefitted the PBM Defendants by allowing them to pocket a significant portion of the rebates as a kickback. Without these misrepresentations, the Levemir/NovoLog Pricing Enterprise could not have achieved its common purpose.

392.    The Levemir/NovoLog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

393.    The impacts of the Levemir/NovoLog Pricing Enterprise's scheme are still in place—*i.e.*, the increased spread between the Levemir and NovoLog list prices and the actual net prices of Levemir and NovoLog is still being maintained, and increased. Consequently, PBMs make a profit on the rebates paid by the Drug Manufacturer Defendants. Under this system, the larger the difference between list and net prices, the greater the spread, *i.e.*, profit, for the PBMs.

394.    The foregoing evidenced that Novo Nordisk, CVS Health, Express Scripts, and OptumRx were each willing participants in the Levemir/NovoLog Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through Novo Nordisk's artificial inflation of the Levemir and NovoLog list prices, coupled with Novo Nordisk's and the PBMs' creation of

substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the Class.

**B.   Conduct of the Levemir/NovoLog Pricing Enterprise.**

395.   During the Class Period, Novo Nordisk exerted control over the Levemir/NovoLog Pricing Enterprise and participated in the operation or management of the affairs of the Levemir/NovoLog Pricing Enterprise, directly or indirectly, in the following ways:

a.   Novo Nordisk selected and published the Levemir and NovoLog list prices;

b.   Novo Nordisk periodically raised the published Levemir and NovoLog list prices[133];

c.   Novo Nordisk granted to the PBMs substantial rebates representing discounts off of the Levemir and NovoLog list prices in exchange for the PBMs' promise to give Levemir and NovoLog exclusive or at least favorable, formulary placement;

d.   Novo Nordisk concealed from the public the amount and purpose of the rebates;

e.   Novo Nordisk intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir and NovoLog) saved health care payers and consumers like Plaintiffs and Class members money on their prescription needs; and

---

[133] *See, e.g., In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

f.      Representing to the general public, through stating of Levemir and NovoLog's list prices without stating that the list prices differed substantially from that negotiated by the PBMs, that the Levemir and NovoLog list prices reflected or approximated Levemir and NovoLog's actual costs.

396.    The scheme had a hierarchical decision-making structure that was headed by Novo Nordisk. Novo Nordisk controlled the Levemir and NovoLog list prices, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Levemir and NovoLog would receive exclusive, or at least favorable, formulary placement.

397.    The PBMs also participated in the conduct of the affairs of the Levemir/NovoLog Pricing Enterprise, directly or indirectly, in the following ways:

a.      The PBMs promised to, and did, confer on Levemir and NovoLog exclusive or at least favorable formulary placement;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir and NovoLog) saved health care payers and consumers like Plaintiffs and Class members money on their prescription needs; and

c.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

398.    The scheme devised and implemented by Novo Nordisk, as well as other members of the Levemir/NovoLog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Levemir and NovoLog; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Levemir and NovoLog written by plan members' physicians.

C.    **Novo Nordisk's Pattern of Racketeering Activity.**

399.    Novo Nordisk conducted and participated in the conduct of the affairs of the Levemir/NovoLog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The pattern of racketeering activity by the Levemir/NovoLog Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Levemir and NovoLog pricing scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Novo Nordisk and the PBMs intended to defraud Plaintiffs, members of the Class, and other intended victims.

400.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the Class. Novo Nordisk and the PBMs calculated and intentionally crafted the Levemir and NovoLog pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the Class who would be over-billed for Levemir and NovoLog. In designing and implementing the scheme, at all times Novo Nordisk was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting list prices and establishing rebates.

401.    By intentionally and artificially inflating the Levemir and NovoLog list prices, and paying PBMs substantial rebates, knowing that the PBMs pocket substantial spreads as kickbacks for formulary placement, and then subsequently failing to disclose such practices to

the individual patients, health plans, and insurers, Novo Nordisk and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

402.    Novo Nordisk's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the Class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Novo Nordisk was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. Novo Nordisk has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Levemir/NovoLog Pricing Enterprise.

403.    The pattern of racketeering activity alleged herein and the Levemir/NovoLog Pricing Enterprise are separate and distinct from each other. Likewise, Novo Nordisk is distinct from the Levemir/NovoLog Pricing Enterprise.

404.    The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.    Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities.**

405.    The Levemir/NovoLog Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the Levemir and NovoLog list prices; the payment from Novo Nordisk to the PBMs of substantial rebates off of the list price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

406.    During the Class Period, the Levemir/NovoLog Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

407.    The nature and pervasiveness of the Levemir and NovoLog pricing fraud scheme, which was orchestrated out of the corporate headquarters of Novo Nordisk and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

408.    Many of the precise dates of the Levemir/NovoLog Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Novo Nordisk's, CVS Health's, Express Scripts', and OptumRx's books and records. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below. And Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. These acts were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

409.    Novo Nordisk's use of the U.S. Mail and interstate wire facilities to perpetrate the Levemir and NovoLog pricing fraud scheme involved thousands of communications throughout the Class Period including, *inter alia*:

a.      Marketing materials about Novo Nordisk's Levemir and NovoLog products and its price, which Novo Nordisk sent to health care payers and health care providers located across the country;

b.      Written communications between Novo Nordisk and the publishers of list price compendia regarding the Levemir and NovoLog list prices and their subsequent mark-ups, which occurred on a regular basis each year;

c.      Written representations and telephone calls between Novo Nordisk and CVS Health regarding Levemir and NovoLog markups and list prices;

d.      Written representations and telephone calls between Novo Nordisk and Express Scripts regarding Levemir and NovoLog markups and list prices;

e.      Written representations and telephone calls between Novo Nordisk and OptumRx regarding Levemir and NovoLog markups and list prices;

f.      Written representations and telephone calls between Novo Nordisk and CVS Health regarding Levemir and NovoLog rebates;

g.      Written representations and telephone calls between Novo Nordisk and Express Scripts regarding Levemir and NovoLog rebates;

h.      Written representations and telephone calls between Novo Nordisk and OptumRx regarding Levemir and NovoLog rebates;

i.      Hundreds of e-mails between Novo Nordisk and the PBMs agreeing to or effectuating the implementation of the Levemir and NovoLog pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Levemir and NovoLog list prices were; the existence, amount, or purpose of the Levemir and NovoLog rebates; and the true costs

of Levemir and NovoLog that were designed to conceal the scheme, deter investigations into Levemir and NovoLog pricing, or forestall changes to healthcare payers reimbursement of Levemir and NovoLog prescriptions based on something other than Levemir and NovoLog list prices; and

> k.    receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

410.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Novo Nordisk that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payors and consumers like Plaintiffs and Class members.

411.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

412.    Defendants aided and abetted others in the violations of the above laws.

**E.    Damages Caused by Novo Nordisk's Levemir and NovoLog Pricing Fraud.**

413.    Novo Nordisk's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and Class members to be injured in their business or property because Plaintiffs and Class members have paid inflated out-of-pocket expenses for Levemir and/or NovoLog.

414.    As described above, when a healthcare consumer fills a prescription for a drug like Levemir and/or NovoLog, she is responsible for paying all or a portion of the medication's cost. If the consumer is uninsured, she is responsible for 100% of the drug's costs. If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible. If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost. And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

415.    The amount of each of these cash payments is based on the drug's list price. Therefore, when Novo Nordisk, through the Levemir/NovoLog Pricing Enterprise, artificially inflates the Levemir and NovoLog list prices, it also artificially inflates the consumers' out-of-pocket expenses.

416.    Plaintiffs' injuries, and those of the Class members, were proximately caused by Novo Nordisk's racketeering activity. But for the misstatements made by Novo Nordisk and the PBMs and the pricing scheme employed by the Levemir/NovoLog Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Levemir and NovoLog expenses.

417.    Plaintiffs' injuries were directly caused by Novo Nordisk's racketeering activity. Drug wholesalers, insurers, and others in the pharmaceutical supply chain are not on the hook for cash payments by those who have no insurance, coinsurance or deductible payments by private and public plan members as well as Medicare plan participants, and payments made in the "Donut Hole" for Medicare members. So, although some of the misstatements made by the

PBMs in furtherance of the Levemir/NovoLog Pricing Enterprise were directed primarily to insurance providers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.

418.    And although the Levemir/NovoLog Pricing Enterprise was effectuated to give Novo Nordisk a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Novo Nordisk's competitors.

419.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or Class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Novo Nordisk's fraudulent scheme.

420.    By virtue of these violations of 18 U.S.C. § 1962(c) and (d), Novo Nordisk is liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT FIVE —
VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.***

(By the Non-ERISA Employee/Exchange Plaintiffs, the ERISA Plaintiffs, the
Medicare Plaintiffs, and the Uninsured Plaintiffs, Against Eli Lilly)

421.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

422.    This claim is brought on behalf of all the Classes against Eli Lilly for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

423.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

424.    Plaintiffs and the members of the Class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Eli Lilly's wrongful conduct.

425.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

426.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

## A.    The Humalog Pricing Enterprise.

427.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

428.    Eli Lilly formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Humalog Pricing Enterprise. The Humalog Pricing Enterprise consists of (a) Eli Lilly, including its employees and agents; (b) the PBM CVS Health, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

429.    Alternatively, each of the above-named entities constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity.

430.    The Humalog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and

maintained systematic links for a common purpose: to secure an exclusive, or at least favorable, formulary position for Eli Lilly's long-acting analog insulin product, Humalog, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

431.    To accomplish this purpose, the Humalog Pricing Enterprise periodically and systematically inflated the list price of Humalog and represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers, including Plaintiffs and the Class, that Humalog' list price fairly and accurately reflected the actual cost of this drug. The Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and Class members, the existence and amount of steep rebates Eli Lilly gave to the PBMs. These rebates were worth at least 25% of the list price. The Humalog Pricing Enterprise also concealed from the public the purpose of these rebates: The difference between the list price and the net price of Humalog negotiated by the PBMs resulted in increased profits for the PBMs. These large rebates served to ensure that the PBMs would place, and maintain, Humalog in a preferred or favorable position on the PBMs' formularies. By securing a favorable position on the formulary, the Humalog Pricing Enterprise ensured that a larger number of Humalog prescriptions would be written and filled. This scheme translated into higher sales (and therefore profits) for Eli Lilly and larger spreads for the PBMs.

432.    The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Eli Lilly. There is regular communication between Eli Lilly and each of the PBMs in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Eli Lilly and the PBMs share information regarding the Humalog list price and discuss and agree on rebate amounts. Eli Lilly

and the PBMs functioned as a continuing unit for the purposes of implementing the Humalog pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

433.    At all relevant times, CVS Health was aware of Eli Lilly's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. CVS Health struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates. CVS Health represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But, it knew that the rebates did not actually decrease the cost of Humalog for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. CVS Health also knew, but did not disclose, that the other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Humalog Pricing Enterprise's unlawful fraud, CVS Health would have had the incentive to disclose the deceit by Eli Lilly, thereby forcing competition on net price. By failing to disclose this information, CVS Health perpetuated the Humalog Pricing Enterprise's scheme, and reaped substantial profits.

434.    At all relevant times, Express Scripts was aware of Eli Lilly's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Express Scripts struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates. Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class)

money on their prescription needs. But, it knew that the rebates did not actually decrease the cost of Humalog for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. Express Scripts also knew, but did not disclose, that the other PBMs—CVS Health and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Humalog Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, Express Scripts perpetuated the Humalog Pricing Enterprise's scheme, and reaped substantial profits.

435.    At all relevant times, OptumRx was aware of Eli Lilly's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. OptumRx struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates. OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But, it knew that the rebates did not actually decrease the cost of Humalog for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. OptumRx also knew, but did not disclose, that the other PBMs—CVS Health and Express Scripts—were engaged in the same rebating scheme, to the detriment of consumers. But for the Humalog Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a

competitive advantage. By failing to disclose this information, OptumRx perpetuated the Humalog Pricing Enterprise's scheme, and reaped substantial profits.

436.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Eli Lilly's reported list prices, terminate their role in the Humalog Pricing Enterprise, nor disclose publicly that the Humalog list price did not accurately reflect the price actually paid for the drug.

437.    CVS Health, Express Scripts, and OptumRx participated in the conduct of the Humalog Pricing Enterprise, sharing the common purpose of securing exclusive or favorable formulary position for Humalog, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.    The actual net price of Humalog;

b.    The extent to which the actual net price of Humalog departed from the published, artificially-inflated list price;

c.    The extent to which Eli Lilly and the PBMs had negotiated the rebates, discounting the list price of Humalog in good faith and for a proper purpose;

d.    Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.    Whether the rebates saved health care payers, plan members, and the general public money;

      f.      Whether Humalog's "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

      g.      Whether Humalog would have been placed in a "preferred" formulary position absent the rebates; and

      h.      The extent to which the rebating scheme would force plan members to incur additional expenses for their Humalog prescriptions.

438.    Eli Lilly alone could not have accomplished the purpose of the Humalog Pricing Enterprise without the assistance of the PBMs. For Eli Lilly to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Humalog was given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts. However, these discounts were only significant because the list prices were artificially inflated. The discounts were fictitious: the result of a deliberate scheme to create large rebates without lowering net prices. And, contrary to their representations, the rebates benefitted the PBM Defendants by allowing them to pocket a significant portion of the rebates as a kickback. Without these misrepresentations, the Humalog Pricing Enterprise could not have achieved its common purpose.

439.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

440.    The impacts of the Humalog Pricing Enterprise's scheme are still in place—*i.e.*, the increased spread between the Humalog list price and the actual net price of Humalog is still

being maintained, and increased. Consequently, PBMs make a profit on the rebates paid by the Drug Manufacturer Defendants. Under this system, the larger the difference between list and net prices, the greater the spread, *i.e.*, profit, for the PBMs.

441.    The foregoing evidenced that Eli Lilly, CVS Health, Express Scripts, and OptumRx were each willing participants in the Humalog Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through Eli Lilly's artificial inflation of the Humalog list price, coupled with Eli Lilly's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the Class.

**B.    Conduct of the Humalog Pricing Enterprise.**

442.    During the Class Period, Eli Lilly exerted control over the Humalog Pricing Enterprise and participated in the operation or management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

> a.    Eli Lilly selected and published the Humalog list price;
>
> b.    Eli Lilly periodically raised the published Humalog list price;[134]
>
> c.    Eli Lilly granted to the PBMs substantial rebates representing discounts off of the Humalog list price in exchange for the PBMs' promise to give Humalog exclusive, or at least favorable, formulary placement;
>
> d.    Eli Lilly concealed from the public the amount and purpose of the rebates;
>
> e.    Eli Lilly intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities promotional and other materials which claimed that

---

[134] *See, e.g.*, *In re Lupron*, 295 F. Supp. 2d at 172.

rebates (such as those applied to Humalog) saved health care payers and consumers like Plaintiffs and Class members money on their prescription needs; and

   f.  Representing to the general public, by stating Humalog's list price without stating that the list price differed substantially from that negotiated by PBMs. Humalog list price reflected or approximated Humalog's actual cost.

   443.  The scheme had a hierarchical decision-making structure that was headed by Eli Lilly. Eli Lilly controlled the Humalog list price, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Humalog would receive exclusive, or at least favorable, formulary placement.

   444.  The PBMs also participated in the conduct of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

   a.  The PBMs promised to, and did, confer on Humalog's exclusive or at least favorable formulary placement;

   b.  The PBMs distribute through the U.S. Mail and interstate wire facilities promotional and other materials which claimed that rebates (such as those applied to Humalog) saved health care payers and consumers like Plaintiffs and Class members money on their prescription needs; and

   c.  The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

   445.  The scheme devised and implemented by Eli Lilly, as well as other members of the Humalog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Humalog; (b) entice health care payers to select one of the

PBMs' formularies; and thereby (c) secure payment for prescriptions of Humalog written by plan members' physicians.

**C.    Eli Lilly's Pattern of Racketeering Activity.**

446.    Eli Lilly conducted and participated in the conduct of the affairs of the Humalog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The pattern of racketeering activity by the Humalog pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Humalog pricing scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Eli Lilly and the PBMs intended to defraud Plaintiffs, members of the Class, and other intended victims.

447.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the Class. Eli Lilly and the PBMs calculated and intentionally crafted the Humalog pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the Class who would be over-billed for Humalog. In designing and implementing the scheme, at all times Eli Lilly was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting list prices and establishing rebates.

448.    By intentionally and artificially inflating the Humalog list price, and paying PBMs substantial rebates, knowing that the PBMs pocket substantial spreads as kickbacks for

formulary placement, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Eli Lilly and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

449.    Eli Lilly's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the Class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Eli Lilly was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. Eli Lilly has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Humalog Pricing Enterprise.

450.    The pattern of racketeering activity alleged herein and the Humalog Pricing Enterprise are separate and distinct from each other. Likewise, Eli Lilly is distinct from the Humalog Pricing Enterprise.

451.    The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.    Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities.**

452.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the Humalog list price; the payment from Eli Lilly to the PBMs of substantial rebates off of the list price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

155

453.    During the Class Period, the Humalog Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

454.    The nature and pervasiveness of the Humalog pricing fraud scheme, which was orchestrated out of the corporate headquarters of Eli Lilly and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

455.    Many of the precise dates of the Humalog Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Eli Lilly's, CVS Health's, Express Scripts', and OptumRx's books and records. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme; Plaintiffs describe this below. And Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. These acts were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

456.    Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the Humalog pricing fraud scheme involved thousands of communications throughout the Class Period including, *inter alia*:

a.      Marketing materials about Eli Lilly's Humalog product and its price, which Eli Lilly sent to health care payers and health care providers located across the country;

b.      Written communications between Eli Lilly and the publishers of list price compendia regarding the Humalog list price and its subsequent mark-ups, which occurred on a regular basis each year;

c.      Written representations and telephone calls between Eli Lilly and CVS Health regarding Humalog markups and list price;

d.      Written representations and telephone calls between Eli Lilly and Express Scripts regarding Humalog markups and list price;

e.      Written representations and telephone calls between Eli Lilly and OptumRx regarding Humalog markups and list price;

f.      Written representations and telephone calls between Eli Lilly and CVS Health regarding Humalog rebates;

g.      Written representations and telephone calls between Eli Lilly and Express Scripts regarding Humalog rebates;

h.      Written representations and telephone calls between Eli Lilly and OptumRx regarding Humalog rebates;

i.      Hundreds of e-mails between Eli Lilly and the PBMs agreeing to or effectuating the implementation of the Humalog pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Humalog list price was; the existence, amount, or purpose of the Humalog rebates; and the true cost of Humalog that were designed to conceal the scheme, deter investigations into Humalog pricing, or forestall changes

to healthcare payers reimbursement of Humalog prescriptions based on something other than Humalog list price; and

k.     Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme; and

457.     In addition to the above-referenced RICO predicate acts, it was foreseeable to Eli Lilly that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payors and consumers like Plaintiffs and Class members.

458.     Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

459.     Defendants aided and abetted others in the violations of the above laws.

**E.     Damages Caused by Eli Lilly's Humalog Pricing Fraud.**

460.     Eli Lilly's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and the Class members to be injured in their business or property because Plaintiffs and Class members have paid inflated out-of-pocket expenses for Humalog.

461.     As described above, when a healthcare consumer fills a prescription for a drug like Humalog, she is responsible for paying all or a portion of the medication's cost. If the

consumer is uninsured, she is responsible for 100% of the drug's costs. If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible. If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost. And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

462.    The amount of each of these cash payments is based on the drug's list price. Therefore, when Eli Lilly, through the Humalog Pricing Enterprise, artificially inflates the Humalog list price, it also artificially inflates the consumers' out-of-pocket expenses.

463.    Plaintiffs' injuries, and those of the Class members, were proximately caused by Eli Lilly's racketeering activity. But for the misstatements made by Eli Lilly and the PBMs, and the pricing scheme employed by the Humalog Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Humalog expenses.

464.    Plaintiffs' injuries were directly caused by Eli Lilly's racketeering activity. Drug wholesalers, insurers, and others in the pharmaceutical supply chain are not on the hook for cash payments (by those who have no insurance), coinsurance or deductible payments by private and public plan members as well as Medicare plan participants, and payments made in the "Donut Hole" (for Medicare members). So, although the misstatements made by the PBMs in furtherance of the Humalog Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility. Therefore, the insurers did not suffer the overcharges that are the harms alleged in this suit.

465.    And although the Humalog Pricing Enterprise was effectuated to give Eli Lilly a wrongfully-obtained advantage over its competitors, the harm this suit seek to remedy was not suffered by Eli Lilly's competitors.

466.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other plaintiff or Class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Eli Lilly's fraudulent scheme.

467.    By virtue of these violations of 18 U.S.C. § 1962(c) and (d), Eli Lilly is liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT SIX —
## VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
## THE RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *ET SEQ.*

(By the Non-ERISA Employee/Exchange Plaintiffs, the ERISA Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against Sanofi)

468.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

469.    This claim is brought on behalf of all the Classes against Sanofi for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

470.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

471.    Plaintiffs and the members of the Class are each "persons," as that term is defined in 18 U.S.C. § 1961(3), who were injured in their business or property as a result of Sanofi's wrongful conduct.

472.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

473.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

## A.     The Lantus/Apidra Pricing Enterprise.

474.     Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

475.     Sanofi formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Lantus/Apidra Pricing Enterprise. The Lantus/Apidra Pricing Enterprise consists of (a) Sanofi, including its employees and agents; (b) the PBM CVS Health, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

476.     Alternatively, each of the above-named entities constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity.

477.     The Lantus/Apidra Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to secure an exclusive, or at least favorable, formulary position for Sanofi's long-acting analog insulin product, Lantus, and Sanofi's rapid-

acting analog insulin, Apidra, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

478.    To accomplish this purpose, the Lantus/Apidra Pricing Enterprise periodically and systematically inflated the list prices of Lantus and Apidra and represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers, including Plaintiffs and the Class, that Lantus' and Apidra's list prices fairly and accurately reflected the actual cost of these drugs. The Lantus/Apidra Pricing Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and the Class members, the existence and amount of steep rebates Sanofi gave to the PBMs. These rebates were worth at least 35% of the list price. The Lantus/Apidra Pricing Enterprise also concealed from the public the purpose of these rebates: the difference between the list prices and the net prices of Lantus and Apidra negotiated by the PBMs resulted in increased profits for the PBMs. These large rebates served to ensure that the PBMs would place, and maintain, Lantus and Apidra in preferred or favorable positions on the PBMs' formularies. By securing a favorable position on the formulary, the Lantus/Apidra Pricing Enterprise ensured that a larger number of Lantus and Apidra prescriptions would be written and filled. This scheme translated into higher sales (and therefore profits) for Sanofi and larger spreads for the PBMs.

479.    The persons engaged in the Lantus/Apidra Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Sanofi. There is regular communication between Sanofi and each of the PBMs, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the U.S. mail in which Sanofi and the PBMs share information regarding the Lantus and Apidra list prices and discuss and agree on rebate amounts.

Sanofi and the PBMs functioned as a continuing unit for the purposes of implementing the Lantus/Apidra pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

480.    At all relevant times, CVS Health was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. CVS Health struck rebate deals with Sanofi to conceal the true prices of Lantus and Apidra and profit from the inflated rebates. CVS Health represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But, it knew that the rebates did not actually decrease the costs of Lantus and Apidra for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. CVS Health also knew, but did not disclose, that the other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Lantus/Apidra Pricing Enterprise's unlawful fraud, CVS Health would have had the incentive to disclose the deceit by Sanofi, thereby forcing competition on net price. By failing to disclose this information, CVS Health perpetuated the Lantus/Apidra Pricing Enterprise's scheme, and reaped substantial profits.

481.    At all relevant times, Express Scripts was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Express Scripts struck rebate deals with Sanofi to conceal the true prices of Lantus and Apidra and profit from the inflated rebates. Express Scripts represented to the public that the rebates it negotiated

saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But, it knew that the rebates did not actually decrease the costs of Lantus and Apidra for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. Express Scripts also knew, but did not disclose, that the other PBMs—CVS Health and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Lantus/Apidra Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, Express Scripts perpetuated the Lantus/Apidra Pricing Enterprise's scheme, and reaped substantial profits.

482.    At all relevant times, OptumRx was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. OptumRx struck rebate deals with Sanofi to conceal the true prices of Lantus and Apidra and profit from the inflated rebates. OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the Class) money on their prescription needs. But, it knew that the rebates did not actually decrease the costs of Lantus and Apidra for consumers. The published list price was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. OptumRx also knew, but did not disclose, that the other PBMs—CVS Health and Express Scripts—were engaged in the

same rebating scheme, to the detriment of consumers. But for the Lantus/Apidra Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, OptumRx perpetuated the Lantus/Apidra Pricing Enterprise's scheme, and reaped substantial profits.

483.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Sanofi's reported list prices, terminate their role in the Lantus/Apidra Pricing Enterprise, nor disclose publicly that the Lantus and Apidra list prices did not accurately reflect the prices actually paid for the drugs.

484.    CVS Health, Express Scripts, and OptumRx participated in the conduct of the Lantus/Apidra Pricing Enterprise, sharing the common purpose of securing exclusive or favorable formulary positions for Lantus and Apidra, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.    The actual net prices of Lantus and Apidra;

b.    The extent to which the actual net prices of Lantus and Apidra departed from the published, artificially-inflated list prices;

c.    The extent to which Sanofi and the PBMs had negotiated the rebates discounting the list prices of Lantus and Apidra in good faith and for a proper purpose;

d.  Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.  Whether the rebates saved health care payers, plan members, and the general public money;

f.  Whether Lantus and Apidra's "preferred" formulary statuses reflected the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

g.  Whether Lantus and Apidra would have been placed in "preferred" formulary positions absent the rebates; and

h.  The extent to which the rebating scheme would force plan members to incur additional expenses for their Lantus and Apidra prescriptions.

485. Sanofi alone could not have accomplished the purpose of the Lantus/Apidra Pricing Enterprise, without the assistance of the PBMs. For Sanofi to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Lantus and Apidra were given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts. However, these discounts were only significant because the list prices were artificially inflated. The discounts were fictitious: the result of a deliberate scheme to create large rebates without lowering net prices. And, contrary to their representations, the rebates benefitted the PBM Defendants by allowing them to pocket a significant portion of the rebates as a kickback. Without these misrepresentations, the Lantus/Apidra Pricing Enterprise could not have achieved its common purpose.

486. The Lantus/Apidra Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands

of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

487.    The impacts of the Lantus/Apidra Pricing Enterprise's scheme are still in place— *i.e.*, the increased spread between the Lantus and Apidra list prices and the net prices of Lantus and Apidra is still being maintained, and increased. Consequently, PBMs and pharmacies make a profit on the rebates paid by the Drug Manufacturer Defendants. Under this system, the larger the difference between list and net prices, the greater the spread, *i.e.*, profit, for the PBMs.

488.    The foregoing evidenced that Sanofi, CVS Health, Express Scripts, and OptumRx were each willing participants in the Lantus/ Apidra Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through Sanofi's artificial inflation of the Lantus and Apidra list prices, coupled with Sanofi's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the Class.

**B.    Conduct of the Lantus/Apidra Pricing Enterprise.**

489.    During the Class Period, Sanofi exerted control over the Lantus/Apidra Pricing Enterprise and participated in the operation or management of the affairs of the Lantus/Apidra Pricing Enterprise, directly or indirectly, in the following ways:

        a.    Sanofi selected and published the Lantus and Apidra list prices;

        b.    Sanofi periodically raised the published Lantus and Apidra list prices;[135]

---

[135] *See, e.g.*, *In re Lupron*, 295 F. Supp. 2d at 172.

c.      Sanofi granted to the PBMs substantial rebates representing discounts off of the Lantus and Apidra list prices in exchange for the PBMs' promise to give Lantus and Apidra exclusive or at least favorable, formulary placements;

d.      Sanofi concealed from the public the amount and purpose of the rebates;

e.      Sanofi intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Lantus and Apidra) saved health care payers and consumers like Plaintiffs and Class members money on their prescription needs; and

f.      The public, through stating of Lantus and Apidra's list prices without stating that the list prices differed substantially from that negotiated by PBMs, that the Lantus and Apidra list prices reflected or approximated Lantus and Apidra's actual costs.

490.    The scheme had a hierarchical decision-making structure that was headed by Sanofi. Sanofi controlled the Lantus and Apidra list prices, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Lantus and Apidra would receive exclusive, or at least favorable, formulary placements.

491.    The PBMs also participated in the conduct of the affairs of the Lantus/Apidra Pricing Enterprise, directly or indirectly, in the following ways:

a.      The PBMs promised to, and did, confer on Lantus and Apidra exclusive or at least favorable formulary placements;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Lantus and Apidra) saved health care payers and consumers like Plaintiffs and Class members money on their prescription needs; and

c.    The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

492.    The scheme devised and implemented by Sanofi, as well as other members of the Lantus/Apidra Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Lantus and Apidra; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Lantus and Apidra written by plan members' physicians.

**C.    Sanofi's Pattern of Racketeering Activity.**

493.    Sanofi conducted and participated in the conduct of the affairs of the Lantus/Apidra Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The pattern of racketeering activity by the Lantus/Apidra Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Lantus and Apidra pricing scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Sanofi and the PBMs intended to defraud Plaintiffs, members of the Class, and other intended victims.

494.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the Class. Sanofi and the PBMs calculated and intentionally crafted the Lantus and Apidra pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the Class who would be over-billed for Lantus and Apidra. In designing and

implementing the scheme, at all times Sanofi was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting list prices and establishing rebates.

495.    By intentionally and artificially inflating the Lantus and Apidra list prices, and paying PBMs substantial rebates, knowing that the PBMs pocket substantial spreads as kickbacks for formulary placement, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Sanofi and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

496.    Sanofi's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the Class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Sanofi was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. Sanofi has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Lantus/Apidra Pricing Enterprise.

497.    The pattern of racketeering activity alleged herein and the Lantus/Apidra Pricing Enterprise are separate and distinct from each other. Likewise, Sanofi is distinct from the Lantus/Apidra Pricing Enterprise.

498.    The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.    Sanofi's Use of the U.S. Mail and Interstate Wire Facilities.**

499.    The Lantus/Apidra Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission

170

and publication of false and misleading information concerning the Lantus and Apidra list prices; the payment from Sanofi to the PBMs of substantial rebates off of the list price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

500.   During the Class Period, the Lantus/Apidra Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

501.   The nature and pervasiveness of the Lantus and Apidra pricing fraud scheme, which was orchestrated out of the corporate headquarters of Sanofi and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

502.   Many of the precise dates of the Lantus/Apidra Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Sanofi's, CVS Health's, Express Scripts', and OptumRx's books and records. Indeed, an essential part of the successful operation of the Lantus/Apidra Pricing Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below. And Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. These acts were related to

each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

503.    Sanofi's use of the U.S. Mail and interstate wire facilities to perpetrate the Lantus and Apidra pricing fraud scheme involved thousands of communications throughout the Class Period including, *inter alia*:

a.    Marketing materials about Sanofi's Lantus and Apidra products and its price, which Sanofi sent to health care payers and health care providers located across the country;

b.    Written communications between Sanofi and the publishers of list price compendia regarding the Lantus and Apidra list prices and their subsequent mark-ups, which occurred on a regular basis each year;

c.    Written representations and telephone calls between Sanofi and CVS Health regarding Lantus and Apidra markups and list prices;

d.    Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus and Apidra markups and list prices;

e.    Written representations and telephone calls between Sanofi and OptumRx regarding Lantus and Apidra markups and list prices;

f.    Written representations and telephone calls between Sanofi and CVS Health regarding Lantus and Apidra rebates;

g.    Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus and Apidra rebates;

h.    Written representations and telephone calls between Sanofi and OptumRx regarding Lantus and Apidra rebates;

i.      Hundreds of e-mails between Sanofi and the PBMs agreeing to or effectuating the implementation of the Lantus and Apidra pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Lantus and Apidra list prices were; the existence, amount, or purpose of the Lantus and Apidra rebates; and the true costs of Lantus and Apidra that were designed to conceal the scheme, deter investigations into Lantus and Apidra pricing, or forestall changes to healthcare payers reimbursement of Lantus and Apidra prescriptions based on something other than the Lantus and Apidra list prices; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

504.    In addition to the above-referenced RICO predicate acts, it was fore*see*able to Sanofi that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payors and consumers like Plaintiffs and Class members.

505.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

506.    Defendants aided and abetted others in the violations of the above laws.

**E.    Damages Caused by Sanofi's Lantus and Apidra Pricing Fraud.**

507.    Sanofi's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and the Class members to be injured in their business or property because Plaintiffs and Class members have paid inflated out-of-pocket expenses for Lantus and Apidra.

508.    As described above, when a healthcare consumer fills a prescription for a drug like Lantus, she is responsible for paying all or a portion of the medication's cost. If the consumer is uninsured, she is responsible for 100% of the drug's costs. If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible. If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost. And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

509.    The amount of each of these cash payments is based on the drug's list price. Therefore, when Sanofi, through the Lantus/Apidra Pricing Enterprise, artificially inflates the Lantus and Apidra list prices, it also artificially inflates the consumers' out-of-pocket expenses.

510.    Plaintiffs' injuries, and those of the Class members, were proximately caused by Sanofi's racketeering activity. But for the misstatements made by Sanofi and the PBMs and the pricing scheme employed by the Lantus/Apidra Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Lantus and Apidra expenses.

511.    Plaintiffs' injuries were directly caused by Sanofi's racketeering activity. Drug wholesalers, insurers, and others in the pharmaceutical supply chain are not on the hook for cash payments by those who have no insurance, coinsurance or deductible payments by private and

public plan members as well as Medicare plan participants, and payments made in the "Donut

Hole" for Medicare members. So, although some of the misstatements made by the PBMs in

furtherance of the Lantus/Apidra Pricing Enterprise were directed primarily to insurers, those

payers did not have to make cash payments for the portions of prescription drugs costs that were,

by definition, excluded from their responsibility.

512.    And although the Lantus/Apidra Pricing Enterprise was effectuated to give Sanofi

a wrongfully-obtained advantage over its competitors, the harm this suit seek to remedy was not

suffered by Sanofi's competitors.

**COUNT SEVEN —**
**VIOLATION OF §§ 1 AND 3 OF THE SHERMAN**
**ACT, 15 U.S.C. §§ 1, 3, *ET SEQ.***

(By the Non-ERISA Employee/Exchange Plaintiffs, the ERISA Plaintiffs, the
Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

513.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

514.    During the Class Period, Defendants engaged in a continuing combination or

conspiracy to unreasonably restrain trade and commerce in the prescription insulin market in

violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, by engaging in a conspiracy to

artificially raise list prices in order to exclude other manufacturers from access to preferred brand

formulary status (and benefit from a PBM-controlled captive market), while maintaining and/or

stabilizing the net prices for Levemir, Lantus, NovoLog, Humalog, and Apidra in the United

States.

515.    Defendants have also agreed, combined, or conspired to raise and/or fix at inflated

prices the list prices of Levemir, Lantus, NovoLog, Humalog, and Apidra in the United States.

These price increases, which are detailed more fully above, were not the result of independent

175

decision making by manufacturers engaged in economic self-interest or free and fair competition.

516.    In formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially fix and/or raise the list prices of Levemir, Lantus, NovoLog, Humalog, and Apidra in the United States.

517.    Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among Defendants.

518.    These agreements constitute trade restraints that are unlawful under all three applicable standards of review: (1) the *per se* standard, which governs bid-rigging and the allocation of markets by horizontal agreement; (2) the "quick-look" standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule-of-reason standard (the "Rule of Reason"), which governs all other challenged restraints of trade. Plaintiffs respectfully submit that the Court should apply well-recognized *per se* rules in order to condemn the challenged trade restraints, but in an abundance of caution plead this claim in the alternative so that it is raised not only under the *per se* rules, but also under the "quick-look" standard and the Rule of Reason.

519.    Defendants' conspiracy had the effect of artificially inflating the list prices of Levemir, Lantus, NovoLog, Humalog, and Apidra in the United States. The inflated list price bears no relationship to the actual cost of the products, or to the prices that would be charged absent the collusive conduct alleged herein.

520.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of all Classes paid more for Levemir, Lantus, NovoLog, Humalog, and Apidra than they otherwise would have paid in the absence of Defendants' unlawful conduct.

521.    By reason of Defendants' unlawful conduct, Plaintiffs and members of all Classes have been deprived of free and open competition on the prices of Levemir, Lantus, NovoLog, Humalog, and Apidra in the United States.

522.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of all Classes have been injured and damaged in their property in an amount to be determined.

523.    Plaintiffs and members of all the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

524.    The business activities of Defendants, as charged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

525.    At all times relevant to this Complaint, Defendants advertised, manufactured, distributed, sold, reimbursed pharmacies for, contracted payments for, set list prices on, and/or paid or received payments for insulin and insulin products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the state in which the Defendants are located.

526.    In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Defendants' insulin products, as well as payments and rebates for insulin products sold by the Drug Manufacturer Defendants, traveled in interstate trade and commerce.

527.    Assuming, *arguendo*, that a relevant market needs to be defined, the relevant product market is the market for long-acting and rapid-acting analog insulins which includes

Lantus, Apidra, Novolog, Levimir, and Humalog and the relevant geographic market is the United States and its territories.

**COUNT EIGHT —**
**PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)**
**FOR VIOLATIONS OF ERISA § 406(B), 29 U.S.C. § 1106(B)**

(By the ERISA Plaintiffs on Behalf of all Members of the ERISA Class,
Against the PBM Defendants)

528.    The ERISA Plaintiffs incorporate by reference all paragraphs as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

529.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

530.    As alleged above, the PBM Defendants are fiduciaries to the ERISA Plans. They violated all three subsections of ERISA § 406(b).

531.    As alleged above, both (i) drug payments from participants and beneficiaries and (ii) the contracts underpinning the ERISA Class members' ERISA Plans are plan assets under ERISA.

532.    First, by setting their own compensation from insulin prescription payments from participants and beneficiaries, as well as from ERISA Plan contributions, collecting their own compensation from those same sources, and managing pharmacy benefits in their own interest or for their own account, the PBM Defendants violated ERISA § 406(b)(1). Specifically, in setting the amount of and taking undisclosed PBM Kickbacks, the PBM Defendants dealt with the ERISA Plans and with the ERISA Plans' plan assets in their own interest and received plan

assets and consideration for their personal accounts. Further, by inducing the Drug Manufacturer Defendants to inflate insulin list prices to accommodate the PBM Defendants' demands for PBM Kickbacks, the PBM Defendants dealt with the ERISA Plans and the plan assets of the ERISA Plans in their own self-interest, rather than in the interest of the ERISA Plans' participants and beneficiaries.

533.    Second, by acting on behalf of the Drug Manufacturer Defendants, who also stood to profit from inflated insulin prices at the expense of the ERISA Plaintiffs and members of the ERISA Class—and thus had interests adverse to the affected participants and beneficiaries—the PBM Defendants engaged in conflicted transactions each time they facilitated, required, or allowed insulin price inflation and/or the payment of PBM Kickbacks, in violation of ERISA § 406(b)(2). Under this subsection of ERISA § 406(b), plan assets need not be involved—dealing with an ERISA Plan is enough.

534.    Third, through their Insulin Pricing Scheme, the PBM Defendants received consideration for their own personal accounts from other parties—including the Drug Manufacturer Defendants, third parties, and the members of the ERISA Class—that were dealing with the ERISA Plans in connection with transactions involving the assets of the ERISA Plans.

535.    The PBM Defendants' prohibited transactions described herein not only profited the PBM Defendants, but also injured the ERISA Plaintiffs and members of the ERISA Class, who have suffered losses through the PBM Kickbacks that the PBM Defendants took through these prohibited transactions.

536.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to

redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." The ERISA Plaintiffs' § 502(a)(3) claims are on behalf of *all participants and beneficiaries* of ERISA Plans whose pharmacy benefits are managed and administered by the PBM Defendants, regardless of the type of ERISA Plan it is and whether or not it is underwritten by an insurance contract with a health insurer, to recover the portions of their copayments, coinsurance, and deductible amounts paid for insulin that was priced subject to Defendants' Insulin Pricing Scheme and financed the PBM Kickbacks.

537.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to the ERISA Plaintiffs and the ERISA Class, including but not limited to:

A.    an accounting;

B.    a surcharge;

C.    correction of the transactions;

D.    disgorgement of profits;

E.    an equitable lien;

F.    a constructive trust;

G.    restitution;

H.    full disclosure of the foregoing acts and practices;

I.    an injunction against further violations; and/or

J.    any other remedy the Court deems proper.

**COUNT NINE —**
**PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)**
**FOR VIOLATIONS OF ERISA § 404, 29 U.S.C. § 1104**

(By the ERISA Plaintiffs on Behalf of all Members of the ERISA Class,
Against the PBM Defendants)

538.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

539.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

540.    In leveraging their access to millions of dollars in insulin purchases through ERISA Plans to which they had access and over whose plan assets they had or exercised control for their own benefit or the benefit of third parties, and to the detriment of participants and beneficiaries, the PBM Defendants have breached their fiduciary duties of loyalty and prudence.

541.    Further, in failing to put the interests of participants and beneficiaries first in managing and administering pharmacy benefits, the PBM Defendants have breached their fiduciary duty of loyalty. And in acting in their own self-interest and in the interest of their own corporate affiliates, the PBM Defendants have violated the "exclusive purpose" standard.

542.    The duty to disclose is part of the duty of loyalty. In concealing and failing to disclose to the ERISA Class the fact or amount of the PBM Kickbacks, the inflation of list prices, or the net price of insulin for which they were being charged, and in concealing and failing to disclose to the ERISA Plaintiffs and the ERISA Class that plan participants were paying inflated amounts for copayments and coinsurance, as well as deductible payments, the PBM Defendants breached this duty. Further, both omissions and misrepresentations are

actionable under ERISA's disclosure obligations, and the type that occurred here are not subject to individualized reliance requirements.

543.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan. In so doing, Defendants violated their duty of prudence.

544.    The ERISA Plaintiffs and the ERISA Class have been damaged and suffered losses in the amount of the PBM Kickbacks the PBM Defendants took.

545.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

546.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to the ERISA Plaintiffs and the ERISA Class, including but not limited to:

        A.    an accounting;

        B.    a surcharge;

        C.    correction of the transactions;

        D.    disgorgement of profits;

        E.    an equitable lien;

        F.    a constructive trust;

        G.    restitution;

        H.    full disclosure of the foregoing acts and practices;

        I.    an injunction against further violations; and/or

        J.    any other remedy the Court deems proper.

**COUNT TEN —**
**PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)**
**FOR VIOLATIONS OF ERISA § 702, 29 U.S.C. § 1182**

(By the ERISA Plaintiffs on Behalf of all Members of the ERISA Class,
Against the PBM Defendants)

547.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

548.    ERISA § 702, 29 USC § 1182, states in pertinent part:

Prohibiting discrimination against individual participants and beneficiaries based on health status.

(a) In eligibility to enroll.

> (1) In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

>> A.    Health status.

>> B.    Medical condition (including both physical and mental illnesses).

>> C.    Claims experience.

>> D.    Receipt of health care.

>> E.    Medical history.

>> F.    Genetic information.

>> G.    Evidence of insurability (including conditions arising out of acts of domestic violence).

>> H.    Disability.

> (2) No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

(A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or

(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3) Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1) In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

549.    In setting the price for prescription insulin and taking excessive and undisclosed rebate payments, Defendants have required plan participants and beneficiaries who have a protected disability condition and/or medical condition that requires prescription insulin subject to Defendants' artificially inflated prices and undisclosed and excessive PBM Kickbacks to pay greater premiums and contributions for their health plan benefits than those participants and beneficiaries who do not have a protected disability or who do not need prescription insulin subject to Defendants' artificially inflated prices and undisclosed and excessive rebate payments.

550.    Under Defendants' scheme, the ERISA Plaintiffs and members of the ERISA Class who needed prescription insulin subject to Defendants' artificially inflated prices and undisclosed and excessive PBM Kickbacks were required to pay hidden additional and/or higher premiums in order to be able to use their benefits as enrollees, thus making the artificially inflated prices and payment of PBM Kickbacks a condition of continued enrollment under their

ERISA Plans. Without paying inflated copayments, coinsurance, or deductible payments, above and beyond the required participant contributions set forth in their plans, the ERISA Plaintiffs and members of the ERISA Class could not obtain covered prescription medications under the ERISA Plans, the effect of which is that they would not be enrolled in the Plans.

551.    The ERISA Plaintiffs and the ERISA Class have been damaged and suffered losses in the amount of the PBM Kickback the PBM Defendants took, which were financed by the inflated costs paid by the ERISA Plaintiffs and the ERISA Class for prescription insulin.

552.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

553.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to the ERISA Plaintiffs and the ERISA Class, including but not limited to:

      A.     an accounting;

      B.     surcharge;

      C.     correction of the transactions;

      D.     disgorgement of profits;

      E.     an equitable lien;

      F.     a constructive trust;

      G.     restitution;

      H.     full disclosure of the foregoing acts and practices;

      I.     an injunction against further violations; and/or

      J.     any other remedy the Court deems proper.

## COUNT ELEVEN —
## PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)
## FOR KNOWING PARTICIPATION IN VIOLATIONS OF ERISA

(By the ERISA Plaintiffs on Behalf of all Members of the ERISA Class,
Against the Drug Manufacturer Defendants)

554.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

555.    As noted above, fiduciary status is not required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction. Accordingly, the ERISA Plaintiffs and the ERISA Class make claims against the Drug Manufacturer Defendants even though they do not have fiduciary status with respect to the ERISA Plans. As nonfiduciaries, they nevertheless must restore unjust profits or fees and are subject to other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

556.    The Drug Manufacturer Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts 8-10 by the PBM Defendants, and these nonfiduciaries are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and *Harris Trust*.

557.    As a direct and proximate result of the fiduciary breaches and prohibited transactions alleged in Counts 8-10 and the participation therein of the Drug Manufacturer Defendants, the members of the ERISA Class directly or indirectly lost millions of dollars and/or plan assets (both participant pharmacy payments and Plan contracts) were improperly used to generate profits for the PBM Defendants and the Drug Manufacturer Defendants. The PBM Defendants collected and/or paid these amounts to themselves, their affiliates, or third parties

from plan assets or generated them through improper leveraging of plan assets and/or their relationships with and access to ERISA Plans. The PBM Defendants' facilitation of profits to the Drug Manufacturer Defendants due to the Insulin Pricing Scheme harmed the ERISA Class, and the Drug Manufacturer Defendants are liable to restore their ill-gotten gains to the ERISA Plaintiffs.

558.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to the ERISA Plaintiffs and the ERISA Class, including but not limited to:

A.    an accounting;

B.    a surcharge;

C.    correction of the transactions;

D.    disgorgement of profits;

E.    an equitable lien;

F.    a constructive trust;

G.    restitution;

H.    full disclosure of the foregoing acts and practices;

I.    an injunction against further violations; and/or

J.    any other remedy the Court deems proper.

**COUNT TWELVE —
VIOLATION OF THE NEW JERSEY
CONSUMER FRAUD ACT AGAINST SANOFI
(N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against Sanofi)

559.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

560.    This claim is brought by Plaintiffs who paid for Lantus and Apidra, on behalf of all members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and the Uninsured Class. While Plaintiffs and Class members hail from across the country, Sanofi U.S. is a corporation with its headquarters in Bridgewater, New Jersey. New Jersey "has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries,"[136] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[137] Furthermore, New Jersey has some of the strongest consumer protection laws in the country so, although other states may have some interest in protecting its own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[138]

561.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. Ann. § 56:8-2.

---

[136] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249, 801 A.2d 281 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[137] *Kalow & Springut LLP v. Commence Corp.*, 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[138] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the New Jersey CFA).

562.    Sanofi and Plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

563.    Sanofi engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

564.    As described above, through the Lantus/Apidra Pricing Enterprise, Sanofi engaged in deceptive business practices prohibited by state consumer protection laws, including: inflating the stated list prices of Lantus and Apidra; representing, affirmatively and through omission, that the Lantus and Apidra list prices were the true prices of these drugs; concealing or misrepresenting the true prices of Lantus and Apidra and the gap between list and net prices, and the amount of the rebate paid to the PBM Defendants for formulary placement; and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce. Sanofi engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission, in connection with the pricing and sale of Lantus and Apidra.

565.    From the outset, Sanofi knew, but did not disclose, that the prices it selected and published for Lantus and Apidra did not reflect the true prices of the products—it knew of the substantial spread resulting in a windfall to the PBM Defendants in exchange for their agreement to grant Lantus and Apidra exclusive or at least favorable placement their formularies. Sanofi knew, but did not disclose, that the rebates paid to PBMs did not result in a reduction in the prices paid by consumers, who paid for all or part of their Lantus and Apidra prescriptions out-of-pocket based on the list price. Sanofi knowingly and deliberately misled consumers regarding the purpose, existence, and amount of price reductions off the Lantus and Apidra list prices.

189

566.    By failing to disclose and by actively concealing this pricing deceit, Sanofi engaged in unfair and deceptive business practices in violation of the New Jersey CFA. In the course of Sanofi's business, it willfully failed to disclose and actively concealed its misrepresentations regarding Lantus and Apidra's prices.

567.    Sanofi intentionally and knowingly misrepresented material facts regarding the true prices of Lantus and Apidra with the intent to mislead consumers, including Plaintiffs. As alleged above, Sanofi, through the Lantus/Apidra Pricing Enterprise, made material misstatements about the prices of Lantus and Apidra and the existence and extent of the Lantus and Apidra list-to-net price spreads that were either false or misleading.

568.    Sanofi owed Plaintiffs a duty to disclose the true prices of Lantus and Apidra and the existence of rebates off of Lantus and Apidra's list prices because Sanofi:

a.    Possessed exclusive knowledge about the means by which they selected the list prices for Lantus and Apidra;

b.    Knew material non-public information regarding the existence and amount of price reductions off of Lantus and Apidra's list prices; and

c.    Made incomplete representations about the prices of Lantus and Apidra, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

569.    Because Sanofi fraudulently concealed the true prices of Lantus and Apidra, Plaintiffs were deprived of the benefit of their bargain since they paid more than their pro-rata share of the actual net prices of Lantus and Apidra (*i.e.*, the price paid by PBMs after the artificially-inflated Lantus and Apidra list prices were reduced by the rebates).

570.    The truth about the actual net price of these drugs, as distinguished from the inflated list price, would be material to a reasonable consumer. Therefore, Sanofi's concealment of the Lantus/Apidra pricing fraud was material to Plaintiffs. Had Plaintiffs been aware of the true prices of Lantus and Apidra, they would have demanded lower prices of Sanofi.

571.    Sanofi's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true prices of Lantus and Apidra.

572.    Sanofi knew, or should have known, that its conduct violated state consumer protection laws.

573.    As a direct and proximate result of Sanofi's violations of the New Jersey CFA, Plaintiffs have suffered injury-in-fact and/or actual damages. As a direct result of Sanofi's misconduct, all Plaintiffs incurred damages in at least the amount of money they paid out-of-pocket for Lantus and Apidra.

574.    This wrongful conduct by Sanofi, coupled with the damage incurred by Plaintiffs and Class members, entitles members of the Class to relief under the New Jersey CFA. Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

**COUNT THIRTEEN —**
**VIOLATION OF THE NEW JERSEY**
**CONSUMER FRAUD ACT AGAINST NOVO NORDISK**
**(N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against Novo Nordisk)

575.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

576.    This claim is brought by Plaintiffs who paid for Levemir and NovoLog, on behalf of all members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and the Uninsured Class. While Plaintiffs and Class members hail from across the country, Novo Nordisk Inc. is a corporation with its headquarters in Plainsboro, New Jersey. New Jersey "has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries," [139] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[140] Furthermore, New Jersey has some of the strongest consumer protection laws in the country so, although other states may have some interest in protecting its own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[141]

577.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. Ann. § 56:8-2.

---

[139] *Boyes*, 27 F. Supp. 2d at 547; *see generally Weinberg*, 173 N.J. at 249, (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[140] *Kalow*, 2012 WL 6093876, at *4 (quoting *DalPonte v.*, 2006 WL 2403982).

[141] *Fu*, 160 N.J. at 122-23; *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the New Jersey CFA).

578.     Novo Nordisk and Plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

579.     Novo Nordisk engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

580.     As described above, through the Levemir/NovoLog Pricing Enterprise, Novo Nordisk engaged in deceptive business practices prohibited by state consumer protection laws, including: inflating the stated list prices of Levemir and NovoLog; representing, affirmatively and through omission, that the Levemir and NovoLog list prices were the true prices of Levemir and NovoLog; concealing or misrepresenting the true prices of Levemir and NovoLog, the gap between list and net prices, and the amount of the rebate paid to the PBM Defendants for formulary placement, and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce. Novo Nordisk engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission, in connection with the pricing and sales of Levemir and NovoLog.

581.     From the outset, Novo Nordisk knew, but did not disclose, that the list prices it selected and published for Levemir and NovoLog did not reflect the true prices of the products—it knew of the substantial gap between list and net prices, resulting in a windfall to the PBM Defendants in exchange for their agreement to grant Levemir and NovoLog exclusive or at least favorable placements on their formularies. Novo Nordisk knew, but did not disclose, that the rebates they paid to the PBMs did not result in a reduction in the prices paid by consumers who paid for all or part of Levemir and/or NovoLog prescriptions out-of-pocket based on the list

price. Novo Nordisk knowingly and deliberately misled consumers regarding the purpose, existence, and amount of price reductions off Levemir and NovoLog's list prices.

582.    By failing to disclose and by actively concealing this pricing deceit, Novo Nordisk engaged in unfair and deceptive business practices in violation of the New Jersey CFA. In the course of Novo Nordisk's business, it willfully failed to disclose and actively concealed its misrepresentations regarding Levemir and NovoLog's prices.

583.    Novo Nordisk intentionally and knowingly misrepresented material facts regarding the true prices of Levemir and NovoLog with the intent to mislead consumers, including Plaintiffs. As alleged above, Novo Nordisk, through the Levemir/NovoLog Pricing Enterprise, made material misstatements about the prices of Levemir and NovoLog and the existence and extent of the Levemir and NovoLog list-to-net price spreads that were either false or misleading.

584.    Novo Nordisk owed Plaintiffs a duty to disclose the true prices of Levemir and NovoLog and the existence of rebates off of Levemir and NovoLog's list prices because Novo Nordisk:

a.    Possessed exclusive knowledge about the means by which it selected the list prices for Levemir and NovoLog;

b.    Knew material non-public information regarding the existence and amount of price reductions off of Levemir and NovoLog's list price; and

c.    Made incomplete representations about the prices of Levemir and NovoLog, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

585.    Because Novo Nordisk fraudulently concealed the true price of Levemir and NovoLog, Plaintiffs were deprived of the benefit of their bargain since they paid more than their pro-rata share of the actual net prices of Levemir and NovoLog (*i.e.*, the net price paid by PBMs after the artificially-inflated Levemir and NovoLog list prices were reduced by the rebates).

586.    The truth about actual net prices of these drugs, as distinguished from the inflated list prices, would be material to a reasonable consumer. Therefore, Novo Nordisk's concealment of the Levemir and NovoLog pricing fraud was material to Plaintiffs. Had Plaintiffs been aware of the true prices of Levemir and NovoLog, they would have demanded lower prices.

587.    Novo Nordisk's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true prices of Levemir and NovoLog.

588.    Novo Nordisk knew, or should have known, that its conduct violated state consumer protection laws.

589.    As a direct and proximate result of Novo Nordisk's violations of the New Jersey CFA, Plaintiffs have suffered injury-in-fact and/or actual damages. As a direct result of Novo Nordisk's misconduct, all Plaintiffs incurred damages in at least the amount of money they paid out-of-pocket for Levemir and NovoLog.

590.    This wrongful conduct by Novo Nordisk, coupled with the damage incurred by Plaintiffs and Class members, entitles the members of the Class to relief under the New Jersey CFA. Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

# COUNT FOURTEEN —
## VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT
## (ALA. CODE § 8-19-1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

591.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

592.    This claim is brought by Plaintiffs on behalf of residents of Alabama who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

593.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

594.    Plaintiffs and Class members are "consumers" within the meaning of Ala. Code. § 8-19-3(2).

595.    Plaintiffs, Class members, Sanofi, Novo Nordisk, Eli Lilly, CVS Health, Express Scripts, and OptumRx are "persons" within the meaning of Ala. Code § 8-19-3(3).

596.    Each Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

597.    Defendants thus violated the Alabama DTPA, at a minimum by: (1) making misleading statements regarding the true cost of the price of the insulin products described herein or causing reasonable inferences about the cost that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin

products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that the PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by the Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

598.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

599.    Pursuant to Alabama Code § 8-19-10, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

600.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code. § 8-19-1, *et seq.*

601.    Certain Plaintiffs will send Defendants letters complying with Ala. Code § 8-19-10(e) concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted 15 days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

## COUNT FIFTEEN —
## VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
## (ALASKA STAT. ANN. § 45.50.471, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

602.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

603.    This claim is brought by Plaintiffs on behalf of residents of Alaska who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

604.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "(10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. Ann. § 45.50.471.

605.    Defendants thus violated the Alaska CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the

tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that the PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by the Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

606.   The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

607.   Pursuant to Alaska Stat Ann. § 45.50.531, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each plaintiff.

608.     Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. Ann. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

609.     Certain Plaintiffs will send letters complying with Alaska Stat. Ann. § 45.50.535(b)(1) to Defendants concurrently with the filing of this Complaint.  This Count is a placeholder only and will be formally asserted thirty (30) days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

## COUNT SIXTEEN —
## VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
## (ARIZONA REV. STAT. § 44-1521, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

610.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

611.     This claim is brought by Plaintiffs on behalf of residents of Arizona who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

612.     The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

613.     Defendants, Plaintiffs, and Class members are "persons" within the meaning of the Arizona CFA, Ariz. Rev. Stat. § 44-1521(6).

614.     Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

615.     Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

616.     Defendants thus violated the Arizona CFA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

617.    The foregoing violations caused harm to Plaintiffs and the members of the

Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

618.    Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against each

Defendant in an amount to be determined at trial. Plaintiffs also seek punitive damages because

each Defendant engaged in aggravated and outrageous conduct with an evil mind.

619.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or

deceptive practices, attorneys' fees, and any other just and proper relief available under the

Arizona CFA.

### COUNT SEVENTEEN —
### VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

620.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

621.    This claim is brought by Plaintiffs on behalf of residents of Arkansas who are

members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the

Uninsured Class.

622.    The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits

"[d]eceptive and unconscionable trade practices," which include, but are not limited to,

"[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce,

or trade." Ark. Code. Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits, in connection

with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of

any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any

material fact with intent that other rely upon the concealment, suppression, or omission." Ark. Code. Ann. § 4-88-108.

623. Defendants, Plaintiffs, and Class members are "persons" within the meaning of Ark. Code. Ann. § 4-88-102(5).

624. Each drug at issue constitutes "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

625. Defendants thus violated the Arkansas DTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling

and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

626.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

627.    Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants acted wantonly in causing Plaintiffs' and Class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

628.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

**COUNT EIGHTEEN —**
**VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT**
**(CAL. CIV. CODE § 1750, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

629.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

630.    This claim is brought by Plaintiffs on behalf of residents of California who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

631.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

632.    Each Defendant is a "person" under Cal. Civ. Code § 1761(c).

633.   Plaintiffs and Class members are "consumers" as defined by Cal. Civ. Code §
1761(d), who purchased one or more prescriptions of each drug at issue.

634.   Defendants thus violated the CLRA, at a minimum by: (1) making material
misrepresentations regarding the true cost of the insulin products described herein that had the
tendency to mislead consumers, including but not limited to publishing, setting, or distributing
the list price of the insulin products described herein; (2) engaging in advertising concerning the
role that Defendants played in setting the price paid for the insulin products described herein,
including but not limited to marketing material averring that PBM Defendants make efforts to
decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or
fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the
insulin products described herein; (4) making material misrepresentations regarding or failing to
disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments
offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the
PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer
Defendants' products on the PBM Defendants' formularies; (5) making material
misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other
payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6)
engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or
facilitating the sale of the insulin products described herein at a grossly inflated and/or
fraudulently obtained price point.

635.   The foregoing violations caused harm to Plaintiffs and the members of the
Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

636.   Plaintiffs seek injunctive relief under the CLRA.

637.    Plaintiffs also seek, under Cal. Civ. Code § 1780(a), monetary relief against Defendants.

638.    Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against each Defendant of up to $5,000 for each Plaintiff or Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA. Each Defendant knew or should have known that its conduct was directed to one or more Plaintiffs or Class members who are senior citizens or disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Plaintiffs or Class members who are senior citizens or disabled persons are substantially more vulnerable to each Defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from each Defendant's conduct.

639.    Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

640.    Certain Plaintiffs will send letters complying with Cal. Civ. Code § 1780(b) to Defendants concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted 30 days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

**COUNT NINETEEN —**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

641.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

642.    This claim is brought by Plaintiffs on behalf of residents of California who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

643.    California Business and Professions Code § 17200 (the "Unfair Competition Law," or "UCL") prohibits "unlawful, unfair, or fraudulent business acts or practices." Defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, Cal. Civ. Code § 1750, *et seq.*, as described above. Defendants also violated the "fraudulent" prong of § 17200 through their pricing fraud, as described throughout this complaint. And Defendants violated the "unfair" prong of § 17200 because the acts and practices set forth in this complaint, including artificially inflating list prices to offer large rebates to the PBMs caused Defendants and the PBMs to profit at the expense of consumers, and the harm caused to consumers greatly outweighs any benefits associated with those practices.

644.    Defendants' actions, as set forth above, occurred within the conduct of their business, and in trade or commerce.

645.    Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that each Defendant has violated the UCL; an order enjoining Defendants from continuing their unfair, unlawful and/or fraudulent trade practices; an order restoring to Plaintiffs any money lost as result of each Defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits Defendants received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. &

Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

## COUNT TWENTY —
## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
## (COLO. REV. STAT. § 6-1-101, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

646.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

647.    This claim is brought by Plaintiffs on behalf of residents of Colorado who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

648.    The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business including, but not limited to, "mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;" and "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105.

649.    Each Defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

650.    Plaintiffs and Class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a).

651.    Each Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

652.    Defendants thus violated the Colorado CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

653.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

654.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at

trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each plaintiff or Class member.

655.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

**COUNT TWENTY-ONE —
VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
(CONN. GEN. STAT. § 42-110A, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

656.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

657.    This claim is brought by Plaintiffs on behalf of residents of Connecticut who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

658.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

659.    Each Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

660.    Defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

661.    Defendants thus violated the Connecticut UTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or

distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

662. The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

663. Plaintiffs and Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

664. Defendants acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

## COUNT TWENTY-TWO —
## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
## (DEL. CODE TIT. 6, § 2513, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

665.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

666.    This claim is brought by Plaintiffs on behalf of residents of Delaware who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

667.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." Del. Code tit. 6, § 2513(a).

668.    Each Defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

669.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

670.    Defendants thus violated the Delaware CFA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants

make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

671.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

672.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct. *See*, *e.g.*, *Stephenson v. Capano Dev.*, Inc., 462 A.2d 1069, 1077 (Del. 1980). Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

673.    Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT TWENTY-THREE —
## VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT
### (D.C. CODE § 28-3901, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

674.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

675.    This claim is brought by Plaintiffs on behalf of residents of the District of Columbia who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

676.    The Consumer Protection Procedures Act ("District of Columbia CPPA") states: "it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia,* "(f) fail to state a material fact if such failure tends to mislead;" "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead;" "(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time;" or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices." D.C. Code § 28-3904.

677.    Each Defendant is a "person" under D.C. Code § 28-3901(a)(1).

678.    Plaintiffs and Class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased the drugs at issue.

679.    Defendants' actions as set forth in this complaint constitute "trade practices" under D.C. Code § 28-3901.

680.    Defendants thus violated the District of Columbia CPPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in

advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

681.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

682.    Plaintiffs and Class members are entitled to recover treble damages or $1500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the court deems proper, under D.C. Code § 28-3901.

683.    Plaintiffs seek punitive damages against Defendants because Defendants' conduct evidences malice and/or egregious conduct. Defendants misrepresented the actual net price of these drugs, inflated the list price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase their profits at the expense of consumers. Defendants

manipulated the list price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy a product necessary to sustain their life. Defendants' conduct constitutes malice warranting punitive damages.

## COUNT TWENTY-FOUR —
### VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (FLA. STAT. § 501.201, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

684.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

685.     This claim is brought by Plaintiffs on behalf of residents of Florida who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

686.     The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

687.     Plaintiffs and Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

688.     Each Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

689.     Defendants thus violated FUDTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein,

including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

690.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

691.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

692.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**COUNT TWENTY-FIVE —**
**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT**
**(GA. CODE ANN. § 10-1-390, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

693.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

694.    This claim is brought by Plaintiffs on behalf of residents of Georgia who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

695.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 101-393(b), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

696.    Plaintiffs and Class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-393(b).

697.    Each Defendant engaged in "trade or commerce" within the meaning of Ga. Code. Ann. § 10-1-393(b).

698.    Defendants thus violated the Georgia FBPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants

218

make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

699.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

700.    Plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

701.    Plaintiffs also seek an order enjoining Defendants unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

702.    Certain Plaintiffs will send letters complying with Ga. Code Ann. § 10-1-399(b) to Defendants concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted 30 days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

**COUNT TWENTY-SIX —
VIOLATION OF THE GEORGIA UNIFORM
DECEPTIVE TRADE PRACTICES ACT
(GA. CODE. ANN § 10-1-370, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

703.     Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits "deceptive trade practices," which include "[m]ak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann § 10-1-372(a).

704.     Defendants, Plaintiffs, and Class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

705.     Defendants thus violated the Georgia UDTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making

220

material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

706.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

707.    Plaintiffs seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

**COUNT TWENTY-SEVEN —
VIOLATION OF THE HAWAII UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT
(HAW. REV. STAT. § 480, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

708.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

709.    This claim is brought by Plaintiffs on behalf of residents of Hawaii who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

710.    The Hawaii Unfair and Deceptive Trade Practices Act ("Hawaii UDTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw. Rev. Stat. § 480-2(a)

711.    Each Defendant is a "person" under Haw. Rev. Stat. § 480-1.

712.     Plaintiffs and Class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1.

713.     Defendants thus violated the Hawaii UDTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

714.     The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

715.    Pursuant to Haw. Rev. Stat. § 480-13, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) $1000 and (b) threefold actual damages in an amount to be determined at trial.

716.    Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seek an additional award against each Defendant of up to $10,000 for each violation directed at a Hawaii elder. Each Defendant knew or should have known that its conduct was directed to one or more Plaintiffs who are elders. Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from each Defendant's conduct.

## COUNT TWENTY-EIGHT —
## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
## (IDAHO CODE ANN. § 48-601, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

717.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

718.    This claim is brought by Plaintiffs on behalf of residents of Idaho who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

719.    The Idaho Consumer Protection Act ("Idaho CPA") prohibits deceptive business practices, including, but not limited to, "(11) [m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(17) [e]ngaging in any

223

act or practice which is otherwise misleading, false, or deceptive to the consumer;" or "(18) engaging in any unconscionable method, act or practice in the conduct of trade or commerce," Idaho Code Ann. § 48-603.

720.    Each Defendant is a "person" under Idaho Code Ann. § 48-602(1).

721.    Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

722.    Defendants thus violated the Idaho CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or

224

facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

723.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

724.    Pursuant to Idaho Code § 48-608, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1000 for each plaintiff.

725.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

726.    Plaintiffs also seek punitive damages against Defendants because each Defendant's conduct evidences an extreme deviation from reasonable standards. Defendants flagrantly, maliciously, and fraudulently misrepresented the actual cost of Lantus and the existence, purpose, and amount of the rebates granted to the PBMs; and concealed facts that only it knew. Defendants' unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

### COUNT TWENTY-NINE —
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILL. COMP. STAT. § 505/1, *ET SEQ.* AND 720 ILL. COMP. STAT. § 295/1A)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

727.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

728.    This claim is brought by Plaintiffs on behalf of residents of Illinois who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

729.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 Ill. Comp. Stat. § 505/2.

730.    Each Defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

731.    Plaintiffs and Class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

732.    Defendants thus violated the Illinois CFA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to

disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

733.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

734.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs seek monetary relief against each Defendant in the amount of actual damages, as well as punitive damages because Defendants each acted with malice and/or was grossly negligent.

735.    Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et seq.*

### COUNT THIRTY —
### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT

### (IND. CODE § 24-5-0.5-3)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

736.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

737.     This claim is brought by Plaintiffs on behalf of residents of Indiana who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

738.     Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." Ind. Code § 24-5-0.5-3(b).

739.     Each Defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2), and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

740.     Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

741.     Defendants thus violated the Indiana DCSA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants

and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

742.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

743.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for Defendants' willfully deceptive acts.

744.    Plaintiffs also seek punitive damages based on the outrageousness and recklessness of each Defendant's conduct.

745.    Certain Plaintiffs will send letters complying with Ind. Code § 24-5-0.5-5(a) to Defendants concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted after written notice is provided if Defendants fail to remedy their unlawful conduct.

### COUNT THIRTY-ONE —
### VIOLATION OF THE IOWA PRIVATE RIGHT OF
### ACTION OR CONSUMER FRAUDS ACT
### (IOWA CODE § 714H.1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

746.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

747.     This claim is brought by Plaintiffs on behalf of residents of Iowa who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

748.     The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

749.     Each Defendant is a "person" under Iowa Code § 714H.2(7).

750.     Plaintiffs and Class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased insulin.

751.     Defendants thus violated the Iowa CFA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the

insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

752.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

753.    Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining each Defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of each Defendant's willful and wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

### COUNT THIRTY-TWO —
### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### (KAN. STAT. ANN. § 50-623, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

754.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

755.    This claim is brought by Plaintiffs on behalf of residents of Kansas who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

756.    The Kansas Consumer Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a). Deceptive acts or practices include, but are not limited to, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact;" "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions," "whether or not any consumer has in fact been misled." Kan. Stat. Ann. § 50-626.

757.    Plaintiffs and Class members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased insulin.

758.    The sale of insulin to Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

759.    Defendants thus violated the Kansas CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the

insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

760.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

761.    Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

762.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT THIRTY-THREE —
## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
## (KY. REV. STAT. ANN. § 367.110, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

763.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

764. This claim is brought by Plaintiffs on behalf of residents of Kentucky who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

765. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. Ann. § 367.170(1).

766. Defendants, Plaintiffs, and Class members are "persons" within the meaning of Ky. Rev. Stat. Ann. § 367.110(1).

767. Each Defendant engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

768. Defendants thus violated the Kentucky CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making

234

material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

769.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

770.    Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

## COUNT THIRTY-FOUR —
## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## (LA. REV. STAT. ANN. § 51:1401, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

771.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

772.    This claim is brought by Plaintiffs on behalf of residents of Louisiana who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

773.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A).

774.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of La. Rev. Stat. Ann. § 51:1402(8).

775.    Plaintiffs and Class members are "consumers" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

776.    Each Defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(9).

777.    Defendants thus violated the Louisiana CPL, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling

and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

778.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

779.    Pursuant to La. Rev. Stat. Ann. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. Ann. § 51:1409.

### COUNT THIRTY-FIVE —
### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

780.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

781.    This claim is brought by Plaintiffs on behalf of residents of Maine who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

782.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Me. Rev. Stat. Ann. tit. 5, § 207.

783.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

784. Defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

785. Defendants thus violated the Maine UTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

786. The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

787.    Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, Plaintiffs seek an order enjoining each Defendant's unfair and/or deceptive acts or practices.

788.    Certain Plaintiffs will send letters complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A) to Defendants concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted 30 days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

### COUNT THIRTY-SIX —
### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### (MD. CODE, COM. LAW § 13-101, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

789.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

790.    This claim is brought by Plaintiffs on behalf of residents of Maryland who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

791.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including the "failure to state a material fact if the failure deceives or tends to deceive;" "false or misleading representation[s] of fact which concern[] . . . [t]he reason of or the existence or amount of a price reduction;" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code, Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code, Com. Law § 13-302.

792.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

793.    Defendants thus violated the Maryland CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

794.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

795.    Pursuant to Md. Code, Com. Law § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT THIRTY-SEVEN —
## VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A)
## (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

796.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

797.    This claim is brought by Plaintiffs on behalf of residents of Massachusetts who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

798.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ch. 93A, § 2.

799.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(a).

800.    Each Defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(b).

801.    Defendants thus violated the Massachusetts Act, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the

inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

802.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

803.    Pursuant to Mass. Gen. Laws Ch. 93A, § 9, Plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

804.    Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

805.    Certain Plaintiffs will send letters complying with Mass. Gen. Laws Ch. 93A, § 9(3) to Defendants concurrently with the filing of this Complaint. This Count is a placeholder

only and will be formally asserted 30 days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

## COUNT THIRTY-EIGHT —
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
## (MICH. COMP. LAWS § 445.903, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

806.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

807.    This claim is brought by Plaintiffs on behalf of residents of Michigan who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

808.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold;" "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

809.    Plaintiffs and Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

810.    Each Defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

811.    Defendants thus violated the Michigan CPA, at a minimum by(1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

812.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

813.     Plaintiffs seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial; (b) statutory damages in the amount of $250 for each plaintiff; (c) reasonable attorneys' fees; and (d) any other just and proper relief available under Mich. Comp. Laws § 445.911.

814.     Plaintiffs also seek punitive damages because each Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented actual net price of these drugs, inflated the list prices, and concealed the reasons for, and amount of, the rebates offered to PBMs in order to increase their profits at the expense of consumers. Defendants manipulated the price of their life-saving product without regard to the impact of their scheme on consumers' ability to afford to buy a product necessary to sustain their life. Defendants' conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT THIRTY-NINE —
## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. § 325F.68, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

815.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

816.     This claim is brought by Plaintiffs on behalf of residents of Minnesota who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

817.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement, or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1).

818.    Each purchase of insulin constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

819.    Defendants thus violated the Minnesota CFA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair, and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

820.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

821.    Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

822.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each Defendant's acts show deliberate disregard for the rights or safety of others.

**COUNT FORTY —**
**VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT**
**(MINN. STAT. § 325D.43-48, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

823.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

824.    This claim is brought by Plaintiffs on behalf of residents of Minnesota who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

825.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." Minn. Stat. § 325D.44.

826.    Defendants thus violated the Minnesota DTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or

distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

827.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

828.    Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

829.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

**COUNT FORTY-ONE —**
**VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT**
**(MISS. CODE. ANN. § 75-24-1, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

830.     Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

831.     This claim is brought by Plaintiffs on behalf of residents of Mississippi who are

members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the

Uninsured Class.

832.     The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair

or deceptive trade practices in or affecting commerce." Miss. Code Ann. § 75-24-5(1). Unfair or

deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the

reasons for, existence of, or amounts of price reductions." Miss. Code Ann. § 75-24-5(2).

833.     Defendants thus violated the Mississippi CPA, at a minimum by: (1) making

material misrepresentations regarding the true cost of the insulin products described herein that

had the tendency to mislead consumers, including but not limited to publishing, setting, or

distributing the list price of the insulin products described herein; (2) engaging in advertising

concerning the role that Defendants played in setting the price paid for the insulin products

described herein, including but not limited to, marketing material averring that PBM Defendants

make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the

inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer

Defendants for the insulin products described herein; (4) making material misrepresentations

regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates,

and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants

and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the

Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making

material misrepresentations regarding or failing to disclose the portion of discounts, rebates,

and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep;

and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling

and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or

fraudulently obtained price point.

834.    The foregoing violations caused harm to Plaintiffs and the members of the

Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

835.    Plaintiffs seek actual damages in an amount to be determined at trial any other

just and proper relief available under the Mississippi CPA.

**COUNT FORTY-TWO —**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**(MO. REV. STAT. § 407.010, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

836.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

837.    This claim is brought by Plaintiffs on behalf of residents of Missouri who are

members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the

Uninsured Class.

838.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful

the "act, use or employment, by any person of any deception, fraud, false pretense,

misrepresentation, unfair practice, or the concealment, suppression, or omission of any material

fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

839.    Each Defendant, Plaintiffs, and the Classes are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

840.    Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

841.    Defendants thus violated the Missouri MPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to, marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

842.    The foregoing violations caused harm to Plaintiffs and the members of the

Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

843.    Defendants are liable to Plaintiffs for damages in amounts to be proven at trial,

including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each

Defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev.

Stat. § 407.025.

## COUNT FORTY-THREE —
## VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
## ND CONSUMER PROTECTION ACT OF 1973
## (MONT. CODE ANN. § 30-14-101, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

844.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

845.    This claim is brought by Plaintiffs on behalf of residents of Montana who are

members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the

Uninsured Class.

846.    The Montana Unfair Trade Practices and Consumer Protection Act ("Montana

CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

847.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of

Mont. Code Ann. § 30-14-102(6).

848.    Plaintiffs and Class members are "consumer[s]" under Mont. Code Ann. § 30-14-

102(1).

849. The sale of each drug at issue occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and each Defendant committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

850. Defendants thus violated the Montana CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

851. The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

852.    Because Defendants' unlawful methods, acts, and practices have caused Plaintiffs to suffer an ascertainable loss of money and property, Plaintiffs seek from each Defendant: (a) the greater of actual damages or $500; (b) discretionary treble damages; and (c) reasonable attorneys' fees.

853.    Plaintiffs additionally seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

**COUNT FORTY-FOUR —**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT**
**(NEB. REV. STAT. § 59-1601, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

854.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

855.    This claim is brought by Plaintiffs on behalf of residents of Nebraska who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

856.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

857.    Defendants, Plaintiffs, and the Classes are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

858.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

859.    Defendants thus violated the Nebraska CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that

had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

860. The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

861. Because Defendants' conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000; an order enjoining each Defendant's unfair or deceptive acts and practices; costs of Court; reasonable attorneys' fees; and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

**COUNT FORTY-FIVE —
VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(NEV. REV. STAT. § 598.0903, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

862.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

863.    This claim is brought by Plaintiffs on behalf of residents of Nevada who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

864.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions;" "[k]nowingly makes any other false representation in a transaction;" "[f]ails to disclose a material fact in connection with the sale or lease of goods or services;" or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion." Nev. Rev. Stat. §§ 598.0915–598.0925.

865.    Defendants thus violated the Nevada DTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising

concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

866.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

867.    Accordingly, Plaintiffs seek their actual damages; punitive damages; an order enjoining Defendants' deceptive acts or practices; costs of Court; attorney's fees; and all other appropriate and available remedies under the Nevada DTPA. Nev. Rev. Stat. § 41.600.

## COUNT FORTY-SIX —
## VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT
### (N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

868.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

869.    This claim is brought by Plaintiffs on behalf of residents of New Hampshire who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

870.    The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, "but . . . not limited to" "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." N.H. Rev. Stat. Ann. § 358-A:2.

871.    Defendants, Plaintiffs, and the Classes are "persons" under N.H. Rev. Stat. Ann. § 358-A:1.

872.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. Ann. § 358-A:1.

873.    Defendants thus violated the New Hampshire CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations

regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

874.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

875.    Because Defendants' willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining each Defendant's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. Rev. Stat. Ann. § 358-A:10.

## COUNT FORTY-SEVEN —
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
## (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

876.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

877.    This claim is brought by Plaintiffs on behalf of residents of New Jersey who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

878.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.

879.    Defendants, Plaintiffs, and the Classes are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

880.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

881.    Defendants thus violated the New Jersey CFA, at a minimum by(1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations

regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

882.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

883.    Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining Defendants' unlawful conduct; treble damages; costs; and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19; and any other just and appropriate relief.

## COUNT FORTY-EIGHT —
## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
## (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

884.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

885.    This claim is brought by Plaintiffs on behalf of residents of New Mexico who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

886.    The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to, "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D).

887.    Defendants, Plaintiffs, and Class members are "person[s]" under N.M. Stat. Ann. § 57-12-2.

888.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

889.    Defendants thus violated the New Mexico UTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making

material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

890.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

891.    Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs; as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

## COUNT FORTY-NINE —
## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §§ 349-350
## (N.Y. GEN. BUS. LAW §§ 349-350)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

892.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

893.    This claim is brought by Plaintiffs on behalf of residents of New York who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

894.    The New York General Business Law ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

895.    Plaintiffs and the Classes are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

896.    Each Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

897.    Defendants' deceptive acts and practices, which were intended to mislead consumers who purchased insulin, were conduct directed at consumers.

898.    Defendants thus violated the New York GBL, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling

and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

899.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

900.    Because Defendants' willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Defendants' deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT FIFTY —**
**VIOLATION OF THE NORTH CAROLINA UNFAIR**
**AND DECEPTIVE ACTS AND PRACTICES ACT**
**(N.C. GEN. STAT. § 75-1.1, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

901.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

902.    This claim is brought by Plaintiffs on behalf of residents of North Carolina who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

903.    North Carolina's Unfair and Deceptive Acts and Practices Act (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

904.    Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

905.    Defendants thus violated the North Carolina Act, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

906.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

907.    Plaintiffs seek an order for treble their actual damages; an order enjoining Defendants' unlawful acts; costs of Court; attorney's fees; and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## COUNT FIFTY-ONE —
## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
## (N.D. CENT. CODE § 51-15-02)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

908.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

909.    This claim is brought by Plaintiffs on behalf of residents of North Dakota who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

910.    The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise . . . ." N.D. Cent. Code § 51-15-02.

911.    Defendants, Plaintiffs, and the Classes are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

912.    Defendants' engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

913.    Defendants thus violated the North Dakota CFA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants

267

make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

914.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

915.    Defendants knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, Defendants are liable to Plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

### COUNT FIFTY-TWO —
### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

916.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

917.    This claim is brought by Plaintiffs on behalf of residents of Ohio who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

918.    Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code Ann. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing that "a specific price advantage exists, if it does not." Ohio Rev. Code Ann. § 1345.02.

919.    Each Defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

920.    Plaintiffs and Class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchases of insulin are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

921.    Defendants thus violated the Ohio CSPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the

insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

922.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

923.    As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages; an order enjoining Defendants' deceptive and unfair conduct; treble damages; court costs; and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.*

### COUNT FIFTY-THREE —
### VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### (OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

924.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

925.    This claim is brought by Plaintiffs on behalf of residents of Oklahoma who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

926.    The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person;" "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;" and making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction." Okla. Stat. tit. 15, §§ 752-753.

927.    Plaintiffs and Class members are "persons" under Okla. Stat. tit. 15, § 752.

928.    Each Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

929.    The sale of insulin to Plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and each Defendant's actions as set forth herein occurred in the conduct of trade or commerce.

930.    Defendants thus violated the Oklahoma CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants

make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

931.    Plaintiffs seek punitive damages because Defendants' conduct was egregious. Defendants misrepresented the actual net price of insulin, inflated the list price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase their profits at the expense of consumers. Defendants manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy a product necessary to sustain their life. Defendants' egregious conduct warrants punitive damages.

932.    Defendants' conduct as alleged herein was unconscionable because (1) Defendants, knowingly took advantage of consumers unable to protect their interests due to their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or a similar factor; (2) at the time the consumer transaction was entered into, Defendants knew or had reason to know that the price consumers were charged grossly exceeded

the price at which similar products were readily obtainable in similar transactions by like

consumers; and (3) Defendants knew or had reason to know that the transaction Defendants

induced the consumers to enter into was excessively one-sided in favor of each Defendant.

933.    The foregoing violations caused harm to Plaintiffs and the members of the

Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

934.    Because Defendants' unconscionable conduct caused injury to Plaintiffs,

Plaintiffs seek recovery of actual damages; discretionary penalties of up to $2,000 per violation;

and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1. Plaintiffs further seek an order

enjoining each Defendant's unfair and/or deceptive acts or practices; and any other just and

proper relief available under the Oklahoma CPA.

**COUNT FIFTY-FOUR —**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**(OR. REV. STAT. §§ 646.605, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

935.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

936.    This claim is brought by Plaintiffs on behalf of residents of Oregon who are

members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the

Uninsured Class.

937.    The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person

from, in the course of the person's business, doing any of the following: "[m]ak[ing] false or

misleading representations of fact concerning the reasons for, existence of, or amounts of price

reductions;" "[m]ak[ing] false or misleading representations of fact concerning the offering price

273

or, or the person's cost for . . . goods;" or "[e]ngag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

938.    Each Defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

939.    Each of the drugs at issue are "goods" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

940.    Defendants thus violated the Oregon UTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

941.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

942.    Plaintiffs are each entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

### COUNT FIFTY-FIVE —
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES ND CONSUMER PROTECTION LAW
### (73 PA. CONS. STAT. § 201-1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

943.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

944.    This claim is brought by Plaintiffs on behalf of residents of Pennsylvania who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

945.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

946.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

947.    Plaintiffs purchased insulin primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

948.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

949.    Defendants thus violated the Pennsylvania CPL, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

950.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

951.    Defendants are liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a). Plaintiffs are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

### COUNT FIFTY-SIX —
### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (R.I. GEN. LAWS § 6-13.1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

952.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

953.    This claim is brought by Plaintiffs on behalf of residents of Rhode Island who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

954.    Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[e]ngaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" "[e]ngaging in any act or practice that is unfair or deceptive to the consumer;" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).

955.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

956.    Defendants were engaged in "trade" and "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

957.    Plaintiffs purchased insulin primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

958.    Defendants thus violated the Rhode Island CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

959.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

960.     Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). Plaintiffs also seek punitive damages at the discretion of the Court.

## COUNT FIFTY-SEVEN —
## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
## (S.C. CODE ANN. § 39-5-10, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

961.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

962.     This claim is brought by Plaintiffs on behalf of residents of South Carolina who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

963.     The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a).

964.     Each Defendant is a "person" under S.C. Code Ann. § 39-5-10.

965.     Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled.

966.     Defendants thus violated the South Carolina UTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products

described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

967.    Plaintiffs further allege that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result. Defendants manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy a product necessary to sustain their life. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

968.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped. Plaintiffs further seek an order enjoining each Defendant's unfair or deceptive acts or practices.

**COUNT FIFTY-EIGHT —**
**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(S.D. CODIFIED LAWS § 37-24-6)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

969.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

970.    This claim is brought by Plaintiffs on behalf of residents of South Dakota who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

971.    The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which include "[k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby;" and "advertising price reductions without . . . including in the advertisement the specific basis for the claim of a price reduction or [o]ffering the merchandise for sale at the higher price from which the reduction is taken for at least seven consecutive business days during the sixty-day period prior to the advertisement." S.D. Codified Laws §§ 37-24-6(1), 37-24-31.

972.    Defendants thus violated the South Dakota CPL, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products

described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

973.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

974.    Under S.D. Codified Laws § 37-24-31, Plaintiffs are entitled to a recovery of their actual damages suffered as a result of Defendant's acts and practices.

## COUNT FIFTY-NINE —
## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
## (TENN. CODE ANN. § 47-18-101, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

975.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

976.    This claim is brought by Plaintiffs on behalf of residents of Tennessee who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

977.    Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." Tenn. Code Ann. § 47-18-104.

978.    Plaintiffs and Class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

979.    Each Defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

980.    Each Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

981.    Defendants thus violated the Tennessee CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates,

and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

982.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

983.    Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs seek monetary relief against each Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT SIXTY —
## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
## (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

984.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

985.    This claim is brought by Plaintiffs on behalf of residents of Texas who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

986.    The Texas Deceptive Trade Practices Consumer Protection Act ("Texas DTPA") declares unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a).

987.    Plaintiffs and Class members are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.45(4).

988.    Each Defendant is a "person" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

989.    Each Defendant's conduct complained of herein consisted of "trade" or "commerce" within the meaning of Tex. Bus. & Com. Code § 17.45(6).

990.    Defendants thus violated the Texas DTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other

payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

991.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

992.    Defendants, to the detriment of Plaintiffs and Class members, took advantage of their lack of knowledge, ability, experience, and capacity to determine that the insulin list price was not a fair or reasonable approximation of the actual cost of insulin, and did so to a grossly unfair degree. Defendants therefore engaged in an unconscionable act within the meaning of Tex. Bus. & Com. Code § 17.45(5).

993.    Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiffs seek monetary relief against each Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, injunctive relief, attorneys' fees, and any other just and proper relief available under the Texas DTPA.

994.    Certain Plaintiffs will send letters complying with Tex. Bus. & Com. Code § 17.505(a) to Defendants concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted 60 days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

### COUNT SIXTY-ONE —
### VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT
### (UTAH CODE ANN. § 13-11-1, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

995.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

996.    This claim is brought by Plaintiffs on behalf of residents of Utah who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

997.    The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not." Utah Code Ann. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code Ann. § 13-11-5.

998.    Defendants thus violated the Utah CSPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material

misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

999.    The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

1000.   Defendants knew, or had reason to know, that consumers would rely on Defendants' reported list price as the price of insulin, and knew that, given the gap between net and list prices that Defendants had created, the insulin list price was not a fair or reasonable approximation of the actual cost of insulin. Defendants therefore engaged in an unconscionable act within the meaning of Utah Code Ann. § 13-11-5.

1001.   Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

### COUNT SIXTY-TWO —
### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
### (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

1002.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1003.   This claim is brought by Plaintiffs on behalf of residents of Vermont who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

1004.   The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce…." Vt. Stat. Ann. tit. 9, § 2453(a).

1005.   Defendants were sellers within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

1006.   Defendants thus violated the Vermont CFA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling

and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

1007.   The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

1008.   Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

## COUNT SIXTY-THREE —
## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
## (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

1009.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1010.   This claim is brought by Plaintiffs on behalf of residents of Virginia who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

1011.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

1012.   Each Defendant is a "supplier" under Va. Code Ann. § 59.1-198.

1013.   Defendants violated the Virginia CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

1014.   The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

1015.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because Defendants'

conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each

plaintiff, the greater of (a) three times actual damages or (b) $1,000.

1016.   Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive

acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief

available under Va. Code Ann. § 59.1-204, *et seq.*

**COUNT SIXTY-FOUR —**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

1017.   Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

1018.   This claim is brought by Plaintiffs on behalf of residents of Washington who are

members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the

Uninsured Class.

1019.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits

"[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce." Wash. Rev. Code. Ann. § 19.96.010.

1020.   Defendants committed the acts complained of herein in the course of "trade" or

"commerce" within the meaning of Wash. Rev. Code. Ann. § 19.96.010.

1021.   Defendants thus violated the Washington CPA, at a minimum by: (1) making

material misrepresentations regarding the true cost of the insulin products described herein that

had the tendency to mislead consumers, including but not limited to publishing, setting, or

distributing the list price of the insulin products described herein; (2) engaging in advertising

concerning the role that Defendants played in setting the price paid for the insulin products

292

described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

1022.   The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

1023.   Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

**COUNT SIXTY-FIVE —**
**VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT**
**AND PROTECTION ACT**
**(W. VA. CODE § 46A-1-101, *ET SEQ.*)**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

1024.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

293

1025.   This claim is brought by Plaintiffs on behalf of residents of West Virginia who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

1026.   The Defendants are "persons" under W. Va. Code § 46A-1-102(31).

1027.   Plaintiff are "consumers," as defined by W. Va. Code §§ and 46A-1-102(12) and 46A-6-102(2), who purchased insulin at inflated prices.

1028.   Defendants engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

1029.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." W. Va. Code § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include:

(A)   Advertising goods or services with intent not to sell them as advertised;

(B)   Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;

(C)   Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(D)   The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; and

(E)   Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner,

any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive; W. Va. Code § 46A-6-102(7).

1030. Defendants violated the West Virginia CCPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

1031.   The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

1032.   Pursuant to W. Va. Code § 46A-6-106, Plaintiffs seek monetary relief against the Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

1033.   Plaintiffs also seek punitive damages against the Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiffs to cruel and unjust hardship as a result.

1034.   Plaintiffs further seek an order enjoining the Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. Va. Code § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1035.   Certain Plaintiffs will send letters complying with W. Va. Code § 46A-6-106(b) to Defendants concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted 20 days after demand letters are sent if Defendants fail to remedy their unlawful conduct.

## COUNT SIXTY-SIX —
## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
## (WIS. STAT. § 110.18)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

1036.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1037.   This claim is brought by Plaintiffs on behalf of residents of Wisconsin who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

1038.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

1039.   Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

1040.   Plaintiffs and the Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

1041.   Defendants violated the Wisconsin DTPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material

297

misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

1042.   The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

1043.   Plaintiffs are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because Defendants' conduct was committed knowingly and/or intentionally, Plaintiffs are entitled to treble damages.

1044.   Plaintiffs also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

### COUNT SIXTY-SEVEN —
### VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. §§ 40-12-105 *ET SEQ.*)

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs, and the Uninsured Plaintiffs, Against All Defendants)

1045.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1046.   This claim is brought by Plaintiffs on behalf of residents of Wyoming who are members of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

1047.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits unlawful trade practices in the course of business and consumer transactions. Wyo. Stat. § 40-12-105. A person engages in a deceptive trade practice when he knowingly: "(vii) Makes false or

misleading statements of fact concerning the price of merchandise or the reason for, existence of, or amounts of a price reduction; or (xv) Engages in unfair or deceptive acts or practices." *Id.*

1048.   Plaintiffs, Class members, and each Defendant are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

1049.   Each Defendant's conduct complained of herein consisted of "consumer transactions" within the meaning of Wyo. Stat. § 40-12-102(a)(ii).

1050.   Defendants thus violated the Wyoming CPA, at a minimum by: (1) making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers, including but not limited to publishing, setting, or distributing the list price of the insulin products described herein; (2) engaging in advertising concerning the role that Defendants played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers; (3) failing to disclose the inflated and/or fraudulent nature of the list price(s) set and/or charged by Drug Manufacturer Defendants for the insulin products described herein; (4) making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Drug Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Drug Manufacturer Defendants' products on the PBM Defendants' formularies; (5) making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the Drug Manufacturer Defendants that the PBM Defendants keep; and/or (6) engaging in misleading, false, unfair and/or deceptive acts or practices by selling

and/or facilitating the sale of the insulin products described herein at a grossly inflated and/or fraudulently obtained price point.

1051.   The foregoing violations caused harm to Plaintiffs and the members of the Classes, and are likely to harm consumers in the future if Defendants' practices are not stopped.

1052.   Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs seek monetary relief against the Defendants measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

1053.   Certain Plaintiffs will send letters complying with Wyo. Stat. §§ 45-12-109 to Defendants concurrently with the filing of this Complaint. This Count is a placeholder only and will be formally asserted after demand letters are sent if Defendants fail to remedy their unlawful conduct.

**COUNT SIXTY-EIGHT —
COMMON LAW FRAUD**

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

1054.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1055.   Plaintiffs bring this Count on behalf of the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

1056.   As alleged extensively above, Defendants affirmatively misrepresented and/or concealed and suppressed material facts concerning: (a) the true cost and/or price of the insulin products described herein; (b) the inflated and/or fraudulent nature of the list price(s) set and/or charged by Defendants for the insulin products described herein; (c) the existence, amount, and/or purpose(s) of discounts and/or rebates offered and/or negotiated by Defendants for those products; and (d) the role that Defendants' played in the price paid for the insulin products

described herein, including but not limited to marketing material averring that Defendants decrease the price of prescription drugs for consumers.

1057.   Defendants valued their profits over the trust, health and safety of Plaintiffs and other Class members.

1058.   Necessarily, Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to consumers, including Plaintiffs and Class members.

1059.   Defendants' false representations and omissions were material to consumers, Plaintiffs and the members of the Classes.

1060.   Plaintiffs and Class members reasonably relied on Defendants' deception, and Defendants intended that they would so rely. Plaintiffs and Class members had no way of discerning that Defendants were, in fact, deceiving them because they possessed exclusive knowledge regarding the nature of insulin pricing; intentionally concealed the foregoing from Plaintiffs, the Classes and the public; and made incomplete or negligent representations about the pricing of the insulin products and the Defendants' role in that pricing, while purposefully withholding material facts from Plaintiffs and the Classes that contradicted these representations.

1061.   Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health. Indeed, as a direct result of Defendants' actions, access to live-saving insulin medication has been limited, denied, or forgone.

1062.   Defendants owed Plaintiffs and the Classes a duty to disclose, truthfully, all the facts concerning the true cost of the insulin products described herein and the inflated and fraudulent nature of their pricing; the existence, amount, and purpose of rebated and discounts

negotiated for those products; and the role that Defendants played in increasing the price of the insulin products described herein.

1063. Defendants hatched their deceptive schemes and knew that their customers, including Plaintiffs and Class members, did not know about (and could not reasonably discover) the manner in which it sought to artificially inflate the price of the insulin medications. Defendants not only concealed all the facts concerning the true cost of the insulin products described herein, but went further to make affirmative misrepresentations in marketing materials and other communications, that Defendants worked to lower the ultimate cost of prescription medications. Defendants engaged in this fraudulent concealment at the expense of Plaintiffs and the Classes.

1064. Plaintiffs and the Class members were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did, had they known the truth.

1065. As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs and the Class members sustained damages, including but not limited to paying excessive and inflated prices for the insulin products described herein.

1066. Defendants are liable to Plaintiffs and the Class members for damages in an amount to be proven at trial. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs and Class members for the purpose of enriching themselves at Plaintiffs' and the Class members' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COUNT SIXTY-NINE —
## UNJUST ENRICHMENT

(By the Non-ERISA Employee/Exchange Plaintiffs, the Medicare Plaintiffs,
and the Uninsured Plaintiffs, Against All Defendants)

1067.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1068.   Plaintiffs bring this Count on behalf of themselves and the Non-ERISA Employee/Exchange Plan Class, the Medicare Class, and/or the Uninsured Class.

1069.   Defendants have benefitted from selling, setting prices for and negotiating discounts for insulin products marketed and sold at an artificially inflated price.

1070.   Defendants have received and retained unjust benefits from the Plaintiffs and Class members, in the form of costs paid, copayments, and coinsurance payments, and inequity has resulted.

1071.   It is inequitable and unconscionable for Defendants to retain these benefits.

1072.   Because Defendants concealed their fraud and deception, Plaintiffs and the Class members were not aware of the true facts concerning the Insulin Pricing Scheme described herein and did not benefit from Defendants' misconduct.

1073.   Defendants knowingly accepted the unjust benefits of its fraudulent conduct.

1074.   As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs and Class members, in an amount to be proven at trial.

## X.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully demand that this Court:

A.      Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (b)(1), and direct that

reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the respective Classes they seek to represent, and appoint their attorneys as Class Counsel;

B.      Enter judgments against Defendants and in favor of Plaintiffs and the Classes for violations of the federal and state laws and legal standards invoked herein;

C.      Award preliminary and permanent injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Classes, including, *inter alia*, an order prohibiting Defendants from engaging in the unlawful acts described above; an order requiring Defendants or their agents to disclose the existence and/or amount of any rebates, discounts, fees, or other payments received by the PBM Defendants for including the prescription insulin medications described herein on any formulary, and an order requiring Defendants or their agents to disclose the true net price of the prescription insulin medication described herein collected by the Drug Manufacturer Defendants;

D.      Find that the PBM Defendants are fiduciaries and/or parties in interest as defined by ERISA;

E.      Find that the PBM Defendants violated their fiduciary duties of loyalty and prudence to ERISA Class members, and that they engaged in prohibited transactions in violation of ERISA;

F.      Award to the ERISA Plaintiffs and the ERISA Class restitution, surcharge, and/or other appropriate equitable relief, including, without limitation, disgorgement of all profits and unjust enrichment that Defendants obtained from the ERISA Plaintiffs and the ERISA Class, as a result of the Defendants' Insulin Pricing Scheme;

G.      Order other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the ERISA Class and the appointment of independent fiduciaries to serve in the roles the PBM Defendants occupied with respect to the ERISA Plans of the ERISA Class, including as pharmacy benefit administrators and managers;

H.      Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

I.      Award the Classes damages (*i.e.*, three times overcharges) in an amount to be determined at trial;

J.      Award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees as provided by law, including under RICO, ERISA, the Sherman Act, the common fund doctrine, and applicable state law;

K.      Find that Defendants are jointly and severally liable for all claims;

L.      Order that Defendants must notify each and every individual who paid a copayment or coinsurance for covered prescription drugs that exceeded the true cost of the drug about the pendency of this action so that they may obtain relief from Defendants for their harm; and

M.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XI.    JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 17th day of March, 2017.

By: /s/ Michael Critchley, Sr.

Michael Critchley, Sr.
Michael Critchley, Jr.
**CRITCHLEY, KINUM & DENOIA, LLC**
75 Livingston Avenue
Roseland, NJ 04068
Tel: (973) 422-9200
Fax: (973) 422-9700
mcritchley@critchleylaw.com
mcjr@critchleylaw.com

Derek W. Loeser *(pro hac vice forthcoming)*
Gretchen S. Obrist *(pro hac vice forthcoming)*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

*Attorneys for Plaintiffs*